E-FILED
Tuesday, 02 October, 2018  03:37:42 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| WILLIAM R. SHARP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:18-cv-03056-SEM-TSH |
| v. | ) | |
| | ) | |
| TRUSTEES OF THE UMWA 1974 PENSION | ) | |
| TRUST, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF, WILLIAM R. SHARP'S
## MOTION FOR SUMMARY JUDGMENT

NOW COMES the Plaintiff, WILLIAM R. SHARP, by and through his attorney,
Grady E. Holley, and pursuant to Rule 56, Federal Rules of Civil Procedure, moves
the Court for Summary Judgment on the issue of the Plaintiff's entitlement to
approval of a disability pension from the 1974 Pension Plan administered by
Defendant, and as grounds therefore, provides the following:

### INTRODUCTION

William Sharp was employed by Freeman United Coal Mining Company at its
Crown II mine near Virden, Illinois for 28 years.  Freeman United Coal Mining
Company is a signatory to the 1974 Pension Plan administered by Defendant.

On December 16, 2003, William Sharp sustained an injury to his low back in
an accident arising out of and in the course of his employment with Freeman
United Coal Mining Co.

On January 17, 2008, Plaintiff was declared disabled by Administrative Law Judge W. Gary Jewell of the Social Security Administration for reasons associated with his low back and symptoms associated with his low back.

On May 21, 2015, Plaintiff filed an application with Defendant for disability benefits under the 1974 Pension Plan.

After submission of medical records and documents in support of his application, Defendant denied the application for disability benefits on October 12, 2017.

Plaintiff filed this suit asserting that Defendant's denial to him of disability benefits is arbitrary, capricious and an abuse of discretion.  Plaintiff seeks judgment that he is entitled to disability benefits under the 1974 Pension Plan and an order for Defendant to calculate and pay Plaintiff appropriate pre-judgment benefits and future benefits during Plaintiff's continued disability.

## UNDISPUTED MATERIAL FACTS

1.      William Sharp was previously employed by Freeman United Coal Mining Company, a signatory company to the 1974 United Mine Workers' of America Pension Plan administered by Defendant (Am. Comp, ¶5, Am. Ans, ¶5).

2.      An accident report was filed with Freeman United Coal Mining Company on December 19, 2003 describing an accident of December 16, 2003 as "Step in hole, twisted his back" (R 116).

### Medical Record Chronology

3.      Mr. Sharp saw his family physician, Dr. Vittal Chapa in Virden, Illinois, on December 19, 2003 (R 93).

4.      Mr. Sharp described to Dr. Chapa on December 19, 2003 an injury at the mine on December 16, 2003 while he was walking the belt and stepped in a hole, twisting his back.  Mr. Sharp complained of pain in the low back radiating down the right lower extremity with symptoms of the right leg going numb on and off and being on Tylenol with Codeine and Vioxx for pain relief (R 93).

5.      Dr. Chapa on December 19, 2003 found positive straight leg raising on both the right and left legs at 70 degrees and placed Mr. Sharp on restricted duty with work not to involve any physical activity (R 93-94).

6.      Mr. Sharp returned to Dr. Chapa on December 23, 2003 with a history of having returned to work but doing no bending, lifting or stooping and limiting his work to supervising only (R 95).  Mr. Sharp complained on December 23, 2003 of the presence of pain, which worsens when riding in a car, and continued complaints of numbness radiating down the right lower extremity (R 95).

7.      On December 23, 2003, Dr. Chapa found a positive straight leg raising test on the right at 70 degrees with mild paravertebral muscle spasms present.  Dr. Chapa's impression was lumbar disk with radiculopathy (R 95).

8.      A MRI ordered by Dr. Chapa was performed on January 5, 2004 and the radiologist found moderate canal and bilateral foraminal stenosis at the L4-5

level secondary to a combination of disk bulge, ligament hypertrophy and facet arthropathy (R 363).

9.      Mr. Sharp returned to Dr. Chapa on January 12, 2004, following up on his back pain which he described as significant.  Mr. Sharp reported returning home after work and being required to lay with a heating pad on the low back for two hours.  The Tylenol with Codeine was not offering much help with pain relief (R 96).  Dr. Chapa referred Mr. Sharp to Dr. David Mack and ordered restricted work of no bending, stooping and limited weight to 20 pounds with instructions not to ride on rough equipment (R 96-97).  Additional medication was prescribed by Dr. Chapa for pain (R 96).

10.      An EMG was performed on Mr. Sharp by Dr. David Smucker on February 11, 2004 and was interpreted by Dr. Smucker as showing mild right L5 and S1 radiculopathy and an impression of low back pain, suggesting discogenic/degenerative disk pain with history of exacerbation the past December (R 365, 366).

11.      Dr. Mack initially saw Mr. Sharp on January 20, 2004.  Dr. Mack felt Mr. Sharp needed back surgery with instrumentation which he did not perform (R 371; p. 14) and therefore Dr. Mack referred Mr. Sharp to Dr. Van Fleet for surgery (R 371; p. 15).

12.      Dr. Van Fleet performed surgery on Mr. Sharp on May 10, 2004 with a preoperative diagnosis of lumbar radiculopathy (R 271).  The surgery was at the

L3-4 and L4-5 levels and included bilateral laminectomies at both levels (R 271-272).

13.     Mr. Sharp returned to Dr. Chapa on September 16, 2004 with complaints of ongoing low back pain after returning to work approximately one week before his visit.  Mr. Sharp complained of shooting pain down his right leg with complaints of the pain being worse than before the surgery that had been performed by Dr. Van Fleet (R 104-105).

14.     Dr. Chapa's impression of his visit with Mr. Sharp on September 16, 2004 was that the patient was status post-lumbar disk surgery with persistent radicular symptoms (R 105).

15.     Mr. Sharp returned to Dr. Chapa on September 30, 2004 with complaints of significant pain in the right thigh radiating from the back (R 106).

16.     Dr. Chapa notes on September 30, 2004 that Mr. Sharp has a history of lumbar disc disease with back surgery in the past, although the patient stated that the surgery did not help him very much (R 106).

17.     Dr. Chapa's impression on the visit of September 30, 2004 was that Mr. Sharp continued with lumbar radiculopathy, status post-lumbar surgery with persistent pain.  Dr. Chapa ordered a new MRI scan and referred him to Dr. Mehra for an EMG (R 106).

18.     Dr. Mehra performed an EMG study on October 27, 2004, taking a history from Mr. Sharp that he had undergone a lumbar laminectomy in May, 2004 following an accident in December, 2003 (R 274).

19.     Mr. Sharp complained to Dr. Mehra on October 27, 2004 of residual burning pain in the back, right thigh and going into the right leg with worse pain when he stands, walks or stoops.  Mr. Sharp gave a history that after the surgery his pain never got better (R 274).

20.     Dr. Mehra's conclusion following the EMG of October 27, 2004 was an old right L-5 irritation with fibrillation and positive waive in the paraspinous tibialus anterior and gastrocnemius with diminished number of motor units with increased polyphasic potential and a clinical impression of status post-lumbar laminectomy with recurrent right L-5 radiculopathy.  Dr. Mehra recommended an epidural block (R 275, 276).

21.     Following Dr. Mehra's EMG on October 27, 2004, Mr. Sharp returned to Dr. Chapa on October 28, 2004 with complaints of significant pain in his back with radiation of pain to the right lower extremity (R 107).

22.     Dr. Chapa, on October 28, 2004, noted an impression of lumbar disk disease, status post-back surgery and persistent pain.  He prescribed Celebrex along with work restrictions and he recommended that Mr. Sharp proceed with epidural injections with Dr. Prasad (R 107, 108).

23.     Mr. Sharp returned to Dr. Chapa on November 4, 2004 with complaints of continued back pain.  While Mr. Sharp indicated he is still working, he requested specific restrictions so that he can go back to restricted work and advised that the Darvocet that he was taking was not helping (R 100).

24.     On Dr. Chapa's visit with Mr. Sharp on November 4, 2014, Dr. Chapa's impression was lumbar radiculopathy and he prescribed Vicodin for pain and stopped the Darvocet.  Dr. Chapa completed forms for light duty (R 100).

25.     Mr. Sharp returned to Dr. Chapa on December 7, 2004 with a history that he had seen Dr. Prasad and had two epidural injections.  Mr. Sharp's history was back symptoms and complaints of back pain about the same (R 110).

26.     On December 7, 2004, Dr. Chapa found positive straight leg raising on both sides and had an impression of chronic back pain with radicular symptoms, status post-back surgery with an esophageal candida.  Dr. Chapa stopped the steroid injections (R 110).

27.     Mr. Sharp returned to Dr. Chapa on December 21, 2004 in follow-up. Mr. Sharp complained of continued back pain and numbness in his right leg. Stoppage of the epidural injections had improved his throat pain and swallowing problems from the prior visit (R 111).

28.     Dr. Chapa's impression on the visit with Mr. Sharp on December 21, 2004 was lumbar radiculopathy and a failed laminectomy syndrome due to a work-related injury dated December 16, 2003 (R 111).

29.    Mr. Sharp saw Dr. Chapa on February 1, 2005 with complaints of intermittent numbness of the right leg and complaints that the right leg gives out on him.  Dr. Chapa's impression was lumbar radiculopathy (R 169).

30.    Mr. Sharp returned to Dr. Mack on February 18, 2005 for evaluation of complaints of pain in the back and down into the leg (R 144).  Mr. Sharp gave a history to Dr. Mack that the surgery performed by Dr. Van Fleet had helped clear up the pain on the left side, however, Mr. Sharp had developed more pain on the right side (R 144).

31.    Dr. Mack, on examination of Mr. Sharp on February 18, 2005, found positive straight leg raising with slight weakness on the right.  Dr. Mack reviewed the results of an EMG of Dr. Mehra which showed inflammation on the right with radicular symptoms along with a MRI of October 13, 2004 which showed that he had a disk bulge at L3-4 and some post-op changes on the right at the L4-5 level. Dr. Mack recommended a repeat decompression of the low back with possibility of a fusion (R 144).

32.    Mr. Sharp saw Dr. Chapa on September 13, 2005 with complaints of back pain.  The back pain was on and off and the right leg was going numb.  Dr. Chapa's impression was lumbar radiculopathy (R 170).

33.    Mr. Sharp saw Dr. Mack on January 26, 2007 with complaints of pain in the low back into the right leg with tingling and numbness and complaints of

right foot weakness.  These symptoms were consistent on the right with severe pain down the leg following his prior surgery (R 145).

34.  Dr. Mack's impression at his visit with Mr. Sharp on January 26, 2007 was a disk of the low back on the right and he recommended an EMG and repeat MRI.  Mr. Sharp's rating of the pain is at a 9 on a scale of 1 to 10 (R 145).

35.  A MRI of Mr. Sharp was performed on February 2, 2007.  The findings of the radiologist include a mild diffuse disk bulge at the L4-5 level and a mild diffuse disk bulge at the L5-S1 level.  The impression was possible post-op changes on the right at L4-L5 with possible mild to moderate spinal canal stenosis at the same level (R 146).

36.  An EMG and nerve conduction test were performed on Mr. Sharp on February 6, 2007 by Dr. Edward Trudeau (R 147).

37.  Dr. Trudeau's EMG testing of February 6, 2007 reflected irritability, positive waves, fibrillations, increase in polyphasic of motor unit potential and decrease in motor unit potential number firing in right L-5 innervated muscles and irritability and occasional positive waves noted in right S1 innervated muscles.  Dr. Trudeau agreed with Dr. Mack's conclusions of a right L-5 radiculopathy, moderately severe in testing terms (R 156).

38.  Dr. Trudeau noted in his February 15, 2007 report that the records and the patient's symptomology since Dr. Mack's evaluation of February 18, 2005

were at the same location on the right L-5 radiculopathy and had both old or chronic as well as acute features (R 156).

39. Mr. Sharp returned to Dr. Mack on February 20, 2007 with complaints of severe pain in the right low back down into the right leg (R 148).

40. Dr. Mack's impression following Mr. Sharp's visit of February 20, 2007 was a disk syndrome on the right with an EMG showing L5-S1 nerve root compatible with Mr. Sharp's pain pattern. Dr. Mack again recommended a partial laminectomy (R 148).

41. Dr. Mack performed low back surgery upon Mr. Sharp at St. John's Hospital on March 23, 2007 (R 149-150).

42. The surgery performed by Dr. Mack on March 23, 2007 was for a recurrent disk and required a decompression laminectomy and post-lateral fusion and disk removal at the L4-5 level (R 148-150). Dr. Mack found considerable scar tissue on the right (R 149).

43. Mr. Sharp returned to Dr. Trudeau on November 27, 2007 for repeat EMG studies (R 182).

44. On November 7, 2007, Dr. Trudeau reviewed Dr. Mack's operative report of March 21, 2007 in which it was noted during the course of the operation that there was considerable scar formation encountered and marked thickening was present in the lateral recess on the right. Dr. Trudeau felt that this finding would likely show a persistent or residual right L5 radiculopathy (R 182).

45.     Dr. Trudeau's final interpretation on his EMG testing of November 27, 2007 was right collateral femoral cutaneious neuropathy, mild to moderately severe, which was new from the prior study of February 6, 2007 and right L5 radiculopathy, old or chronic, as well as acute features from a likely persistent or residual lesion since the studies of February 6, 2007 (R 184); (R 294-305).

46.     As part of the ongoing workers' compensation claim, Mr. Sharp was examined by Dr. Lange at the request of his employer, Freeman United Coal Mining Company on June 19, 2009 (R 65; 67-71).

47.     Mr. Sharp gave Dr. Lange a history of his occupation in 2003 as a mine examiner, walking between 8 and 10 miles per day while wearing equipment (R 67).

48.     Mr. Sharp gave Dr. Lange a report of progressive low back pain and also right thigh discomfort which led him to bid off of the mine examining job to a midnight shift belt shoveling job (R 67).

49.     Mr. Sharp's current complaints to Dr. Lange on June 19, 2009 included chronic pain with back pain with prolonged sitting or standing with numbness and burning over the anterior lateral right thigh which arose after the surgery by Dr. Mack in March of 2007 (R 68).

50.     Portions of Dr. Lange's examination of June 19, 2009 included Waddell testing which was totally normal.  In a seated position, reflexes were

essentially absent in the lower extremities symmetrically with the right extensor digitorum brevis muscle mass soft and atrophic (R 68).

51.     Dr. Lange also reviewed multiple treatment and evaluation records of Mr. Sharp, including electrodiagnostic tests from February, 2007 and November, 2007, suggesting persistent right L5 radiculopathy as well as a new finding in November, 2007 of femoral cutaneious neuropathy on the right (R 69).

52.     Dr. Lange's conclusions after the June 19, 2009 consult with Mr. Sharp included no signs of symptom magnification and complaints from Mr. Sharp consistent with a persistent right L5 radiculopathy and right lateral femoral cutaneious neuropathy, symptoms which are also substantiated by the electrodiagnostic findings (R 70).

53.     Dr. Lange opined in his June 19, 2009 report that the current treatment was at least indirectly related to the original injury and treatment to address the initial 2003 injury.  Unfortunately for Mr. Sharp, he had a residual L5 radiculopathy on the right and residuals from two decompression attempts by Dr. Van Fleet and Dr. Mack.  Dr. Lange attributed the right lateral femoral cutaneious neuropathy to a complication of the second surgical procedure due to positioning. He concluded that both neuropathies in one way or the other were related to the 2003 accident (R 70).

54.     Dr. Lange concluded in his June 19, 2009 report, based upon his examination of Mr. Sharp and a review of medical records provided by his

employer, that Mr. Sharp was currently taking toxic doses of Darvocet and he supported the overall concept that Mr. Sharp should reach maximum medical improvement after a spinal cord stimulator trial (R 70).

55.     Subsequent to Dr. Lange's evaluation, Mr. Sharp underwent surgery by Dr. Koteswara Narla on November 5, 2009 (R 313 – 314).

56.     Dr. Narla performed surgery on Mr. Sharp on November 5, 2009 for percutaneous insertion of a trial spinal cord stimulator pursuant to a diagnosis of failed back syndrome, having had two laminectomy surgeries with persistent pain radiating down the right lower limb (R 313).

57.     Mr. Sharp subsequently underwent the permanent insertion of a spinal cord stimulator by Dr. Pineda (R 52).

## Social Security Chronology

58.     Mr. Sharp applied for Social Security benefits on March 28, 2007 (R 187).  On January 17, 2008, Administrative Law Judge W. Gary Jewell entered a fully favorable decision for Mr. Sharp, finding him disabled since March 21, 2007 (R 83-87).

59.     Mr. Sharp, in applying for Social Security benefits, indicated difficulty bending over to tie his shoes and his ability to lift common objects has diminished after his surgery (R 214-216).

60.　　On July 12, 2007, Dr. Vittal Chapa wrote a report indicating Mr. Sharp would be unable to perform more than sedentary work (R 86; 130-131).

61.　　In his July 12, 2007 report, Dr. Chapa gave his opinion that Mr. Sharp was status post-back surgery x2 with persistent lumbar radicular symptoms.

62.　　The Administrative Law Judge for the Social Security Administration entered findings of fact and conclusions of law which included a finding that Mr. Sharp suffered from disorders of the back (discogenic and degenerative), neuropathy and obesity.

63.　　The evidence relied upon by the ALJ included that Mr. Sharp stopped working in March, 2007 because of a recurrent back injury that resulted in surgery in February, 2005 and again in March, 2007.  The ALJ found that the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms were generally credible and that the demands of the claimant's past relevant work exceed his residual functional capacity (R 81).

## Evidence Deposition Testimony

64.　　Dr. David Mack gave his evidence deposition as part of the workers' compensation claim filed regarding the December 16, 2013 accident.  The deposition was taken on September 9, 2004 (R 368-375).

65.　　Dr. Mack was an orthopedic surgeon who, during the course of his practice, had occasion to treat Mr. Sharp (R 368).

66.     On an initial visit on January 20, 2004, Mr. Sharp complained of pain into his back and down into his legs.  While he had a long history of difficulty with his back, Mr. Sharp felt he was doing fairly well until December 16, 2003 when he stepped into a hole and twisted his back (R 368-369).

67.     Following a number of visits and attempts to treat Mr. Sharp's complaints conservatively, Dr. Mack, at the visit of April 7, 2004, believed that a bilateral decompression and possible posterior lateral fusion was medically reasonable and necessary (R 368, pp. 4-14; R 371, pp. 14-15).

68.     Dr. Mack opined, based upon a reasonable degree of medical certainty, that the accident of December 16, 2003 was a cause of the condition necessitating the surgery performed on May 10, 2004 by Dr. Van Fleet (R 373; p. 21).

69.     Dr. Mack in his deposition described Mr. Sharp's problem as a classic history where there will be degenerative changes present and you are doing fairly well when you suddenly get into an accident.  While half of the time you can bail out patients with a combination of shots, medicine and an epidural, a small percentage will go on just like him (Sharp) and you end up doing surgery (R 373).

70.     Dr. Vittal Chapa testified by way of evidence deposition in the workers' compensation claim relating to the December 16, 2003 accident.  His deposition was taken on January 4, 2005 (R 378-385).

71.     Dr. Chapa is a licensed physician in the State of Illinois practicing in Virden and Rochester, Illinois since 1979.  His practice is internal medicine (R 376, pp. 3-4).

72.     Dr. Chapa has served as Mr. Sharp's family physician for a number of years.  Dr. Chapa saw Mr. Sharp on December 19, 2003 when he obtained a history of an accident on December 16, 2003 that occurred at work.  Mr. Sharp was walking the belt.  He stepped in a whole and twisted his back and came to see Dr. Chapa because of the back pain radiating down the right lower extremity (R 376, p. 4).

73.     On the initial visit of December 19, 2003, Dr. Chapa placed restrictions on Mr. Sharp that he could return to work without any physical activity (R 377, pp. 5-6).

74.     In an early January visit in 2004, Dr. Chapa referred Mr. Sharp to Dr. Mack but continued him on restrictions that advised no bending, stooping, weight lifting over 20 pounds and not to ride on rough equipment (R 377, p. 8).

75.     Dr. Chapa saw Mr. Sharp consistently through and after the surgery by Dr. Van Fleet.  By September 16, 2004, Mr. Sharp was complaining of back pain radiating down the right lower extremity, stating that the pain was worse than before his surgery.  Mr. Sharp had positive straight leg raising on the right which could indicate that there is a pinched nerve in the back.  Dr. Chapa's impression

was that Mr. Sharp had persistent radicular symptoms following the back surgery (R 378, pp. 10-11).

76.     Dr. Chapa, at his September 30, 2004 visit with Mr. Sharp, referred him to Dr. Mehra to try to find out in detail the radicular pain.  Dr. Mehra's report showed that Mr. Sharp was status post-lumbar laminectomy with a recurrent right L5 radiculopathy.  Dr. Chapa restricted Mr. Sharp's work from prolonged walking (R 379, pp. 13-14).

77.     Dr. Chapa is of the opinion that the December 16, 2003 accident in the mine caused the pain in the back and the lower extremity symptoms (R 380, p. 18).  The doctor's diagnosis was failed laminectomy syndrome and he noted some patients do not respond to surgery and continue to have back pain in spite of the surgery (R 380, p, 19).

## Work History

78.     Mr. Sharp testified under oath at a Social Security Disability hearing before the ALJ that his job as a Mine Examiner required him to carry instruments on his belt which weighed 25 to 30 pounds, along with wearing a hard hat, self-rescuer and light (R 341).  Mr. Sharp was assigned to walk along a conveyer belt line and inspect the lines which required that he walk over piles of coal and stoop and check for fires and coal spills.  Mr. Sharp walked as a Mine Examiner four to six miles per shift and did so in three in a half to four hours (R 341).

79.     William Sharp testified under oath at a workers' compensation trial about the accident that he sustained on December 16, 2003, indicating he had been working as a Mine Examiner from 1999 until his return to that position sometime in the year 2001 and he had worked full-time without incident until December 16, 2003 (R 325).

80.     Following Mr. Sharp's accident on December 16, 2003, he was off work until December 20, 2003 (R 317, ¶5).

81.     During the period of December 20, 2003 to May 10, 2004, Mr. Sharp returned to work on light duty, subject to the restrictions of no bending, stooping or lifting in excess of 20 pounds as set by his doctor (R 317, ¶5).

82.     Following Mr. Sharp's surgery on May 10, 2004, he remained off work with Freeman United Coal Company until on or about September 7, 2004 when he returned to work without restrictions by order of Dr. Van Fleet (R 317, ¶6).

83.     Upon Mr. Sharp's return to his job as a Mine Examiner on or about September 7, 2004, he began immediately to have problems with his low back and his right leg (R 317-318; ¶6).

84.     Mr. Sharp saw his family physician on September 16, 2004 with pain in the right leg which he felt was worse than it had been prior to the surgery of May 10, 2004 (R 318, ¶6).

85.     Shortly following September 16, 2004, Mr. Sharp "bid off" of his job as a Mine Examiner and bid for an "Out-By" position on the midnight shift, a job which involved performing general labor (R 318, ¶6).

86.     The Out-By position that Mr. Sharp bid for shortly after September 16, 2004 caused a reduction in pay from the work as a Mine Examiner and Mr. Sharp bid for the lower position and took the pay reduction due to the fact that he was unable to perform the duties of the Mine Examiner position as a result of low back pain and radiating symptoms into the leg (R 318, ¶6).

87.     Mr. Sharp's last day of employment at Freeman United Coal Mine was November 22, 2004 (R 318, ¶6).

88.     Beginning in approximately 1999, Mr. Sharp, in addition to working full-time for Freeman United Coal Company, worked for B-Sharp Electric, a business predominantly owned by Mr. Sharp's wife (R 318, ¶7).

89.     Following the accident that occurred on December 16, 2003, Mr. Sharp no longer performed normal duties of a licensed electrician which he had performed between the years 1993 and December 16, 2003.  Following December 16, 2003 from May 10, 2014 and thereafter through the early part of 2007, Mr. Sharp did work for B-Sharp Electric but only performed light work, which included doing estimates and bids for the company and going to projects where he was present in a supervisory capacity where other employees of the company performed the physical work (R318-319, ¶8).

90.     At no time following his return to work after his first back surgery in May, 2004 did Mr. Sharp actually earn money for any manual labor for B-Sharp Electric (R 319, ¶8).

## Illinois Workers' Compensation Proceedings

91.     Mr. Sharp did file a workers' compensation case with the Illinois Workers' Compensation Commission for benefits arising from the accident at Freeman United Coal Mining Company on December 16, 2003 (R 322-328).

92.     Arbitrator Jeffery Tobin with the Illinois Workers' Compensation Commission ruled in favor of William Sharp and against Freeman United Coal Mining Company requiring the employer to pay for necessary medical services and time off for the December 16, 2003 accident (R 322-328).

93.     On the issue of causal connection, Arbitrator Jeffery Tobin in the decision of August 10, 2005 found that:

> "Given the significant complaints and lack of any treatment for low back complaints between the years 2001 and the date of the accident on December 16, 2003 and the testimony of Dr. Mack and Dr. Chapa supporting causal connection, the evidence viewed in its entirely supports the conclusion that the condition of Petitioner and the surgery performed on May 10, 2004 is causally related to Petitioner's accident of December 16, 2003." (R 326)

94.     Arbitrator Jeffery Tobin in his decision of August 10, 2005, also found that the need for a second surgery (ultimately performed by Dr. Mack in 2007) was causally connected to the accident of December 16, 2003, finding that:

> "Given the totality of the evidence, including the onset
> of recurrent symptoms in the low back and radiation of
> pain into the right leg within a week to ten days after
> returning to heavy labor on a full-time basis with
> Respondent, and considering the testimony of Dr.
> Chapa and his diagnosis of "failed laminectomy
> syndrome" and the report of Dr. Mack indicating the
> reasonableness of a repeat decompression, the
> proposed treatment of a repeat decompression is
> reasonable and proper and causally related to the
> accident of December 16, 2003." (R 327-328)

95.   The decision of Arbitrator Jeffery Tobin was reviewed on appeal by

three members of the Illinois Workers' Compensation Commission who entered an

Amended Decision and Opinion on August 22, 2007, upholding the original finding

of Arbitrator Jeffery Tobin that the injury of December 16, 2003 caused the need

for surgery performed by Dr. Van Fleet on May 10, 2004 and the need for a repeat

surgery as recommended by Dr. Mack and for authorization for performance of the

surgery recommended by Dr. Mack (R 340-358; 357).

## ARGUMENT

### A.   The Required Elements Of Proof For Disability Claim Under The 1974 Pension Plan.

In order to establish entitlement to disability benefits under the 1974

Pension Plan, Plaintiff must establish that:

> (a)   He was employed in a classified job for a
> signatory employer under the 1974 Pension Plan
> (Am. Complaint, ¶5, and Answer to Complaint,
> ¶5);

(b)     Plaintiff was involved in a mine accident on December 16, 2003 (Am. Complaint, ¶7, and Amended Answer to ¶7);

(c)     Plaintiff has been awarded disability under the Social Security Act (R 82-87);

(d)     The Social Security Administration award of disability is causally linked to a mine accident or mine accidents.  This fourth element is the only basis of denial raised by Defendant in the pleadings.  Fotta v. Trustees of the United Mine Workers' of America 1974, 319 F.3d 612 (3d Cir. 2002); (See Exh. 1, Plan Document, p. 5).

Elements (a) through (c) are not in dispute.  The issue is whether the accident of December 16, 2003 was a cause of the disablement found in the SSA decision.

### B.     The Decision Of The Defendant Is Arbitrary, Capricious And Constitutes An Abuse Of Discretion Based Upon The Administrative Record.

Under the 1974 Pension Plan, the Plan Administrator is given discretion to determine the eligibility for benefits, including disability benefits (Exh. 1; Plan Document, p. 29).  As a result, in reviewing a decision of the Plan Administrator, this Court must determine whether the decision denying disability benefits under the evidence in the record is arbitrary and capricious.  Cerentano v. UMWA Health and Ret. Funds, 735 Fd.3d 976 (7th Cir. – 2013).  It is not sufficient that there is some evidence to support the administrator's decision, but rather it can be supported only if there is substantial evidence in support of its decision.  Brown v.

Retirement Comm. of Briggs & Stratton Retirement Plan, 797 Fd.2d 521 (7th Cir. –

1986).  For practical purposes, the "arbitrary and capricious" standard is

synonymous with a finding of an abuse of discretion in reaching a decision on the

evidence available in the record.  Holmstrom v. Metro. Life Ins. Co., 615 Fd.3d 758

(7th – 2010).

Applying these standards, Plaintiff submits that a clear abuse of discretion

has occurred based on the totality of the evidence.  Plaintiff's mine-related accident

on December 16, 2003 was a cause of the disabling conditions which formed the

basis of the Social Security award.

At the outset, it should be made clear that Plaintiff had low back pain for a

number of years, a history given by Mr. Sharp to all of his physicians (R 368, p. 4;

365, 274; 335, ¶2).  It is also true that the arthritic conditions, including narrowing

or stenosis of the low back foramen and degenerative changes, preexisted the

mine accident of December 16, 2003 as acknowledged by Dr. Mack (R 368, p. 4).

But what is also true and unrebutted is that Plaintiff went to work every day

in his job as a Mine Examiner from his last bout with low back pain in 2001 until

injuring his low back on December 16, 2003 with immediate onset of right leg

radiculopathy (R 325, 335).  Also true and unrebutted is a consistent history with

EMGs supporting objective findings of right leg radiculopathy three days post-

accident until pain stimulator implantation in 2009 (R 365-366; 274-276; 147-156;

294-305) with the absence of any similar complaints of right leg radiculopathy before December 16, 2003.

Plaintiff's case in this Court, as it was before the Illinois Workers' Compensation Commission, is that the December 16, 2003 accident was "a cause" of Plaintiff's ensuing unremittent symptoms, multiple surgeries and ultimately leading to the SSA decision.  This is a theory well recognized even by Defendant's own attorneys on a former occasion.  Cerentano v. UMWA Health and Ret. Funds, 735 Fd.3d 976, 981-982 (7th Cir. – 2013).  The theory of aggravation of a preexisting condition recognized by other courts as well.  Boyd v. Trs. Of UMW Health & Ret. Funds, 873 Fd.2d 57, 59 (4th Cir. 1989); Odom v. UMW Health & Ret. Funds, 687 Fd.2d 843, 847 (6th Cir. 1982).

While Defendant cited Q & A 252 as a basis to deny a disability pension (R 411), here where preexisting conditions existed, that same guideline recognizes that preexisting conditions do not bar qualification for a disability pension (see subparagraph (k); no one suffers a heart attack without the presence of a preexisting condition).  Defendant does not cite DP-1 (81) (a guideline promulgated in 1981 to replace former Q & A 322) that gives clear examples of the right to a disability pension under aggravation of a preexisting condition theory (Exh. 2 attached).

Defendant, in ruling against Plaintiff, does not explain how the December 16, 2003 accident does not rise to the level of an aggravation of preexisting

conditions (R 391-412).  Silence in the face of overwhelming evidence is an indication of arbitrary and capricious treatment of an ERISA claim for benefits. Holmstrom v. Metro Life Ins. Co., 615 Fd.3d 758, 778 (7th Cir. – 2010).

In support of causal connection, Plaintiff submitted the evidence deposition of Dr. David Mack, an orthopedic physician who saw Mr. Sharp initially on January 20, 2004, just over one month following the mine accident of December 16, 2003. Dr. Mack was of the opinion that Mr. Sharp needed back surgery with instrumentation and he therefore referred him to Dr. Van Fleet, an orthopedic spine surgeon.  Dr. Van Fleet performed surgery on May 10, 2004 with a diagnosis of lumbar radiculopathy (R 271) (radiculopathy means: "pinching of a nerve root causing symptoms"; hopkinsmedicine.org).  The Van Fleet surgery involved bilateral laminectomies at the L3-4 and L4-5 levels (R 271-272).

Mr. Sharp eventually returned to Dr. Mack on February 18, 2005 with complaints of low back pain down into the right leg (R 144).  The history was that the prior surgery by Dr. Van Fleet had helped with pain on the left extremity but that Mr. Sharp had developed more pain after the surgery on the right side.  Dr. Mack found positive straight leg raising and weakness of the right leg and he reviewed an EMG reflecting a disk bulge at L3-4 and some post-operative changes at the L4-5 level.  On February 18, 2005, Dr. Mack recommended a repeat decompression of the low back with a fusion (R 144).  Dr. Mack eventually performed that surgery at St. John's Hospital on March 23, 2007 for a recurrent

disk and a decompression laminectomy and fusion at the L4-5 level, the same area of the back the original surgery by Dr. Van Fleet addressed.

Dr. Mack, in discussing the need for the original May 10, 2004 surgery, offered his opinion, based upon a reasonable degree of medical certainty, that the condition for which Dr. Van Fleet performed surgery and the cause for the need of that surgery was the accident that Mr. Sharp had on December 16, 2003, explaining that while Mr. Sharp did have preexisting degenerative changes in the low back which were doing well by history before the date of the accident, suddenly, following the accident, he had the onset of pain and radicular symptoms. When those symptoms did not respond to medicine, cortisone shots and epidurals, surgery was necessary.  This is a "classic case" of a non-symptomatic but arthritic back leading to surgery as a result of a twisting trauma (R 373, p. 21).

Dr. Chapa, Mr. Sharp's family physician, saw Mr. Sharp three days after the accident on December 19, 2003 and obtained a history that he had been involved in a mine accident on December 16, 2003 while walking along the belt when he stepped into a hole and twisted his back.  On that first visit, Dr. Chapa obtained a history of pain in the back radiating down the right leg (R 376, p. 4).  Prior to the December 19, 2003 visit, Dr. Chapa had seen Mr. Sharp on eleven separate occasions from 2001 to December 19, 2003 and in none of those visits had there been a single complaint of low back pain or any radiating symptoms into the right leg (R 325).

Dr. Chapa followed Mr. Sharp consistently throughout his treatment in 2004, including following up on September 16, 2004 when Mr. Sharp complained of low back pain radiating down the right lower leg with complaints that the pain in the back was worse than it had been before the surgery performed by Dr. Van Fleet. Plaintiff had symptoms consistent with a pinched nerve in the back and Dr. Chapa's impression was that Mr. Sharp had persistent radicular symptoms even following the surgery which he had undergone on May 10, 2004 (R 378, pp. 10-11). Ultimately, Dr. Chapa diagnosed Mr. Sharp with failed laminectomy syndrome.  He voiced the opinion that Mr. Sharp's condition requiring the first surgery and the condition of failed laminectomy syndrome where he continued to have pain and radicular symptoms that had not responded to the initial surgery were caused by the accident of December 16, 2003 (R 380, pp. 18-19).

The two treating physicians were doctors who actually treated Mr. Sharp. Both voiced opinions by way of deposition and both clearly concluded that there was a direct causal connection between the accident and the surgeries, with Dr. Chapa concluding that the continuing symptoms which he saw up through early 2005 were also related to the December 16, 2003 accident.

While Plaintiff's workers' compensation case was ongoing, his former employer, Freeman United Coal Mining Company, sent Mr. Sharp to an orthopedic physician for an examination.  Dr. Lange saw Mr. Sharp on January 19, 2009 and he issued a report of his review of medical records and his physical examination of

Mr. Sharp (R 67-71).  In addition to reviewing extensive medical records and testing results of Mr. Sharp, Dr. Lange performed a physical examination which included Waddell testing that eliminated malingering or exaggeration of symptoms and he also found a loss of reflexes in both extremities and some muscle atrophy (R 68-69).  Significantly, Dr. Lange found the complaints consistent with persistent L5 radiculopathy along with the neuropathy in the right thigh area, all of which were substantiated by the electrodiagnostic tests and test results which he reviewed (R 70).  Dr. Lange found that the ongoing and proposed treatment of the implantation of a nerve stimulator in order to help decrease the level of pain being experienced by Mr. Sharp were either directly or indirectly related to the original accident that had occurred in 2003.  He attributed the right thigh neuropathy to the surgical positioning for Dr. Mack's surgery in 2007 (an indirect relationship to the 2003 accident) and the ongoing L5 radiculopathy directly related to the 2003 accident (R 70).  In sum, on January 19, 2009, Dr. Lange, the orthopedic surgeon hired by Freeman United in the Workers' Compensation case for the 2003 accident, determined that the Plaintiff's ongoing radiculopathy was related to the 2003 accident and a spinal cord stimulator was necessary to treat Plaintiff's low back and right leg pain.

    In denying Plaintiff disability status, Defendant concluded that Mr. Sharp's disability was caused by a progressive degeneration of his low back but offered no rationale or basis to discount the opinions of two qualified treating medical

physicians and the coal mine's own selected orthopedic surgeon, Dr. Lange.  Even under a deferential standard of review, Defendant cannot arbitrarily refuse to credit reliable evidence of treating physicians and where the evidence provided by doctors who examined and actually treated the patient are so overwhelming.  The Defendant has ignored these three physician opinions and offered no basis to contest the treating doctors' opinions.  This reflects an arbitrary and capricious decision-making process.  Holmstrom v. Metro Life Insurance Company, 615 F.3d 758, (7th Cir. – 2010).

Here there are not only two treating physicians concluding a causal relationship exists but also an orthopedic physician, Dr. Lange, who was hired by Freeman United, an adverse party to the Plaintiff who agreed: the 2003 accident was "a cause" of Plaintiff's ongoing low back problems.  Ignoring these medical opinions, Plaintiff submits, is an abuse of discretion.

The entire history and timing of the Plaintiff's physical complaints of ill-being completely support the causal connection between the December, 2003 accident and Plaintiff's surgeries and resulting disability.  Mr. Sharp had back complaints in the past, including a work accident by history in 1999 that caused him to be treated by Dr. Van Fleet on a non-operative basis and, at the time that the case was arbitrated before the Illinois Workers' Compensation Commission, left him with occasional pain in the left leg (R 335, ¶2).  However, Plaintiff returned to his work as a Mine Examiner in 2001, walking four to six miles per day through abandoned

mining areas and mining shafts over uneven surfaces, carrying 25 to 30 pounds of equipment (R 341).  Importantly, between the years 2001 and December 16, 2003, Mr. Sharp worked uninterrupted in performing his duties as a Mine Examiner and he saw his primary doctor, Dr. Chapa, on eleven separate occasions between 2001 and December 16, 2003, never voicing a complaint of low back pain or any right leg radiculopathy (R 335, ¶2).

After the accident on December 16, 2003, Plaintiff was off work and saw his doctor on December 19, 2003 with immediate complaints of low back pain with radiation down the right leg.  This is the first indication of any difficulty Plaintiff had with radiating or radicular symptoms into the right leg in any medical records reviewed by Defendant.

From December 19, 2003 until the day before May 10, 2004, Mr. Sharp continued to work but in light duty jobs with no bending, stooping or lifting over 20 pounds (R 93-94; 96-97).  Surgery was performed by Dr. Van Fleet on May 10, 2004 and Mr. Sharp did not return to work until on or about September 7, 2004 (R 317, ¶6).  Within less than two weeks after returning to work in his job as a Mine Examiner, performing the same work that he had been doing on and prior to December 13, 2003, Plaintiff returned to Dr. Chapa's office with complaints of low back pain which started up about one week before the office visit and this was accompanied with shooting pain down his right leg.  In fact, Mr. Sharp complained that the pain in the right leg was worse than it had been before the surgery by Dr.

Van Fleet (R 104-105).  Dr. Chapa diagnosed post-lumbar disk surgery and persistent radicular symptoms.

Plaintiff saw Dr. Chapa on multiple occasions throughout the balance of 2004 with no improvement with his radicular symptoms.  His return to work late in September, 2004 was not as a Mine Examiner but as an "Out-By" laborer working the midnight shift.  The history shows that Mr. Sharp began having problems immediately upon going back to work performing the Mine Examiner duties and he not only sought medical care but took a lower paying job in order that he could work at his own pace on the midnight shift (R 318, ¶6).  An EMG performed by Dr. Mehra in October, 2004 showed multiple muscle groups with right L-5 irritation and a diagnosis of status lumbar laminectomy with recurrent L5 radiculopathy or symptoms of ongoing nerve root irritation or entrapment.  By February 18, 2005, Dr. Mack had concluded that the initial surgery by Dr. Van Fleet had helped symptoms on the left side, but Mr. Sharp had continued low back pain with radiation to the right leg which necessitated, based upon his treatment and the results from Dr. Mehra's EMG and a MRI, that a repeat decompression with possible fusion was required (R 144).

Dr. Trudeau saw Mr. Sharp on February 6, 2007 and continued to find right L5 radiculopathy which he described as moderately severe (R 156).  Dr. Trudeau's testings were similar to Dr. Mack's findings in February of 2005 that there was right L5 radiculopathy which Dr. Trudeau found to be in part old or chronic in nature (R

156).  Mr. Sharp's second surgery was then performed at St. John's Hospital by Dr.

Mack on March 23, 2007 (R 149-150).  Dr. Mack performed a decompression

laminectomy and this time a post-lateral fusion was performed at the L4-5 level (R

148-150).

By work history, Plaintiff was discharged by Freeman United Coal Mining

Company on November 22, 2004 and did not return to any gainful employment

except for his continued activity as a licensed electrician for B-Sharp Electric where

his duties were limited to estimating for jobs and supervising other persons at

worksites.  Mr. Sharp performed no strenuous labor involving lifting (R 31, 318-

319).

This history, when taken as a whole, shows not only immediate complaints

to the physicians of the December 16, 2003 accident, but objective findings by the

physicians of radicular symptoms into the right lower extremity and no ability to

perform any type of strenuous labor which involved climbing, stooping or lifting

over 20 pounds up through the date of his second surgery on March 23, 2007 by

Dr. Mack.  In determining the issue of causation, the onset date of the disabling

condition and its proximity to the mine accident and the residual problems from the

accident is entitled to great weight.  Hurley v. Holland, 929 F.Supp. 977, 979-80

(S.D. W.Va. – 1996).

Defendant's denial of benefits gives no weight to a work and activity history

which is consistent with the medical history: an accident that occurred at work that

caused low back pain with radicular or radiating symptoms into the right leg which persisted to the first surgery in May, 2004.  This was followed by an attempt to return to his former job as a Mine Examiner and, within a week's time, the onset of renewed complaints of increasing low back pain and symptoms radiating into the right leg.  Plaintiff then voluntarily surrendered a higher paying job and went to work on the midnight shift in an effort to continue to make a living and get by with symptoms which proved to be unbearable.  By December 21, 2004, Plaintiff was diagnosed with a failed laminectomy (R 111), requiring a repeat surgery diagnosed by February 18, 2005, which unfortunately could not be accomplished until March, 2007 while Plaintiff continued to litigate his workers' compensation case.

In denying causation between the December, 2003 mine accident and the Social Security disability award, Defendant relied upon its nurse's description of the impairments chosen by the ALJ from the conditions available in SSA regulations: "Disorders of the back (discogenic and degenerative); neuropathy and obesity."  All of the conditions except obesity referenced in the technical impairments chosen relate to a condition of the back and the related radiculopathy into the right leg.

Fixating on the degenerative nature of changes in the Plaintiff's lower back, the Defendant's nurse employee speculates concerning degenerative conditions that can in some people become symptomatic (although this is not in conformance with Dr. Mack's description of the actual medical causation factors and how the condition becomes symptomatic – R 373, 374-375, pp. 48-51).  Defendant's nurse-

employee fails to recognize that Plaintiff ceased his regular work duties immediately after the accident and worked light duty with severe restriction on physical activities due to his back injury until returning to his former job on September 7, 2004 and then only briefly until his symptoms intensified again causing a visit to Dr. Chapa on September 16, 2004.

The Defendant gives no weight to the ALJ's description of the facts leading to his decision: the factual background of a February, 2005 (actually May, 2004) and March, 2007 surgeries (R 85).  It is clear these two surgeries and the resulting limitations were central to the ALJ's decision (R 85-86).  Only a tunnel vision of the facts fails to recognize the causal link between the December 16, 2003 accident and the SSA disability award.

As a result of the December 16, 2003 accident, Plaintiff also prosecuted a workers' compensation claim before the Illinois Workers' Compensation Commission.  The claim was eventually determined in Plaintiff's favor with a finding that the December 16, 2003 accident was the cause of Plaintiff's low back injury and symptoms, including a finding that the initial surgery performed on May 10, 2004 was causally related to the accident and, in addition, a finding that when the symptoms again intensified, including radiation with pain into the right leg within a week to ten days of returning to heavy labor on a full-time basis, that the surgery performed by Dr. Mack in March of 2007 was also causally related to the December

16, 2003 accident (R 327-328).  Those determinations were ultimately upheld on appeal by a panel of the Commission on August 22, 2007 (R 357).

While it is certainly true that the Defendant is not bound or required to follow the decisions or rules and standards of the Illinois Workers' Compensation Commission, nonetheless, the decision of this neutral body specifically assigned the task of deciding issues of "causality" cannot be ignored.  Defendant, in reaching its decision, offered no criticism of the procedure followed before the Illinois Workers' Compensation Commission.  The Defendant offered no criticism of the evidence before the Illinois Workers' Compensation Commission.  The Defendant did not provide any basis that the Arbitrator or Illinois Workers' Compensation Commission overlooked any legal principles in reaching their respective decisions in favor of the Plaintiff.  Failure to take note of the entire picture, including the submission of the causation issue to a neutral agency and selectively reading the medical records to reach a contrary decision is the hallmark of an arbitrary and capricious decision.  Holmstrom v. Metro Life Ins. Co., 615 Fd.3d 758, 777 (7th Cir. – 2010).

Plaintiff recognizes that the most common remedy following a finding that an ERISA decision has been reached arbitrarily is remand for further review and findings.  However, unless this Court feels that there are genuine questions raised that additional evidence or additional review would be aided by remand, Plaintiff believes that the evidence in the record is clear-cut and that it was a clear abuse of

discretion by Defendant to deny Plaintiff's application for disability benefits.

Holmstrom, supra, p. 778.

WHEREFORE, Plaintiff prays that the Court enter an Order requiring

Defendant to calculate and pay the appropriate disability benefits from March 21,

2007 to the present and for continuation of disability benefit payments during

Plaintiff's continued disability or for such other equitable relief as the Court deems

appropriate.

WILLIAM R. SHARP, Plaintiff,

By_____/s/ Grady E. Holley_____
One of His Attorneys

**GRADY E. HOLLEY (1247204)**
**STEVEN J. ROSEN (6204042)**
**HOLLEY, ROSEN & BEARD, LLC**
440 South Grand Avenue West
Springfield, Illinois 67204
217-544-3368

## CERTIFICATION

Grady E. Holley hereby certifies that the Argument portion of this motion complies with the type volume limitation; it contains 3,720 words, 22,733 characters and 319 lines of text.

_____/s/ Grady E. Holley_____

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2018, the foregoing was filed electronically with the court and served via the ECF filing system to all participating parties.

/s/ Grady E. Holley