IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

|  |  |
|---|---|
| WILLIAM R. SHARP, <br><br> Plaintiff, <br> v. <br><br> UNITED MINE WORKERS OF AMERICA HEALTH AND RETIREMENT FUNDS, <br><br> Defendants. | Civil Action No. 3:18-cv-03056 |

**RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff's Motion for Summary Judgment is without merit and should be denied. Plaintiff argues that the Trustees' decision to deny his application for disability pension benefits under the UMWA 1974 Pension Plan ("the Plan") was arbitrary and capricious. He is wrong. The Trustees' decision was made in accordance with the terms of the Plan and is supported by substantial evidence within the Administrative Record. To be eligible for a disability pension, Plaintiff must prove that he is disabled, as established by a Social Security Disability Insurance ("SSDI") award, by reason of a mine accident. In support of his case, Plaintiff argues that a mine accident must only be "a cause" of an applicant's social security disability to receive benefits under the Plan. However, as established by comprehensive case law, the Trustees may only award benefits when a mine accident either by itself or in combination with a preexisting or subsequent condition, *proximately causes* (i.e. substantially contributes to) the applicant's social security disability conditions.

The Trustees thoroughly considered and weighed all the evidence submitted by Plaintiff in support of his application during the administrative proceeding, as evidenced by the detailed explanation of denial the Trustees provided to Plaintiff during the administrative process. This evidence failed to establish that Plaintiff's December 2003 mine accident proximately caused his 2007 award of SSDI benefits. Additionally and contrary to Plaintiff's assertion, the Trustees were within their discretion to rely, in part, on Dr. Leventhal's independent medical opinion when making their determination, as well as other supporting objective evidence in the record, over the opinions regarding causation given by other doctors in the context of a Workers' Compensation case. The Trustees are charged with applying the standard of the Plan, which significantly differs from that of Workers' Compensation.

In sum, substantial evidence within the Administrative Record fully supports the Trustees' decision that Plaintiff's mine accident did not proximately cause or substantially contribute to his social security disability conditions. To reach their decision, the Trustees relied on objective medical evidence regarding Plaintiff's degenerative back condition, Plaintiff's work history, the Social Security Administration Administrative Law Judge's decision, and Plaintiff's disability onset date.  Under the appropriate standard of review and the weight of this evidence, this court must defer to the Trustees' decision.

## RESPONSE TO UNDISPUTED MATERIAL FACTS

I.    *Undisputed Material Facts*

The following numbered facts in Plaintiff's Memorandum in Support of Summary Judgment are conceded to be undisputed and material:

Paragraphs 1, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22;

Paragraph 23 is undisputed material fact, but the correct citation is to page 109 of the Administrative Record;

Paragraph 24 is undisputed material fact, but the correct citation is to page 109 of the Administrative Record;

Paragraphs 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35;

Paragraph 36 is undisputed material fact, but the correct citation is to pages 154-159 of the Administrative Record;

Paragraphs 37, 38, 39, 40, 42, 43, 44, 46, 48, 49, 50, 51, 52, 54, 55, 56;

Paragraph 58 is undisputed material fact, but the correct citation for the first sentence is to page 122 of the Administrative Record;

Paragraphs 59, 60, 61, 62;

Paragraph 63 is undisputed material fact, but the correct citation is to pages 85-86 of the Administrative Record;

Paragraphs 64, 65, 66, 67, 68, 69;

Paragraph 70 is undisputed material fact, but support for this paragraph begins on page 376 of the Administrative Record;

Paragraphs 71, 72, 73, 74;

Paragraph 75. The majority of this paragraph is undisputed material fact. However, the Plaintiff states "Dr. Chapa saw Mr. Sharp consistently through and after the surgery by Dr. Van Fleet." (Pl. Br. ¶ 16). "Consistently through and after the surgery" could be interpreted in different ways, and the Trustees clarify that Dr. Chapa saw Mr. Sharp once a month from January through Mr. Sharp's surgery on May 10, 2004. (A.R. 377-378). Mr. Sharp's first visit

with Dr. Chapa regarding his back after the surgery was on September 16, 2004, approximately four months after the surgery. (A.R. 378);

Paragraphs 78, 91, 92, 93, 94, 95.

II.     *Disputed Material Facts*

There are no disputed material facts.

III.    *Disputed Immaterial Facts*

Paragraph 2. The majority of this paragraph is undisputed material fact. However, the Trustees put the date of the Accident Report as December 17, 2003, and Plaintiff puts the date of the Accident Report as December 19, 2003. (Pl. Br. ¶ 2). The date is handwritten and is difficult to read; it could be either date. (A.R. at 116). A difference of two days is immaterial.

Paragraph 11. The majority of this paragraph is undisputed material fact. However, Plaintiff stated that Dr. Mack felt Plaintiff "needed" back surgery with instrumentation. (Pl. Br. ¶ 4). Regarding instrumentation, the deposition testimony provides that Dr. Mack felt that Plaintiff "might profit" by instrumentation. (A.R. 371). While the Trustees want to make this clarification, the exact wording is immaterial.

Paragraph 13. The majority of this paragraph is undisputed material fact. However, Plaintiff describes his complaint as "ongoing back pain" on September 16, 2004. The doctor visit notes provide that he "states he started with back pain a few weeks ago." (A.R. 105). The Trustees want to make this clarification, because the word "ongoing" is imprecise.

Paragraph 41. While the majority of this paragraph is undisputed material fact, the date of the surgery was March 21, 2007, not March 23, 2007 as stated by Plaintiff. (A.R. 149; Pl. Br. ¶ 10). This is immaterial, because it appears to be an inadvertent error.

4

Paragraph 45. The majority of this paragraph is undisputed material fact. However, Plaintiff notes that Dr. Trudeau's interpretations on November 27, 2007 were "right collateral femoral cutaneious neuropathy" and "right L5 radiculopathy, old or chronic, as well as acute features from a likely persistent or residual lesion since the studies of February 6, 2007." (Pl. Br. ¶ 11). Yet, the interpretations were "right lateral femoral cutaneous neuropathy" and "right L5 radiculopathy, old or chronic as well as acute features, likely persistent or residual lesion and not unusual given time frame since previous electroneurophysiologic studies of 2-6-2007 and operative intervention of 3-21-2007…" (A.R. 184). This is immaterial, because it appears to be an inadvertent error.

Paragraph 47. Plaintiff provides that he indicated to Dr. Lange that he walked between 8 and 10 miles per day as a mine examiner. (Pl. Br. ¶ 11). The report provides, however, that he indicated he walked between 4 and 8 miles per day. (A.R. 67). This is immaterial, because it appears to be an inadvertent error.

Paragraph 53. The majority of this paragraph is undisputed material fact. However, the Plaintiff states that Dr. Lange referred to the L5 radiculopathy and the right lateral femoral cutaneous neuropathy as "both neuropathies." (Pl. Br. ¶ 12). Dr. Lange only said "both in one way or the other…" (A.R. 70). Therefore, the L5 radiculopathy was not referred to as a "neuropathy." This is immaterial, because it appears to be an inadvertent error.

Paragraph 57. While the Plaintiff states that he asserted in his disability pension application that he had surgery by a Dr. Pineda, this page of the Administrative Record does not describe the surgery as a "permanent insertion of a spinal cord simulator." (A.R. 52; Pl. Br. ¶ 13). This is immaterial, because it appears to be an inadvertent error.

Paragraph 76. The majority of this paragraph is undisputed material fact. However, Dr. Chapa's review of Dr. Mehra's report and the restriction of prolonged walking took place at an October 28, 2004 appointment. (A.R. 379). Plaintiff's recitation made it sound as though this occurred at the September 30, 2004 appointment. (Pl. Br. ¶ 17). This is immaterial, because it appears to be inadvertent.

Paragraph 77. The majority of this paragraph is undisputed material fact. However, Plaintiff stated Dr. Chapa was of the opinion that the December 16, 2003 accident "caused" the pain in the back and lower extremity. (Pl. Br. ¶ 17). Dr. Chapa stated in his deposition that the pain was "related" to the December 16, 2003 accident. (A.R. 380). This is immaterial, because it appears to be an inadvertent error.

Paragraph 79. Plaintiff provides that he "had been working as a Mine Examiner from 1999 until his return to that position sometime in the year 2001…" (Pl. Br. ¶ 18). The citation does not support that statement exactly, but provides, "[Plaintiff] had injured his back in 1999…[t]he case was arbitrated in July 2001…at [that] time, [Plaintiff] had returned full-time to his regular position as a mine examiner." (A.R. 325). Plaintiff also provides that he "worked full-time without incident until December 16, 2003." (Pl. Br. ¶ 18). The citation for this statement only indicates Plaintiff was working full-time during July 2001. (A.R. 325). However, a different page of the Administrative Record provides "[f]rom…July 2001 until December 16, 2003, [Plaintiff] was employed full time…and performed his regular mine examiner duties." (A.R. 353). The Trustees clarify that this reference does not state "without incident." This is immaterial, because it appears to be an inadvertent error.

Paragraphs 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90. The source for these facts asserted by Plaintiff is an affidavit executed by Plaintiff on October 19, 2016 in support of his application

for disability pension benefits. (A.R. 316-320; Pl. Br. ¶ 18-20). The veracity of the statements

contained with the affidavit is not conceded by the Trustees. However, this is immaterial,

because the fact that these statements were set forth in the affidavit and that the affidavit is

included within the Administrative Record as evidence for the Trustees to weigh in making their

decision is material and undisputed.

IV.    *Undisputed Immaterial Facts*

 There are no undisputed immaterial facts.

V.    *Additional Material Facts*

1. Dr. Trudeau's report in February 2007 provided:

> We do suspect that…Mr. Sharp may have right L5 and right S1 radiculopathies on
> the basis of structural abnormalities both at L4/5 and L5/S1. The patient has disc
> bulge at both L4/5 and L5/S1 levels, it was noted that there is possibly moderate
> spinal canal stenosis at L4/5, and we suspect that structural abnormalities at the
> L4/5 level may compromise both the right L5 and less so the right S1 nerve root.

(A.R. 157).

2. Plaintiff provided that his job at B. Sharp Electric required him to climb for 5

hours a day, and stoop for 2 hours a day. (A.R. 222).

3. In describing the lifting and carrying for his job at B. Sharp Electric, he stated,

"carried supplies from truck to job site. Carried material from van to basement. Hold

boxes up to be fasten to house or other structures." (A.R. 222).

4. The Trustees' denial included a detailed explanation for the appeal, providing, in

part:

>  …The neurologic exam [on December 19, 2003] was normal and Dr.
> Chapa returned him to work the following day. Dr. Chapa diagnosed low back
> strain with a history of lumbar disc disease and rule out radiculopathy. On January
> 5, 2004, an MRI of the lumbar spine revealed significant canal stenosis and
> foraminal stenosis at L4-5…[t]he [February 11, 2004] EMG revealed right L5 and
> S1 radiculopathy suggestive of degenerative disc disease, but no neuropathy. On

May 10, 2004, Dr. Van Fleet performed bilateral laminectomies at L3-4 and L4-5. This surgical procedure, as described by Dr. Van Fleet, was intended to relieve the pain caused by degenerative spondyloradiculopathy…. In his operative report, Dr. Van Fleet made no reference to repairing an injury or removing a herniated or ruptured disc. He stated he found evidence of age related stenosis and bony overgrowth during the surgical procedure. On February 18, 2005, Mr. Sharp saw Dr. Mack for evaluation of back pain and leg pain and was diagnosed with degenerative disc disease with foraminal stenosis…After that visit, the records indicated that Mr. Sharp did not see Dr. Mack or any doctor for seven months. If stepping into a hole and twisting the back caused an acute and disabling injury, then it would be reasonable to expect immediate medical intervention with the diagnosis of a traumatic injury. **It is reasonable to assume that Mr. Sharp suffered a temporary worsening of an existing degenerative spine condition when he strained his back on December 16, 2003, as opined by Dr. Leventhal**…Mr. Sharp suffered from disc disease and arthritis of the shoulders as early as the 1980s…It would have been helpful to have had the missing records…He returned to work in the mine after an injury in 1999. In 2000, he was hospitalized for uncontrollable low back pain. He suffered low back strain in 2003, and again he returned to work. The nature of spinal disc disease is progressive and despite treatment, it can worsen over time. There can also be periods of reduced pain, as evidenced by gaps in Mr. Sharp's medical care…The medical records, in the file of evidence, clearly described an on-going, progressive and degenerative condition of the spine over a period of more than 20 years. Mr. Sharp had a successful return to gainful employment after this injury. After Mr. Sharp recovered from back surgery, Dr. Van Fleet returned him to full time, regular duty on June 25, 2004, although he did not return to work in the mine until September 7, 2004 due to a work suspension. He continued to work in the mine until he was terminated on November 22, 2004…Mr. Sharp was a self-employed electrician from 1999 until March 21, 2007, the date he stated that he became disabled, almost four years after his mine accident. He described his work as an electrician as heavy duty: lifting 50 or 100 pounds, carrying supplies and holding boxes up to house to be attached and operating machinery…**For these reasons, it would not be reasonable to conclude that the 2003 mine accident caused or significantly contributed to his total disability as defined by Social Security**…

(A.R. 409-410).

## ARGUMENT

VI. *Plaintiff's Mine Accident Injury, Whether Alone or in Combination with a Previous or Subsequent Condition, must be Substantially Responsible for his SSDI Disability to be Eligible for Benefits*

The Trustees do not dispute that an injury from a mine accident can aggravate a preexisting condition so that, in combination, the mine accident proximately causes the applicant's SSDI disability. However, Plaintiff argues that a mine accident must only be "a cause" of his SSDI disability. (Pl. Br. ¶ 23, 24). This is not the Plan's causation standard. Regardless of whether a mine accident combines with another injury or condition to cause an SSDI disability, the injury from the mine accident must be "substantially responsible" for the SSDI disability. This is supported by DP-1(81), as cited to by the Plaintiff, and well-established case law, which is why the Trustees' denial focused on whether the mine accident was a substantial cause: "For these reasons, it would not be reasonable to conclude that the 2003 mine accident caused or significantly contributed to his total disability as defined by Social Security." (A.R. 410). As the Fourth Circuit has found:

> The only reasonable interpretation of the requirement that total disability be 'the result of a mine accident,' therefore, is that it requires total disability to have been proximately caused by the mine accident. That is, if the plaintiff was injured in a mine accident and that injury, whether in combination with a previous or subsequent condition, is substantially responsible for plaintiff's inability to perform his job and for whatever medical and vocational reasons he is unable to perform an alternative job, then his total disability results from a mine accident.

*Robertson v. Connors*, 848 F.2d 472, 475 (4th Cir. 1988) (*citing Horn v. Mullins*, 498 F. Supp. 1197, 1200 (W.D. Va. 1980)). *See McCoy v. Holland*, 364 F.3d 166, 170 (4th Cir. 2004); *Boyd v. Trustees of United Mine Workers Health & Retirement Funds*, 873 F.2d 57, 59 (4th Cir. 1989).

Several courts have upheld previous decisions by the Trustees to deny disability pension benefits in cases with analogous facts. In *McCoy*, the plaintiff was hit on the head by a falling

rock, treated in the emergency room on the same day, and diagnosed with a sprained neck. *McCoy*, 364 F.3d at 167. He was awarded SSDI benefits based, in part, on "degenerative disc disease of the cervical and lumbar spine." *Id*. at 167, 169. The Fourth Circuit noted that "'miners who become disabled by progressive diseases…cannot be considered 'disabled as the result of a mine accident.' When a progressive disease combines with a mine accident to proximately cause a claimants' Qualifying Disability, however, the claimant is eligible for a disability pension." *Id.* at 170 (*citing Richards v. United Mine Workers of Am. Health & Ret. Fund*, 895 F.2d 133, 136-137 (4th Cir. 1990)). The Fourth Circuit went on to reverse the district court's decision (finding it engaged in an improper *de novo* review of the record) and found that the Trustees' decision to deny disability pension benefits was supported by substantial evidence. *Id*. at 171. In doing so, the court emphasized the following important facts: the disability onset date was over two years after the mine accident; the plaintiff was off of work for only a short period of time following the mine accident; the plaintiff continued working for over two years after the mine accident; the plaintiff did not seek medical treatment related to the mine accident or indicate he was experiencing pain for approximately two years before the disability onset date; and the plaintiff was diagnosed with degenerative disc disease on numerous occasions by several different physicians. *Id*. These facts are remarkably similar to the present facts: Plaintiff's disability onset date is over three years after the mine accident (A.R. 87); Plaintiff returned to work six days following the mine accident (A.R. 94); Plaintiff continued working for over three years after the mine accident (including in the mines until he was fired on November 23, 2004 and then continuing as a self-employed electrician frequently performing heavy lifting duties) (A.R. 220, 222); Plaintiff did not seek medical treatment related to his back condition or make any complaints of back or extremity pain for approximately a year and a half from September 14,

2005 to January 25, 2007; and Plaintiff was diagnosed with degenerative back conditions on numerous occasions by several different physicians. As in *McCoy*, the evidence supporting the Trustees' decision is substantial, and it was reasonable for the Trustees to conclude that Plaintiff's disability was not proximately caused by his mine accident.

In the District Court for the Western District of Pennsylvania, the court noted that "[u]nder the 1974 Pension Plan, the Trustees are obligated to treat the recipient of an SSDI award as disabled without further question. However, the Trustees *must* conduct a thorough and independent review to determine whether a mine accident *substantially caused* the applicant's disability." *Pacconi v. Trs. of the UMW. Health & Ret. Fund of 1974*, No. 02:05cv1488, 2006 U.S. Dist. LEXIS 77997, *32 (W.D. Pa. Oct. 26, 2006) (emphasis added). The court found that the Trustees' decision to deny benefits to the plaintiff in *Pacconi* was supported by substantial evidence in the record. *Id*. at *27-28. The plaintiff had nine mine accidents which involved back strains and ankle sprains, and received SSDI benefits, in part, for degenerative disc disease of the lumbar spine, right ankle pain-status/post ankle reconstruction, and degenerative joint disease of the cervical spine. *Id.* at *9-10, *20-21. Regarding the plaintiff's back and neck conditions, the court noted that "this case contains many references to the degenerative nature of these problems. For example, [a doctor] concluded that Plaintiff's 'degenerative changes in his back is [sic] unlikely to get any better, it is a progressive disorder.'" *Id*. at *29. Regarding the plaintiff's ankle condition, the court provided that while the administrative record reflected that the plaintiff had numerous ankle sprains, a doctor "attributed Plaintiff's chronic ankle pain and stiffness to degenerative arthritic changes, which would render the ankle condition ineligible for consideration under Q&A 252." *Id*. at 30. The Third Circuit affirmed the District Court's decision regarding the ankle condition, also noting that the plaintiff continued to work after his

ankle accident, returned to work after his ankle surgery, and continued to work until the mine

shut down. *Pacconi v. Trs. of the UMW. Health & Ret. Fund of 1974*, 264 Fed. Appx. 216, 218

(3rd Cir. Feb. 11, 2008). Similarly, Plaintiff clearly has an extensive degenerative back disorder,

and, like the doctor in *Pacconi*, one of the physicians in Plaintiff's case, Dr. Leventhal, attributed

Plaintiff's overall back disorder and need for surgery in 2004 to his spinal stenosis, which was

degenerative and progressive. (A.R. 351). In addition, Plaintiff's physicians, Drs. Mack and

Chapa, often referred to Plaintiff's progressive condition. Dr. Mack opined on September 9,

2004 that Plaintiff's injury from the mine accident would not cause a permanent exacerbation of

his degenerative condition. (A.R. 375). Also, Dr. Chapa could not determine whether the bulging

disc viewed on the October 12, 2004 MRI was due to dehydration of the disc, which is normal

aging process, or due to injury. (A.R. 349). Dr. Chapa also noted that Plaintiff's degenerative

changes had progressed to the point that they impinged on the nerves. (A.R. 350).

Other courts have also upheld the Trustees' decisions to deny disability pension benefits

in cases with similar facts. *See Yano v. UMWA Health & Ret. Funds*, No. 5:05CV91, U.S. Dist.

Lexis 68743 (N.D. W. Va. Sept. 22, 2006) (finding the SSA disability onset date of four years

after the mine accident, combined with the SSDI diagnosis of "discogenic and degenerative

disorders of the spine," preexisting diagnoses of degenerative disc disease and spondylosis,

plaintiff's return to work, an independent medical examination findings, etc., constituted

substantial evidence to support the Trustees' decision); *Morgan v. Holland*, No. 5:05CV45, 2006

U.S. Dist. LEXIS 70090, *16-18 (N.D. W. Va. Sept. 27, 2006) (agreeing with the Trustees'

decision to credit other substantial evidence within the record over a doctor's assertion that the

plaintiff's mine accident caused his back injuries in light of the plaintiff's degenerative disorders

and disability onset date); *Stepp v. Holland*, No. 5:04-cv-01062, 2005 U.S. Dist. LEXIS 31108,

*6-7 (S.D. W. Va. Nov. 17, 2005), *aff'd*, 189 Fed. Appx. 246 (4th Cir. July 12, 2006) (the SSA disability onset date of five years after the mine accident, combined with medical opinions that the plaintiff's back problems were likely the result of degenerative disc disease, constituted substantial evidence to support the Trustees' decision).

Plaintiff attempts to divert the Court's attention from this case law by falsely alleging that the Trustees ignored what he describes as a "theory of aggravation," which, he argues, is "well-recognized even by Defendant's own attorneys" in *Cerentano v. UMWA Health and Ret. Funds*, 735 F.3d 976 (7th Cir. 2013). (Pl. Br. ¶ 24). First, the Trustees did not ignore this standard. It is clearly addressed in the Trustees' October 2017 denial, as is more fully discussed herein. Second, this "theory of aggravation" is not novel. As exhibited in the comprehensive collection of cases above, there are decades of case law applying this analysis. In every case, save one, the court noted that the Plan requires that the total disability be proximately caused by, meaning substantially responsible for, the mine accident. The one case that applied a different causation analysis was the 36-year old case of *Odom v. United Mine Workers of America Health and Retirement Funds*, 687 F.2d 843 (6th Cir. 1982), wherein the Court stated that the causation question was whether the accident "contributed in some part to the disability." *Id*. at 847. However, after *Odom*, the Sixth Circuit adopted the widely accepted causation analysis developed in the Third and Fourth Circuits, described above, in determining disability pension benefits under the Plan. *See Ball v. Holland*, 142 Fed. Appx. 860, 863 (6th Cir. 2005). In *Ball*, the District Court relied on *Odom's* causation analysis and found that the mine accidents contributed "in some part" to the plaintiff's SSDI disability. *Id*. at 862. However, the Appellate Court held that the District Court misinterpreted the Plan's causation requirement and ruled that the plaintiff was "required to show that his mine accidents were 'substantially responsible' for his

disabilities." *Id*. (citing *Robertson*, 848 F.2d at 476; *Boyd*, 873 F.2d at 59). Based on this analysis, the Sixth Circuit reversed the decision of the District Court and reinstated the Trustees' decision to deny benefits. *Id*. at 864.

In *Cerentano*, the court did not apply a causation analysis. Rather, the court held that it was an abuse of discretion for the Plan not to consider all of the applicant's disabilities, "both severe and non-severe – that the ALJ relied on in finding [the applicant] disabled." *Cerentano*, 735 F.3d at 982. The *Cerentano* court remanded the case back to the Trustees for further review. *Id*. In the present case, the Administrative Law Judge ("ALJ") did not name any "non-severe" impairments, and the Trustees considered all the impairments relied on by the ALJ -  disorders of the back (discogenic and degenerative), neuropathy, and obesity. Therefore, the reason for the court's finding in *Cerentano* does not apply to Plaintiff's case.

## VII.    *There is Substantial Evidence in the Record Supporting the Trustees' Decision that the Mine Accident did not Proximately Cause Mr. Sharp's SSDI Disabilities*

Plaintiff relies heavily on the assertion that he purportedly had no right leg radiculopathy symptoms prior to the mine accident. (Pl. Br. ¶ 23, 25, 26, 30). However, as noted in the Trustees' explanation for denial, Plaintiff did not submit *any* original medical records from before December 16, 2003 during the administrative process to substantiate this assertion. It is improper for Plaintiff to rest much of his argument on medical records that were never submitted for review to the Trustees during the administrative process. Moreover, secondary references to medical records within the Workers' Compensation decisions that were submitted to the Trustees contradict Plaintiff's argument, demonstrating preexisting radiculopathy. For instance, Plaintiff was diagnosed with "radiculopathy" in 1999 and with "lumbar disc radiculopathy" in 2000, with "positive straight leg raises." (A.R. 349). Also, medical records from after the mine accident indicate a preexisting history of radiculopathy. For instance, in the February 11, 2004 EMG, Paul

A. Smucker, M.D. provided that "[Plaintiff] has a history of episodic low back problems and describes an ongoing tendency to experience numbness and tingling in both his thighs and at times throughout the entire legs bilaterally." (A.R. 268, 365). Additionally, Dr. Van Fleet noted in the May 10, 2004 Preoperative Report that, "[p]atient is a 49-year-old gentleman who has a history of lumbar spondyloradiculopathy…" (A.R. 271).

Finally, substantial evidence within the record supports that Plaintiff's radicular complaints were symptoms of his degenerative disorder. Dr. Trudeau attributed Mr. Sharp's right L5 radiculopathy in February 2007 to structural abnormalities, more specifically a disc bulge and spinal canal stenosis, i.e. degenerative conditions. His report provided:

> We do suspect that…Mr. Sharp may have right L5 and right S1 radiculopathies on the basis of structural abnormalities both at L4/5 and L5/S1. The patient has disc bulge at both L4/5 and L5/S1 levels, it was noted that there is possibly moderate spinal canal stenosis at L4/5, and we suspect that structural abnormalities at the L4/5 level may compromise both the right L5 and less so the right S1 nerve root.

(A.R. 157). Dr. Mack provided Plaintiff's radicular complaints were consistent with his progressive condition and noted that "[t]he results in the [February 11, 2004] EMG would have been a nerve problem prior to December 16, 2003." (A.R. 347). Dr. Chapa testified that Plaintiff's December 2003 x-rays showed significant degenerative changes, and those degenerative changes had progressed to the point where they pinched Plaintiff's nerves in his back. (A.R. 350). Accordingly, the January 5, 2004 MRI of Plaintiff's lumbar spine revealed significant canal and bilateral foraminal stenosis secondary to a combination of disc bulge, ligamentous hypertrophy and facet arthropathy at L4-5 and degenerative changes in the disc with small central disc bulge at L5-S1 (locations where mild radiculopathy was found by an EMG on February 11, 2004). (A.R. 269, 363). Similarly, the February 2, 2007 MRI of Plaintiff's lumbar spine showed mild diffuse disc bulges at the L4-5 and L5-S1 (L5 was where moderate to severe

radiculopathy was found by an EMG on February 6, 2007). (A.R. 146, 159). As opined by Dr. Chapa, a diffuse bulge is usually a degenerative finding as opposed to a focal bulge, which can be traumatic. (A.R. 350). In addition, there is a clear progression in Plaintiff's radiculopathy between February 11, 2004 (after the mine accident) and February 6, 2007 going from "mild" to "moderate to severe," indicative of a progressive condition. In fact, in November 2007, Dr. Trudeau described the radiculopathy as "chronic" and "not unusual given time frame since previous [EMG]." (A.R. 184).  The evidence is substantial that Plaintiff's radicular complaints were symptoms of his degenerative, progressive condition.

Plaintiff also argues that on several visits to Dr. Chapa between 2001 and 2003, he made no complaints of low back pain or radiating symptoms into the right leg. (Pl. Br. ¶ 26). Again, Plaintiff did not submit any original medical records from before December 19, 2003 to substantiate this argument. A review of the Workers' Compensation decisions shows that numerous medical records prior to 2003 exist, but Plaintiff chose not to provide them to the Trustees during the administrative process. In addition, Plaintiff acknowledged in testimony during his Workers' Compensation case that from July 2002 up to December 16, 2003, he did in fact have low back pain. (A.R. 353).

Notwithstanding the lack of original evidentiary support for Plaintiff's assertion that he had no pain prior to the mine accident, a period of time with little or no complaints of pain can still reflect a pattern that is indicative of a progressive condition. (A.R. 409). Indeed, the pattern was repeated when Plaintiff made no complaints of low back pain or radiating symptoms *after* the mine accident between September 13, 2005 and January 26, 2007, for approximately a year and a half. Accordingly, Plaintiff's need for surgery on March 21, 2007 demonstrates a reemergence of his progressive symptoms. Plaintiff argues that the "repeat surgery…could not

16

be accomplished until March 2007 while Plaintiff continued to litigate his workers'
compensation case." However, the March 21, 2007 surgery took place five months *before* the
final decision in Plaintiffs' Workers Compensation case on August 22, 2007. Therefore,
Plaintiff's argument is not persuasive.

None of Plaintiff's arguments can dispute the fact that substantial evidence within the
record supports a finding that Plaintiff's surgeries stem from his degenerative condition. The
doctors' diagnoses leading up to the May 10, 2004 surgery clearly describe degenerative
conditions, and there was no indication that Dr. Van Fleet, the 2004 surgeon, removed a
herniated disc during surgery or encountered any evidence of a traumatic injury to the spine.
Rather, he removed degenerative bony growth that had been occurring for a number of years and
some degenerative ligamentum flavum. (A.R. 347). Accordingly, Dr. Mack's diagnosis prior to
the May 10, 2004 surgery was "L4-5 spinal stenosis with radicular pain" and "degenerative
changes with foraminal stenosis," and Dr. Chapa's impression in his preoperative examination
on the same date as the May 10, 2004 surgery was "spinal stenosis," and "osteoarthritis." (A.R.
102, 344). Finally, on April 23, 2004, Dr. Van Fleet saw Plaintiff for what appears to be the first
time after the mine accident but stated that he had *previously* had the occasion to administer a
discogram[1] to Plaintiff, which had demonstrated three positive disc spaces. Because of this prior
test, Dr. Van Fleet opined that Plaintiff would not do well with a spinal fusion. (A.R. 344). The
discogram report was not submitted to the Trustees during the administrative process.

---

[1] An x-ray picture of an intervertebral disk. See under *discography* and *intervertebral disk*. J. E.
Schmidt, M.D., *Attorneys' Dictionary of Medicine* (Matthew Bender) at D.
*Discography* is a diagnostic procedure used to detect and localize injured or pathological
intervertebral disks. A radiopaque material is injected into the disk, or in the space around it, so
that its form can be visualized by x-ray examination. Also spelled *diskography*. J. E. Schmidt,
M.D., *Attorneys' Dictionary of Medicine* (Matthew Bender) at D.

Regarding causation, in his brief, Plaintiff overstates Dr. Mack's opinion when he states that Dr. Mack opined that the December 16, 2003 accident was "the cause" for the May 10, 2004 surgery. (Pl. Br. ¶ 26). In referring to the mine accident, Dr. Mack only agreed that it was "a cause," not "the" cause. (A.R. 373). Similarly, Plaintiff argues that Drs. Chapa and Mack "both concluded that there was a direct causal connection between the accident and the surgeries." (Pl. Br. ¶ 27). This is an exaggeration, which is not supported by the Administrative Record. The extent to which the doctors connected the accident and the surgeries did not rise higher than "a cause," "related to," "at least indirectly related," or "related in one way or another." (A.R. 70, 373, 380).

VIII. _The SSA Disability Onset Date, the ALJ's Decision, and Plaintiff's Return to Work After the Mine Accident Support the Trustees' Decision to Deny Plaintiff Benefits_

The Trustees discuss the importance of the disability onset date in their Memorandum. (Def. Br. ¶ 37-38). As Plaintiff concedes, great weight should be given to the disability onset date. (Pl. Br. ¶ 32). In this case, this is March 21, 2007, which coincides with Plaintiff's decompressive laminectomy with posterolateral fusion and disk removal at the L4-5 level on March 21, 2007. (A.R. 149). This surgery and onset date were over three years removed from the day Plaintiff stepped in a hole and felt pain in his back. Plaintiff unconvincingly attempts to connect the surgery and onset date to this December 2003 accident, arguing that Plaintiff had "no ability to perform any type of strenuous labor which involved climbing, stooping or lifting 20 pounds up through the date of the [March 21, 2007] surgery." (Pl. Br. ¶ 32). However, the record is clear that any formal restrictions imposed on Plaintiff by his doctors or himself did not prevent him from working during this time. He only ceased working for his coal employer, Freeman United Coal Company ("Freeman"), on November 23, 2004, because he was fired for misrepresenting his condition, an action by Freeman that an arbitrator found was justified. (A.R.

18

345, 355). In fact, the reasoning for his termination was that Freeman obtained videotapes of him climbing ladders, among other things. (A.R. 345, 355). He then continued to work for B. Sharp Electric, a job that he described as requiring him to frequently lift 50 lbs. or more, until his disability onset date of March 21, 2007. (A.R. 220, 222). He also provided that his job at B. Sharp Electric required him to climb for 5 hours a day and stoop for 2 hours a day. (A.R. 222). Even more specifically, in describing the lifting and carrying that was a frequent part of his work activities, he stated, "carried supplies from truck to job site. Carried material from van to basement. Hold boxes up to be fastened to house or other structures." (A.R. 222). Clearly, this does not support Plaintiff's argument that he had "no ability" to do physical activity prior to March 21, 2007.

Plaintiff additionally argues that the Trustees gave no weight to the "ALJ's description of the facts leading to his decision," when deciding his case. (Pl. Br. 34). This is false. The explanation for the Trustees' decision specifically noted that the ALJ's decision did not refer to a specific injury as being the cause of Plaintiff's disability. (A.R. 411). The ALJ provided, regarding a cause, that "the claimant stopped working in March 2007 because of a recurrent back injury that resulted in surgery in February 2005 and again in March 2007…." Considering the overwhelming documentation in the record that Plaintiff's only injury from the December 16, 2003 mine accident was a lumbosacral sprain, the ALJ's choice of words appear to describe Plaintiff's progressive back disorder, which produced recurrent back issues. The ALJ could have easily referenced the December 16, 2003 mine accident, but he did not.

IX.    _All the Evidence within the Administrative Record was Thoroughly Considered by the Trustees_

The Plaintiff argues repeatedly throughout his brief that the Trustees ignored various pieces of evidence. (Pl. Br. ¶ 24, 29, 35). However, a review of the 22-page explanation of the

Plan's final denial, dated October 12, 2017, shows consideration of *every* piece of medical

evidence within the Administrative Record (A.R. 391-408). The Trustees' explanation was

incredibly thorough and inclusive of all of the evidence within the Administrative Record.

Plaintiff argues that the Trustees "did not explain how the December 16, 2003 accident

does not rise to the level of an aggravation of preexisting conditions." However, the Trustees'

explanation described exactly that, providing, in part:

> …The neurologic exam [on December 19, 2003] was normal and Dr. Chapa
> returned him to work the following day. Dr. Chapa diagnosed low back strain
> with a history of lumbar disc disease and rule out radiculopathy. On January 5,
> 2004, an MRI of the lumbar spine revealed significant canal stenosis and
> foraminal stenosis at L4-5…[t]he [February 11, 2004] EMG revealed right L5 and
> S1 radiculopathy suggestive of degenerative disc disease, but no neuropathy. On
> May 10, 2004, Dr. Van Fleet performed bilateral laminectomies at L3-4 and L4-5.
> This surgical procedure, as described by Dr. Van Fleet, was intended to relieve
> the pain caused by degenerative spondyloradiculopathy…. In his operative report,
> Dr. Van Fleet made no reference to repairing an injury or removing a herniated or
> ruptured disc. He stated he found evidence of age related stenosis and bony
> overgrowth during the surgical procedure. On February 18, 2005, Mr. Sharp saw
> Dr. Mack for evaluation of back pain and leg pain and was diagnosed with
> degenerative disc disease with foraminal stenosis…After that visit, the records
> indicated that Mr. Sharp did not see Dr. Mack or any doctor for seven months. If
> stepping into a hole and twisting the back caused an acute and disabling injury,
> then it would be reasonable to expect immediate medical intervention with the
> diagnosis of a traumatic injury. **It is reasonable to assume that Mr. Sharp**
> **suffered a temporary worsening of an existing degenerative spine condition**
> **when he strained his back on December 16, 2003, as opined by Dr.**
> **Leventhal**…Mr. Sharp suffered from disc disease and arthritis of the shoulders as
> early as the 1980s…It would have been helpful to have had the missing
> records…He returned to work in the mine after an injury in 1999. In 2000, he was
> hospitalized for uncontrollable low back pain. He suffered low back strain in
> 2003, and again he returned to work. The nature of spinal disc disease is
> progressive and despite treatment, it can worsen over time. There can also be
> periods of reduced pain, as evidenced by gaps in Mr. Sharp's medical care…The
> medical records, in the file of evidence, clearly described an on-going,
> progressive and degenerative condition of the spine over a period of more than 20
> years. Mr. Sharp had a successful return to gainful employment after this injury.
> After Mr. Sharp recovered from back surgery, Dr. Van Fleet returned him to full
> time, regular duty on June 25, 2004, although he did not return to work in the
> mine until September 7, 2004 due to a work suspension. He continued to work in
> the mine until he was terminated on November 22, 2004…Mr. Sharp was a self-

employed electrician from 1999 until March 21, 2007, the date he stated that he became disabled, almost four years after his mine accident. He described his work as an electrician as heavy duty: lifting 50 or 100 pounds, carrying supplies and holding boxes up to house to be attached and operating machinery…**For these reasons, it would not be reasonable to conclude that the 2003 mine accident caused or significantly contributed to his total disability as defined by Social Security**…

(A.R. 409-410).

Of importance is the explanation's note that it was reasonable to credit Dr. Leventhal's opinion that the mine accident injury was a "temporary worsening of an existing degenerative condition" and that it was not reasonable to conclude that the mine accident "significantly contributed" to Plaintiff's SSDI disability. Clearly, the Trustees explained how the December 16, 2003 accident does not rise to the level of being substantially responsible for Plaintiff's SSDI disability. To say that the Trustees were "silent" is a gross misstatement. (Pl. Br. ¶ 25).

Another gross misstatement is Plaintiff's argument that the Trustees ignored the opinions of Drs. Chapa, Mack and Lange and "offered no basis to contest" their opinions. (Pl. Br. ¶ 28-29). The doctors' opinions were discussed thoroughly in the Trustees' decision. (A.R. 395-396; 407). The basis for not deferring to their opinions regarding causation is set forth in depth within the explanation and included supporting facts like Dr. Leventhal's opinion that the mine accident injury was temporary, the gaps in Plaintiff's treatment, his return to work, the SSDI disability onset date, Dr. Van Fleet's surgical notes, the objective medical tests all showing degenerative disease, and the radiculopathy or pinched nerve being the result of degenerative changes and not caused by a single event. (A.R. 408-412).

In addition, the Supreme Court has found that plan administrators are not required to give special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). In reviewing a plan administrator's decision, courts should not impose

21

"a discrete burden of explanation when [plan administrators] credit reliable evidence that conflicts with a treating physician's evaluation." *Id*. at 834. As described above, the Trustees properly credited other reliable evidence in their decisions. It is also important to note that the Court should not view the doctors' opinions regarding causation in a vacuum. These opinions were given in the context of Plaintiff's case for Workers' Compensation benefits. As explained by the Trustees in their brief, Worker's Compensation benefits are governed by a different set of rules and laws than disability benefits under the Pension Plan. (Def. Br. ¶ 34). The leading questions regarding causation asked of Drs. Chapa and Mack in their Workers' Compensation depositions[2] were framed within the context of Workers' Compensation requirements (whether the work accident was "a cause"), and the doctors responded in kind. Dr. Lange's report in 2009, over 5 years after the mine accident, was also given within the context of whether Plaintiff was entitled to Workers' Compensation benefits and only provided that the work accident was "related in one way or another." As the Third Circuit has noted, "these [Workers' Compensation] benefits are of little significance for present purposes. A settlor of an ERISA plan is not required to incorporate worker's compensation standards into the plan, and unless such standards are incorporated we see no reason why they should bind the plan's trustees or administrator." *Moats v. United Mine Workers of America Health & Retirement Funds*, 981 F.2d 685, 689 (3rd Cir. 1992).

Plaintiff also argued that the Trustees ignored the decision of the Workers' Compensation Commission. (Pl. Br. ¶ 35). Again, Plaintiff's argument is not supported by the record. The Workers' Compensation decisions were thoroughly discussed in seven pages of the Trustees' explanation. (A.R. 393-399). In fact, the Trustees' decision relied on much of the evidence

---

[2] Plaintiff only submitted the direct and re-direct portions of these depositions to the Trustees during the administrative process, omitting the cross and re-cross portions.

discussed within the Workers' Compensation opinion. While Plaintiff concedes that the Trustees are not bound by these opinions, he goes on to argue that the Trustees were required to offer "criticism" of the Commission's procedures and provide a basis that the Commission "overlooked…legal principals." (Pl. Br. ¶ 35). This borders on absurdity. Regarding the Commission's finding of a causal relationship, the Trustees' explanation properly provided, "The Funds does not rely on Workers' Compensation guidelines or regulations when determining eligibility for a Funds Disability Pension" and went on to describe the substantial evidence supporting the denial, which conflicted with a finding that the mine accident proximately caused Plaintiff's SSDI disabilities. (A.R. 410). As further explained in the Trustees' brief, it is rooted in established legal precedent that the Trustees are not bound by a Workers' Compensation decision (Def. Br. ¶ 34). Finding otherwise would be inappropriate.

In summary, Plaintiff's feeble argument that the Trustees ignored various pieces of evidence has no merit and falls short. The Trustees considered every document submitted by Plaintiff and gave a thorough and rational explanation for their decision, one which is supported by law. "If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final." *Exbom v. Central States, Southeast & Southwest Areas Health & Welfare Fund*, 900 F.2d 1138, 1143 (7th Cir. 1990) (*citing Smart v. State Farm Ins. Co*., 868 F.2d 929, 936 (7th Cir. 1989)).

## **CONCLUSION**

Based upon the foregoing, it is respectfully submitted that Plaintiff's Motion for Summary Judgment should be denied, the Trustees' decision to deny Plaintiff a disability

pension was not arbitrary or capricious, the Trustees' decision should be sustained, and the

Defendant is entitled as a matter of law to a judgment dismissing the Plaintiff's claim.

Respectfully submitted,

s/Abigail A. Petouvis

ABIGAIL A. PETOUVIS
Assistant General Counsel
UMWA HEALTH & RETIREMENT FUNDS
Office of the General Counsel
2121 K Street, N.W.
Washington, D.C. 20037
Telephone: 202-521-2357
apetouvis@umwafunds.org

s/Greg Campbell

GREG CAMPBELL
Greg A. Campbell, MO 35381
Hammond and Shinners, PC
7730 Carondelet, Ste 200
Clayton, MO 63105
(314)727-1015
gcampbell@hammondshinners.com

s/Emily R. Perez

EMILY R. PEREZ
Emily R. Perez, MO 62537
Hammond and Shinners, PC
13205 Manchester Road, Ste. 210
St. Louis, MO 63131
Telephone: 314-727-1015
eperez@hammondshinners.com
COUNSEL FOR DEFENDANTS

**Certificate of Service**

I hereby certify that on October 23, 2018, the foregoing was filed electronically with the court and served via the ECF filing system to all participating parties.

/s/ Emily R. Perez

24