IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| WILLIAM R. SHARP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 3:18-cv-03056-SEM-TSH |
| v. | ) |
| | ) |
| TRUSTEES OF THE UMWA 1974 PENSION | ) |
| TRUST, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.      Introduction.**

Plaintiff ("Sharp") filed a Complaint on March 23, 2018 against the Trustees of the UMWA 1974 Pension Trust ("Defendant"), alleging that he is entitled to disability pension benefits pursuant to the terms of the UMWA 1974 Pension Plan ("The Plan").  Sharp contends that the Defendant's decision to deny him disability pension benefits based upon a medical review of its employee-nurse, despite the overwhelming medical evidence established in the medical records and physician evidence depositions, is arbitrary and capricious.

To establish eligibility for disability benefits under the Plan, the following must be established:

> (1)     The applicant must be totally disabled as evidenced by a SSDI award;
>
> (2)     He must have suffered a mine accident; and

(3)    The Social Security Administration ("SSA")
       award of disability is causally linked to the mine
       accident or mine accidents.

There is no dispute that Sharp satisfies the requirements of elements (1)

and (2).  The only dispute is whether Sharp satisfies the third element, specifically

that the SSA award of disability is causally linked to the mine accident of December

16, 2003.  Defendant's position is that Plaintiff's disability is from the natural

progression of a low back condition and that the unexpected, definite work

accident of December 16, 2003 involving a twisting of the body while stepping into

a hole in a dark, abandoned coal shaft, was not causally linked to the SSA's award

of disability.

Plaintiff has never claimed that he did not have a history of low back pain

and medical treatment prior to the December 16, 2003 accident nor has he denied

that he had arthritic changes in his low back.  Plaintiff contends, however, that the

unrebutted, credible medical evidence is that the December 16, 2003 accident was

a causative factor of his unremitting low back symptoms (including radicular

symptoms into his right leg), necessitating multiple surgeries and the basis of the

SSA decision finding him disabled.  Plaintiff's claim is based on the well-established,

longstanding legal principle that "aggravation" of a preexisting condition can be the

cause of a disabling condition.  The medical evidence and the evidence depositions

of Plaintiff's treating physicians overwhelmingly support Plaintiff's position.

The medical basis offered to support the Defendant employee-nurse's

decision to deny Plaintiff disability pension benefits is non-existent.  For the reasons

stated herein, the Defendant's Motion for Summary Judgment should be denied. Furthermore, for the reasons stated in the Plaintiff's Motion for Summary Judgment, this Court should determine that the Defendant's decision to deny Plaintiff disability pension benefits was arbitrary and capricious and enter judgment in Sharp's favor.

## II. Statement Of Facts

### A.    Defendant's Statement Of Material Facts That Sharp Does Not Dispute.

1.    Defendant's Paragraph No. 9:

"On December 17, 2003, an Accident Report was completed by Freeman United Coal Company ("Freeman"), Mr. Sharp's employer, providing that Mr. Sharp stepped in a hole and twisted his back.  A.R. 116.  The nature of the injury was reported as a sprain.  A.R. 116."

2.    Defendant's Paragraph No. 10:

"On December 19, 2003, Mr. Sharp visited Dr. Chapa and reported that he stepped in a hole and twisted his back on December 16, 2003 while walking the belt at work. A.R. 93. Mr. Sharp reported pain in the low back, radiating down the right lower extremity, but he provided his pain was somewhat better since the accident. A.R. 93. Dr. Chapa's impression was "lumbosacral sprain," "rule out lumbar radiculopathy" and "previous history of lumbar disk disease." A.R. 93. Dr. Chapa directed Mr. Sharp to continue Tylenol #3 and Vioxx. A.R. 93. Dr. Chapa noted that Mr. Sharp could return to restricted work on December 20, 2003". A.R. 94.

**Note:  This undisputed and material fact is incomplete in that it omits the statement that Mr. Sharp "feels like the right leg is going numb off and on.  Two days ago he was started on Tylenol with Codeine and Vioxx".  Following this omission, the note of Dr. Chapa indicates that Mr. Sharp "states the pain is somewhat better, but he still has pain".**

3.    Defendant's Paragraph No. 11:

"On December 23, 2003, Mr. Sharp reported to Dr. Chapa that his pain was still present, with numbness radiating down his right lower extremity. A.R. 95. He provided that he was at work, but not doing any bending, lifting or stooping. A.R. 95. Dr. Chapa's impression was lumbar disk with radiculopathy, and he ordered an MRI scan of the lumbar spine. A.R. 95."

4.    Defendant's Paragraph No. 12:

"On January 5, 2004, Mr. Sharp underwent an MRI of the lumbar spine, which showed the following:

The L1-2 and the L2-3 interspaces reveal mild degenerative change without significant canal or foraminal stenosis. At L3-4, there is mild degenerative change without significant canal or foraminal stenosis. At L4-5, there is moderate canal and bilateral foraminal stenosis secondary to a combination of disc bulge, ligamentous hypertrophy and facet arthropathy At L5-S1, there is minimal degenerative changes in the disc with small central disc bulge. No significant canal or foraminal stenosis. There is rudimentary disc at S1-S2.
Summary: Significant canal and foraminal stenosis at L4-5. Very small disc at S1-2. A.R. 363."

5.    Defendant's Paragraph No. 14:

"On January 12, 2004, Dr. Chapa examined Mr. Sharp, and his impression was spinal stenosis A.R. 96. Dr. Chapa planned to refer Mr. Sharp to Dr. Mack and prescribe Vioxx #20 and Darvocet N-100 #30. A.R. 96. Dr. Chapa advised in a restricted work note that Mr. Sharp should not bend or stoop, lift over 20 pounds, or ride in rough car. A.R. 97."

6.    Defendant's Paragraph No. 18:

On February 11, 2004, Paul A. Smucker, M.D., upon referral from Dr. Mack, performed electromyographic testing ("EMG") on Mr. Sharp. A.R. 268-269. Mr. Sharp reported:
"longstanding pain in his low back, with an exacerbation this past December when he stepped into a hole. At the time he felt a sharp pain radiating into his right leg. He has a history of episodic low back problems and describes ongoing tendency to experience numbness and tingling in both his thigh and at times throughout the entire legs bilaterally. His low back pain is more bothersome than his lower extremity symptoms. A.R. 268".

7.    Defendant's Paragraph No. 19:

      "Dr. Smucker's conclusions were "1. Mild right L5 and S1
      radiculopathy. There is no electrodiagnostic evidence of definable
      radiculopathy on the left. 2. No electrophysiologic evidence of diffuse
      peripheral neuropathy." A.R. 269

8.    Defendant's Paragraph No. 20:

      "Dr. Smucker's impression was "[l]ow back pain, suggesting possible
      discogenic/degenerative disc pain, with history of exacerbation this
      past December." A.R. 269."

9.    Defendant's Paragraph No. 21:

      "On February 19, 2004, Mr. Sharp was performing restricted work
      and reporting back pain. A.R. 98-99. Dr. Chapa's impression was
      lumbar disk radiculopathy. A.R. 98-99".

10.   Defendant's Paragraph No. 27:

      "On May 10, 2004, Mr. Sharp underwent L3-4 and L4-5 bilateral
      laminectomies performed by Dr. Van Fleet. A.R. 271-272. The pre-
      operative diagnosis was lumbar radiculopathy. A.R. 271. Dr. Van
      Fleet noted that Mr. Sharp had "a history of lumbar
      spondyloradiculopathy who has failed to improve despite
      nonoperative measures..." A.R. 271.

11.   Defendant's Paragraph No. 29:

      "On May 26, 2004, Mr. Sharp was doing well and the pain in his legs
      had improved. A.R. 347".

12.   Defendant's Paragraph No. 30:

      "On June 23, 2004, Mr. Sharp reported to Dr. Van Fleet that he had
      no significant difficulties other than occasional burning into the leg.
      A.R. 347."

13.   Defendant's Paragraph No. 31:

      "On June 25, 2004, Mr. Sharp was released by Dr. Van Fleet to return
      to full duty and in good condition. A.R. 326, 327, 344."

14.     Defendant's Paragraph No. 34:

        "On August 4, 2004, Mr. Sharp reported that his back felt well, but he
        had occasional leg numbness on the right side. A.R. 347."

15.     Defendant's Paragraph No. 35:

        "Due to the work suspension, Mr. Sharp did not return to work until
        September 7, 2004. A.R. 327, 345."

16.     Defendant's Paragraph No. 36:

        "In a deposition dated September 9, 2004, Dr. Mack was asked
        whether the December 16, 2003 accident "was a cause by way of
        aggravation of the condition for which [he] treated him, and for
        which [the May 10, 2004] surgery was performed..." A.R. 373."

17.     Defendant's Paragraph No. 39:

        "Dr. Mack also noted Mr. Sharp would be able to get back on the job
        and "probably do well for a while." A.R. 375."

18.     Defendant's Paragraph No. 42:

        "Mr. Sharp asserted that after the September 16th appointment with
        Dr. Chapa, he "´bid off` the mine examiner job, took a reduction in
        pay, and began performing duties as a general laborer on the
        midnight shift." A.R. 327.

19.     Defendant's Paragraph No. 43:

        "During a follow-up visit with Dr. Chapa on September 30, 2004, Mr.
        Sharp reported significant pain in his right thigh that radiated down
        from his back. A.R. 106. Dr. Chapa noted that Mr. Sharp was known
        to have lumbar disc disease, ordered an MRI of the lumbar spine and
        referred him for an EMG. A.R. 106. Dr. Chapa's impression was
        lumbar radiculopathy with persistent pain, status post lumber
        surgery. A.R. 106."

20.     Defendant's Paragraph No. 45:

"On October 27, 2004, M.L. Mehra, M.D., a neurologist, conducted an examination of Mr. Sharp and an EMG. A.R. 274-277. Dr. Mehra noted that Mr. Sharp:

had a lumbar laminectomy done in May 2004 after an accident in December 2003. He is seen with residual burning pain in the back, right thigh and going into the right leg...He has no pain in the left side. Three years ago, he had lumbar disc disease. He had an epidural block. He has also had a local Cortisone injection. He says after the surgery, his pain never got better...His MRI Scan was reviewed. It shows mild postop changes at L4/5." A.R. 274.

21.     Defendant's Paragraph No. 46:

"Dr. Mehra noted that the:

EMG of the paraspinous, quadriceps, tibialis anterior, extensor hallicus longus, extensor digitorium brevis, gastrocnemius, soleus and hamstrings shows an old right L5 irritation with fibrillation and positive wave in the paraspinous, tibialis anterior and gastrocnemius with diminished number of motor units and increased polyphasic potential." A.R. 275.

22.     Defendant's Paragraph No. 47:

"Dr. Mehra's impression was "Status Post Lumbar Laminectomy with Recurrent Right L5 Radiculopathy." A.R. 276.  He recommended and scheduled an epidural block.  Id."

23.     Defendant's Paragraph No. 49:

"On October 28, 2004, Mr. Sharp complained of significant back pain that sometimes radiated the right lower extremity. A.R. 107. Dr. Chapa noted that Dr. Mehra diagnosed a L5 root irritation and referred Mr. Sharp for epidural injections. A.R. 107. Dr. Chapa's impressions were lumbar disc disease, status post back surgery, and persistent pain. A.R. 107. Dr. Chapa advised restricted work as tolerated with no prolonged walking. A.R. 108."

24.     Defendant's Paragraph No. 50:

"On November 4, 2004, Mr. Sharp reported back pain to Dr. Chapa, who restricted him to light duty work.  A.R. 109."

25.     Defendant's Paragraph No. 51:

"On November 9, 2004, Dr. Chapa again reported that Mr. Sharp was able to perform light work. A.R. 114.

26.     Defendant's Paragraph No. 54:

"On December 7, 2004, Mr. Sharp complained to Dr. Chapa of back pain, and was having side effects from his epidural injections.  A.R. 110."

27.     Defendant's Paragraph No. 55:

"On December 21, 2004, Mr. Sharp reported to Dr. Chapa continued back pain and numbness in the right leg. Dr. Chapa's impressions were lumbar radiculopathy and "failed laminectomy syndrome due to work related injury dated 12-16-03." A.R. 111."

28.     Defendant's Paragraph No. 56:

"On January 4, 2005, Dr. Chapa testified in a deposition that the "pain in the back and the lower extremity symptoms are related to the injury of [December 16, 2003]." A.R. 380."

29.     Defendant's Paragraph No. 58:

"On February 4, 2005, Dr. Mehra conducted a nerve conduction study on Mr. Sharp, and his clinical impression was status post lumbar laminectomy with mild right L5 radiculopathy. A.R. 193."

30.     Defendant's Paragraph No. 59:

"On February 18, 2005, Dr. Mack provided the following:

Dr. Van Fleet saw him on 5/4/04 and at that time, scheduled him for bilateral laminectomies. The patient had the laminectomy done on 5/10/04, at which time he had the diagnosis of spinal stenosis. He had the decompression at the L3-4 and L4-5 levels. The patient did fairly well, as far as clearing up all of the pain on the left; however, developed more pain on the right...

X-rays: ...showed him to have the inflammation in the right with radicular symptoms. The patient had evidence back in February 2004 of the mild right L5-S1 radiculopathy. The patient had an MRI on

10/13/04. This showed him to have a mild, diffuse disc bulge at the L3-4; however, had some post-op changes on the right at the L4-5 level. Impression: Degenerative disc with foraminal stenosis. Recommendations: We will repeat the decompression of the low back and possibly do a fusion."  A.R. 144.

31.    Defendant's Paragraph No. 60:

"On March 17, 2005, Lawrence Leventhal, M.D. performed an independent medical examination of Mr. Sharp at Freeman's request. A.R. 351."

32.    Defendant's Paragraph No. 61:

"On May 11, 2005, Dr. Leventhal testified in a deposition concerning Mr. Sharp. A.R. 351."

33.    Defendant's Paragraph No. 64:

"On August 10, 2005, the Illinois Workers' Compensation Commission issued an arbitration decision awarding Mr. Sharp Temporary Total Disability Benefits from Freeman for the period from May 10, 2004 through June 25, 2004. A.R. 324. The arbitrator in the matter noted:

Prior to December 16, 2003, the Petitioner suffered from a condition of both spinal stenosis and foraminal stenosis, predominantly at the L3-4 and L4-5 levels. Petitioner had injured his back in 1999 and received treatment to his low back, including epidural steroid injections. The case was arbitrated in July, 2001 and the Petitioner testified at that time that he still suffered from occasional low back pain and occasional radiation of pain into the left leg...There is no indication that the Petitioner had any treatment for low back pain or symptoms radiating into either leg during the calendar year 2001 and 2002...Dr. Mack acknowledged that the spinal stenosis and foraminal stenosis was a degenerative condition which existed prior to December 16, 2003, but testified that the accident of December 16, 2003 was a cause by way of aggravation of his preexisting condition, and that the need for surgery performed by Dr. Van Fleet was related to the accident of December 16, 2003. It was Dr. Mack's opinion that the onset of low back pain with pain radiating into the legs is usually traumatic in nature and the injury as described (a fall with twisting) is most consistent as the cause which lead to the need for surgery on May 10, 2004...Respondent's IME physician, Dr. Lawrence Leventhal, agreed that Petitioner's accident of December 16, 2003 could indeed

result in Petitioner's preexisting condition of spinal stenosis and foraminal stenosis becoming symptomatic and further agreed that the Petitioner's preexisting condition made him more prone to injury from a trauma than a person who did not have a degenerative condition in his low back. While Dr. Leventhal concluded that the symptoms would be causally related only on a temporary basis…Dr. Mack and Dr. Van Fleet, were of the opinion…that surgery was indicated and necessary. A.R. 325-326.

34.    Defendant's Paragraph No. 65:

"The Workers' Compensation arbitrator found that the May 10, 2004 surgery was "causally related" to the December 16, 2003 accident. A.R. 326"

35.    Defendant's Paragraph No. 66:

"Consequently, temporary total disability benefits were awarded for 6 and 4/7ths weeks. A.R. 326."

36.    Defendant's Paragraph No. 67:

"On August 25, 2005, Mr. Sharp's employer filed a Petition for Review concerning the arbitrator's decision in the Workers' Compensation case on August 10, 2005. A.R. 341."

37.    Defendant's Paragraph No. 68:

"On September 13, 2005, Mr. Sharp reported to Dr. Chapa back pain on and off, with his right leg going numb occasionally. A.R. 170. Dr. Chapa noted that the MRI performed in October 2004 revealed "no evidence of disc herniation or significant central canal stenosis." A.R. 170. Dr. Chapa's impression was lumbar radiculopathy. A.R. 170"

38.    Defendant's Paragraph No. 69:

"Following oral arguments regarding Freeman's Petition for Review, the Illinois Workers' Compensation Commission affirmed the August 10, 2005 arbitrator's decision on July 19, 2006. A.R. 330, 341. Subsequently, Freeman appealed to the Circuit Court of Macoupin County, which remanded the case to the Commission for further consideration. A.R. 341."

39.    Defendant's Paragraph No. 73:

"On January 26, 2007, Mr. Sharp complained to Dr. Mack of "pain of the low back and down into the right leg with tingling and numbness." A.R. 145. Dr. Mack noted that this was initially on the left but went to the right-side following surgery. A.R. 145. Dr. Mack further noted that x-rays showed "a great deal of degenerative changes at the two lower levels." A.R. 145. His impression was "disc of the low back on the right" and recommended an EMG and repeat MRI. A.R. 145."

40.    Defendant's Paragraph No. 74:

"An MRI was performed on February 2, 2007 of Mr. Sharp's lumbar spine. A.R. 146. The MRI showed mild degenerative disc disease and mild facet arthritis at L3-L4, mild diffuse disc bulge and facet arthritis at L4-L5, and mild diffuse disc bulge at L5-S1. A.R. 146. The physician noted that, at L4-L5, the "axial data set is extremely limited. There is possibly postop changes on the right. Possibly moderate spinal canal stenosis. Foraminal narrowing, greater on the left" and at L5-S1 "possible small central disc protrusion. Foraminal narrowing, greater on right." A.R. 146. The impression was "[v]ery limited views. Possible postop change on the right at L4-L5. Possible mild to moderate spinal canal stenosis at this level. Small central disc protrusion at L5-S1. Suggestion of right foraminal narrowing." A.R. 146."

41.    Defendant's Paragraph No. 75:

"On February 6, 2007, Edward R. Trudeau, M.D., conducted an EMG of Mr. Sharp. A.R. 154-159."

42.    Defendant's Paragraph No. 76:

"Dr. Trudeau's interpretations were "Right L5 radiculopathy – moderately severe in electroneurophysiologic testing terms; old or chronic as well as acute features; consistent with quite correct clinical assessment of Dr. Mack" and "Right S1 radiculopathy – mild in electroneurophysiologic testing terms." A.R. 159. There was no suggestion of peripheral neuropathy. A.R. 69, 159."

43.    Defendant's Paragraph No. 77:

"Dr. Trudeau noted that his findings "may be consistent with a persistent, residual lesion and would not be unusual given this time frame ..." A.R. 156."

44.   Defendant's Paragraph No. 78:

"Dr. Trudeau suggested a bone scan of the low back and right lower extremity, among other things, to assess for degenerative, occult, or inflammatory lesions." A.R. 157.

45.   Defendant's Paragraph No. 79:

"On February 20, 2007, Mr. Sharp reported severe pain of his right low back and down into the right leg. A.R. 148. Dr. Mack noted that Mr. Sharp was a self-employed electrician, and he was having trouble "if he spent too much time up." A.R. 148. Mr. Sharp's pain was on the left before his surgery, but at this time his pain was on his right. A.R. 148. Dr. Mack noted that the MRI showed "degenerative changes" and the EMG showed "an L5-S1 nerve root which is compatible with his pain pattern." A.R. 148. Dr. Mack recommended a partial laminectomy. A.R. 148."

46.   Defendant's Paragraph No. 80:

"On March 13, 2007, Mr. Sharp underwent a preoperative examination. A.R. 174. His history included "lumbar radicular Sx on Rt, lumbar radiculopathy, osteoarthritis." A.R. 174."

47.   Defendant's Paragraph No. 81:

"On March 21, 2007, Mr. Sharp underwent a decompressive laminectomy with posterolateral fusion and disk removal at the L4-5 level, performed by Dr. Mack. A.R. 149. The operative report noted that Mr. Sharp "had a previous procedure for which a disk was removed and the pain eliminated from the left leg. That did well for a while; however, the pain came back in the right leg." A.R. 149."

48.   Defendant's Paragraph No. 82:

"Mr. Sharp filed for SSA disability benefits on March 28, 2007. A.R. 122."

49.   Defendant's Paragraph No. 85:

"Mr. Sharp filed a reconsideration of the SSA decision on May 9, 2007. A.R. 120"

50.   Defendant's Paragraph No. 87:

"On July 2, 2007, Mr. Sharp complained to Dr. Chapa of back pain and shooting pain down his right leg. A.R. 129. Dr. Chapa's impressions were hypertension, hyperlipidemia, chronic back pain and "status post back surgery x 2." A.R. 129."

51.   Defendant's Paragraph No. 88:

"On July 12, 2007, Dr. Chapa wrote a letter To Whom It May Concern, which provided:

...In December 2003, he [Mr. Sharp] had back injury while at work. He had back surgery in May 2004. He went back to work in September 2004. After going back to work, he had re-injury to the back. He had a second back surgery in March 2007. The patient complains of numbness in the right thigh. He also has pain in the back radiating down the left lower extremity. These symptoms have not improved since the second surgery... Impression: 1. Status post back surgery x 2 with persistent radicular symptoms.

Recommendations: This patient continues to have significant pain in the back radiating down the lower extremities in spite of having two back surgeries..."
A.R. 130-131.

52.   Defendant's Paragraph No. 89:

"On July 13, 2007, Mr. Sharp reported leg soreness to Dr. Mack, who noted that Mr. Sharp had a decompression with fusion on March 21, 2007. A.R. 136. Dr. Mack recommended an injection in Mr. Sharp's back, that Mr. Sharp join Weight Watchers and lose weight, and that he go to physical therapy for abdominal strengthening. A.R. 136."

53.   Defendant's Paragraph No. 90:

"On August 22, 2007, the Illinois Workers' Compensation Commission issued an Amended decision and Opinion on Review on Remand. A.R. 340-358."

54.   Defendant's Paragraph No. 91:

"The Commission affirmed the August 10, 2005 decision, finding a causal relationship existed between injuries sustained on December 16, 2003 and his "condition of ill-being." A.R. 355."

55.    Defendant's Paragraph No. 92:

"The Commission noted that Mr. Sharp was temporarily totally disabled for 6- and 4/7-weeks covering May 10, 2004 to June 25, 2004, and that he was entitled to prospective medical care of a repeat decompression surgery. A.R. 355."

56.    Defendant's Paragraph No. 94:

"On November 27, 2007, Dr. Trudeau performed an EMG and evaluated Mr. Sharp. A.R. 180-185. Dr. Trudeau found, "[r]ight lateral femoral cutaneous neuropathy (meralgia paresthetica), mild to moderately severe in electroneurophysiologic testing terms, new since previous study of 2-6-2007" and "[r]ight L5 radiculopathy, old or chronic as well as acute features, likely persistent or residual lesion and not unusual given time frame since previous electroneurophysiologic studies of 2-6-2007 and operative intervention of 3-21-2007..." A.R. 184."

57.    Defendant's Paragraph No. 95:

"Dr. Trudeau further noted that March 21, 2007 operative report showed "considerable scar formation was encountered...marked thickening was present in the lateral recess on the right...the L5 and S1 nerve roots freed up." A.R. 182. He provided that Mr. Sharp "has likely, on this basis, a persistent or residual right L5 radiculopathy." A.R. 182."

58.    Defendant's Paragraph No. 96:

"On January 17, 2008, W. Gary Jewell, an ALJ for the SSA issued a decision finding that Mr. Sharp was disabled under sections 216(i) and 223(d) of the Social Security Act beginning on March 21, 2007. A.R. 87."

59.    Defendant's Paragraph No. 97:

"The ALJ found that Mr. Sharp had the following SSA disability diagnoses: "disorders of the back (discogenic and degenerative), neuropathy, and obesity." A.R. 85

60.   Defendant's Paragraph No. 98:

"While the ALJ found that Mr. Sharp had certain residual functional capacity, he determined that no jobs existed in significant numbers in the national economy considering Mr. Sharp's age, education, work experience, and residual functional capacity. A.R. 86"

61.   Defendant's Paragraph No. 99:

"In making this decision, the ALJ noted:

The evidence of record shows that the claimant stopped working in March 2007 because of a recurrent back injury that resulted in surgery in February 2005 and again in March 2007. David Mack, M.D., the surgeon performed a laminectomy at L3 and L4-5 and a decompressive laminectomy with fusion and disc removal at L4-5. During the second surgery, considerable scar tissue was revealed. The claimant continues to complain of back pain and numbness radiating down the left lower extremity... In July 2007, Vittal Chapa, M.D., the claimant's long-time treating physician indicated that the claimant would be unable to perform more than sedentary work..." A.R. 85

62.   Defendant's Paragraph No. 100:

"On February 11, 2008, the SSA issued a Notice of Award to Mr. Sharp, providing that he became disabled under their rules on March 21, 2007. A.R. 72."

63.   Defendant's Paragraph No. 101:

"On June 19, 2009, Mr. Sharp was seen by David R. Lange, M.D. for an independent spine evaluation at Freeman's request. A.R. 67."

64.   Defendant's Paragraph No. 102:

"Mr. Sharp provided to Dr. Lange that he underwent a second surgery in March 2007 by Dr. Mack, and that subsequently he felt better. A.R. 68. However, Mr. Sharp stated that he had more chronic pain than he would prefer. A.R. 68. He described that he had an

unpleasant burning and numbing sensation in his right thigh. A.R. 68. However, he noted that these symptoms were "definitely new subsequent to the March 2007 surgery." A.R. 68.

65.   Defendant's Paragraph No. 103:

"After review of various medical records and an examination of Mr. Sharp, Dr. Lange found that "Mr. Sharp presents with residual mechanical low back pain and right lower extremity symptoms consistent with a persistent right L-5 radiculopathy and a right lateral femoral cutaneous neuropathy." A.R. 70.

66.   Defendant's Paragraph No. 104:

"Dr. Lange opined that:

[t]he current treatment is at least indirectly related to the original injury and the treatment to address the initial 2003 injury. Unfortunately, Mr. Sharp has a residual L5 radiculopathy on the right despite 2 compressive attempts…The right lateral femoral cutaneous neuropathy unfortunately is likely a complication of the second surgical procedure, presumably due to positioning. As such, both in one way or the other are related to the 2003 incident.  A.R. 70."

67.   Defendant's Paragraph No. 105:

"Dr. Lange suggested a trial with respect to a spinal cord stimulator to address the right lower extremity pain and noted that Mr. Sharp would be at maximal medical improvement after the trial. A.R. 70."

68.   Defendant's Paragraph No. 106:

"On November 5, 2009, Mr. Sharp underwent a Percutaneous Insertion of Trial Spinal Cord Stimulator. A.R. 313. The preoperative diagnosis was "failed back syndrome, having had 2 laminectomy surgeries, with persistent pain radiating down the right lower limb." A.R. 313.

69.   Defendant's Paragraph No. 107:

"On December 22, 2009, Mr. Sharp activated his service pension application with the Pension Trust, and he began receiving a 1974 Deferred Vested Pension effective March 1, 2010. A.R. 33-34, 44."

70.     Defendant's Paragraph No. 108:

        "On May 27, 2015, over seven years after he began receiving his
        SSDI award, Mr. Sharp applied for disability pension benefits from
        the Pension Plan. A.R. 51-52."

71.     Defendant's Paragraph No. 109:

        "On July 26, 2016, Mr. Sharp's application for a disability pension
        from the Plan was denied. A.R. 252."

72.     Defendant's Paragraph No. 112:

        "On October 18, 2016, Mr. Sharp appealed his denial of disability
        pension benefits. A.R. 256-257. In an affidavit, he asserted that he
        only performed light work while working as a licensed electrician from
        2004 to 2007. A.R. 318-319."

73.     Defendant's Paragraph No. 113:

        "On February 1, 2017, the Plan informed Mr. Sharp that a new review
        of the medical evidence would be conducted in accordance with his
        appeal, and any medical evidence that was not previously considered
        that he wished to be submitted would be accepted and considered.
        A.R. 258."

74.     Defendant's Paragraph No. 114:

        "On July 17, 2017, the Plan received a letter from Mr. Sharp's counsel
        submitting the following medical evidence (some of which was
        submitted previously): an EMG report dated May 10, 2004, the 2004
        operative report, an EMG report dated October 27, 2004, an EMG
        report dated February 6, 2007, the 2007 operative report, a EMG
        report dated November 27, 2007, Dr. Lange's June 19, 2009 report,
        and the report of spinal cord stimulator surgery on November 5,
        2009. A.R. 261-262.

75      Defendant's Paragraph No. 115:

        "On October 17, 2017, Mr. Sharp's appeal of his denial of a disability
        pension from the Plan was denied. A.R. 389."

**B.**    **Defendant's Statement Of Facts That Sharp Asserts Are Disputed Material Facts.**

1.    Defendant's Paragraph No. 41:

"Mr. Sharp reported to Dr. Chapa on September 16, 2004 that his pain was worse than before the surgery, and it radiated to the right lower extremity. A.R. 105. Mr. Sharp reported he was back at work. A.R. 104. Dr. Chapa's impression was persistent radicular symptoms status post-surgery. A.R. 104. Dr. Chapa testified that Mr. Sharp did not link his renewed back pain to a worsening or new onset at work. A.R. 349".

**Response:  Plaintiff agrees that he reported to Dr. Chapa on September 16, 2004 that his pain was worse than before the surgery and it radiated to the right lower extremity; Plaintiff believes that the records of Dr. Chapa reflect that he (Sharp) had went back to work last week and now was reporting shooting pain down his right leg (R 104).   Dr. Chapa's written note shows an impression of status post-lumbar disk surgery; persistent radicular symptoms (R105).   Plaintiff does not dispute the statement that Dr. Chapa testified that Mr. Sharp did not link his renewed back pain to a worsening nor new onset at work (R 349).**

2.    Defendant's Paragraph No. 116:

"The Plan included a detailed explanation for the appeal denial, which included consideration of all the medical evidence received by the Plan. A.R. 391-412".

**Response:  The report of the nurse employee of the Plan contains a description and recital of the contents of the medical records but Plaintiff disputes that it included actual consideration of the medical testimony of Dr. Chapa, Dr. David Mack and the written report of an, examining physician, Dr. David Lange, for Freeman United Coal Mining Company relating to the issue of causation, all for the reasons set forth in Plaintiff's Motion for Summary Judgment; the recital of the medical records and the denial of benefits fail to discuss or consider that Plaintiff has established his disability under the Plan's own guidelines for recognizing that a disability occurs with proof of the**

**disability arising from the aggravation of a preexisting condition (Plan Document DP-1 (81); Exh. 1 attached).**

3.      Defendant's Paragraph No. 117:

"The explanation further noted:
On May 10, 2004, Dr. Van Fleet performed bilateral laminectomies at L3-4 and L4-5. This surgical procedure, as described by Dr. Van Fleet was intended to relieve the pain caused by degenerative spondyloradiculopathy. Radiculopathy and neuropathy are different conditions, although they have some of the same symptoms. In his operative report, Dr. Van Fleet made no reference to repairing an injury or removing a herniated or ruptured disc. He stated he found evidence of age-related stenosis and bony overgrowth during the surgical procedure...If stepping into a hole and twisting the back caused an acute and disabling injury, then it would be reasonable to expect immediate medical intervention with the diagnosis of traumatic injury. It is reasonable to assume that Mr. Sharp suffered a temporary worsening of an existing degenerative spine condition when he strained his back on December 16, 2003, as opined by Dr. Leventhal.
...
The medical records, in the file of evidence, clearly described an on-going, progressive and degenerative condition of the spine over a period of more than 20 years. Mr. Sharp had a successful return to gainful employment after this injury ... He continued to work in the mine until he was terminated on November 22, 2004 ...Mr. Sharp was a self-employed electrician from 1999 until March 21, 2007, the date he stated that he became disabled, almost four years after his mine accident ... The onset date of his disability, the lack of records defining functional limitations, the lack of medical evidence of a traumatic injury, the gaps in medical care and his return to work were critical factors in determining that a causal link did not exist between his accident and his Social Security award. A.R. 409-410".

**Response:   The content of Paragraph 117 is material because it is a nurse-employee's assessment of the medical records and her opinion, which contradicts the opinions of medical physicians, including Dr. Chapa, Dr. Mack and Dr. Lange.   The content of this excerpt from Ms. Carr's appeal denial is disputed for the reasons set forth in Plaintiff's Motion for Summary Judgment; as it relates to the specific contents set forth in Paragraph 117, the following specific additional reasons for dispute exist:**

(a)  Dr. Van Fleet's diagnosis of spondylo radiculopathy has a fairly direct meaning. Lumbar "radiculopathy" refers to any disorder that affects the nerve roots in the spine in the lower back which can result in nerve pain that radiates down the legs; it is at times referred to as sciatica[1]. The term "spondylo" is a descriptor, meaning a vertebra. While it is true that damage to various components of the vertebra can be and often are degenerative, it is also true, as reflected in the testimony of both Dr. Chapa and Dr. Mack and the report of Dr. Lange that trauma will cause the onset of pain symptoms with radiculopathy which, if unremitting, can lead to surgery (R 380, pp. 18-19; R 373; R 70). The conclusion that an accident consisting of stepping into a hole and twisting one's back while trying to grab a beltline cannot cause a disabling injury is inconsistent with the Plan's own guidelines which recognize that an activity such as "straining a back while shoveling gravel" will constitute an aggravating condition which in fact can lead to total disability as a result of a mine accident (Exh. 1 DP-1 (81). Plaintiff disputes the conclusion that there was not immediate medical intervention; the accident occurred on December 16, 2003 and Plaintiff was in the doctor's office by December 19, 2003 with complaints of back pain and radiation or "radiculopathy" in his right leg. By history, the Plaintiff indicated that the pain continued to intensify although he was on some pain medications that he had (R 93-94). In further disputing this conclusion, Plaintiff would cite the findings both of the Arbitrator as well as the full Industrial Commission panel finding that there was a causal connection between the December 16, 2003 accident and Plaintiff's symptoms and need for surgeries based upon the medical evidence presented. The Illinois Workers'

---

[1] AAPM&R (American Academy of Physical Medicine & Rehabilitation) aapmr.org.

Compensation Commission is in a unique position to determine causation since it is often called upon to make these determinations of causation between an accident and an ensuing disability. <u>Long v. Industrial Commission</u>, 76 Ill.2d 561, 31 Ill. Dec. 815 (1979); <u>Berry vs. Industrial Commission</u>, 99 Ill.2d 401, 76 Ill. Dec. 828 (1984). There is no testimony or basis to conclude there was any significant lapse between the accident and seeking of medical treatment that would create a reasonable issue on the promptness of medical care for the injuries sustained.

(b)    Plaintiff disputes any reliance upon an excerpted opinion of Dr. Leventhal, the physician employed by Plaintiff's employer to defend against the claim for benefits under the Workers' Compensation Act. Dr. Leventhal's opinion that the injury sustained in the accident of December 16, 2003 was "temporary" was rejected by the Arbitrator and Industrial Commission in their expertise, based in large part because the Plaintiff had immediate onset of pain and radicular symptoms which continued up through and including the date of surgery by Dr. Van Fleet on May 10, 2003 and the fact there were no complaints over a course of two years preceding December 16, 2003 reflected in medical records of eleven visits to the family physician that indicated no complaints either for back pain, radicular symptoms or the need for medication relating to back pain (R 327-328; R 335-336).

(c)    The findings recited in Paragraph 117 relating to Mr. Sharp's work history are misleading and inaccurate. Mr. Sharp did work from the time that he first saw Dr. Chapa on December 19, 2003 until the day before his surgery on May 10, 2004, but on restricted duty where he was doing no manual labor and supervising only (R 317). Following Dr. Van Fleet's surgery of May 10, 2003, Plaintiff did not return to work until

**approximately September 17, 2004 and, within a week's time, was back at Dr. Chapa's office complaining of increased low back pain, radicular symptoms into the right leg and an inability to perform the necessary walking required by his job as a mine examiner, leading him to take a lower paying job (R 317-318; R 104-105).**

**(d)   The record reflects that the workers' compensation claim of Mr. Sharp was contested by his employer and was continually litigated in different forums from 2004 to 2009, during which period the medical treatment for his back pain and radicular symptoms into his right leg were not paid for under workers' compensation provisions but rather was covered while he was employed at Freeman United under his employee healthcare provider, Blue Cross Blue Shield (R 381-382) and until the appellate process came to a close in 2007 with a directive that Plaintiff's employer cover the medical bills both for the initial surgery of Dr. Van Fleet but also for the surgery felt necessary by Dr. Mack since February 18, 2005 (R 144). There is no basis to conclude that Plaintiff had any available method to pay for ongoing care for his condition after 2005.**

4      Defendant's Paragraph No. 118:

"Regarding the SSA's diagnosis of "disorders of the back (discogenic and degenerative)," the explanation provided, in part:
This is a broad diagnostic term used to describe osteoarthritis…Mr. Sharp had been diagnosed with lumbar spinal stenosis in 1999, or earlier in the 1980s, which is an age-related, progressive and degenerative condition…[a]fter Mr. Sharp underwent a laminectomy; his condition improved temporarily, but later he developed additional symptoms. That speaks to the progressive and changeable nature of discogenic and degenerative spine conditions….R. 411".

**Response:   Plaintiff acknowledges that the portion of the nurse-employee recitation relating to the findings of the SSA**

**is material since it forms a basis for the Plan's decision but the conclusions are disputed.**

**The term "discogenic" relates to pain which originates in the disk or disk area but is not a descriptor for osteoarthritis (Tabers Cyclopedia Medical Dictionary 16th Edition), and is not synonymous with osteoarthritis.  Mr. Sharp did undergo a procedure which included a laminectomy on May 10, 2004 which he acknowledged did help with the radiating symptoms into his left leg (R 271) but Plaintiff disputes that he improved temporarily; the back pain worsened immediately upon his return to any type of activity that involved labor work and the radicular symptoms into the right leg worsened immediately.  Within a period of one week following Plaintiff's return to actual work at the coal mine, Mr. Sharp was back at his family doctor complaining of pain in the low back which in fact was worse than it had been prior to the surgery (R 104-105).  Plaintiff therefore disputes the conclusion that this somehow supports the idea that the pain is simply progressive.  Such conclusion is also contrary to the medical testimony of Dr. Mack, Dr. Chapa and the conclusions drawn by Dr. Lange in his examination report as well as the conclusion of the Illinois Industrial Commission which is specifically charged, in part, to resolve issues of "causation" and did so in this case based upon the evidence (820 ILCS 305/8; <u>Washington Elec. Co. v. Industrial Commission</u>, 64 Ill2d 244, 1 Ill. Dec. 28 (1976).**

5.    Defendant's Paragraph No. 119:

"Regarding the SSA's diagnosis of "neuropathy," the explanation provided, in part:
On February 11, 2004, Dr. Smucker completed an EMG and found no peripheral (hands and feet) neuropathy. Dr. Trudeau noted on February 6, 2007, that electrodiagnositcs revealed no evidence of peripheral neuropathy. Repeat studies performed on November 27, 2007 revealed right lateral cutaneous femoral neurpathy, or meralgia parasthetica. This diagnosis was made four years after the reported mine accident. In this condition, the nerve is pinched where the hip meets the pelvis, not in the spine... A.R. 411".

**Response: Plaintiff admits that the language quoted is material since it forms the basis for the Plan's decision. Plaintiff does agree with the earlier statement made by**

**Defendant's nurse-employee that the terms "neuropathy"
and "radiculopathy" are often used in a synonymous
manner.  Dr. Smucker did find on February 11, 2004
evidence of a right radicular lesion in the leg, indicating
damage to a nerve root on the right side of Mr. Sharp's body
(R 365-366).  It is accurate that the conclusions by Dr.
Trudeau relating to the meralgia parasthetica find that on
February 6, 2007 there was no indication of the meralgia but
on November 27, 2007 it existed.  The nurse-employee does
not mention nor does she attempt to explain the conclusion
of Dr. Lange in his 2009 report that in fact the meralgia is
indirectly related to the December, 2003 accident because of
the positioning necessary to perform the surgery which was
performed by Dr. Mack on March 23, 2007 (between the
initial test by Dr. Trudeau on February 6, 2007 and the post-
surgery testing done on November 7, 2007) (R 70).**

**C.** **Defendant's Statement Of Facts that Plaintiff Asserts Are
Disputed And Immaterial Facts.**

1.    Defendant's Paragraph No. 32:

"While Mr. Sharp was off work on medical leave, Freeman obtained
video surveillance on June 2, 3, 4 and 8, which depicted Mr. Sharp
performing work for B. Sharp Electric. A.R. 344-345. Mr. Sharp was
terminated from employment. A.R. 344".

**Response:  This statement is taken from a recitation of
evidence presented at the arbitration of Plaintiff's workers'
compensation claim before the Illinois Workers'
Compensation Commission and relates to video surveillance
of Mr. Sharp by his employer presented at the trial.  The
surveillance and its contents are not material to any issue to
be determined in this case, particularly since the videos
themselves are not part of the record.  Both the Arbitrator
and ultimately the Workers' Compensation Commission
rejected the arguments of the employer that the video
contents in any way affected Mr. Sharp's credibility or the
weight of the medical evidence reflecting an injury caused
by the accident of December 16, 2003 (R 355-358).**

2.    Defendant's Paragraph No. 33:

"Mr. Sharp filed a grievance, and the termination was changed to a suspension with intent to discharge for being absent from work for reasons other than a proven disabling sickness or injury and misrepresenting his physical condition and/or continuing to obtain sickness and accident benefits. A.R. 344-345".

**Response:   This statement is taken from a recitation of evidence presented at the arbitration of Plaintiff's workers' compensation claim before the Illinois Workers' Compensation Commission.   The actual charge made by Freeman United Coal Mining Company is immaterial to any issue in this case since it deals with the issue of "sickness and accident" benefits and does not deal with any issue relating to this case.   The charge itself was denied by the Plaintiff and grieved through a non-judicial union procedure which resulted in a suspension (R 344-345).**

3.     Defendant's Paragraph No. 38:

"Dr. Mack also stated that miners are more prone towards foraminal stenosis due to the regular work labor of miners. A.R. 374-375".

**Response:  To the extent that this statement relates to the relationship between coal mining and the development of foraminal stenosis in Plaintiff, the conclusion by Dr. Mack's own statement is "speculative", which makes this conclusion immaterial (R 374).  Plaintiff admits that Dr. Mack testified that coal miners are more prone to back problems due to the heavy labor nature of their work (R 373-374).**

4.     Defendant's Paragraph No. 93:

"On September 4, 2007, the SSA affirmed the prior decision of May 9, 2007 and provided, "[w]e realize that your condition will prevent you from doing your past job(s), but considering your education of 12 years of school completed and age of 52, you will be able to do other types of work that are less demanding within 12 months from the onset of your condition." A.R. 120-121; 224-226.

**Response:  The fact that on September 4, 2007 the SSA affirmed its decision dated May 9, 2007 denying Sharp Social Security disability benefits is immaterial because upon further appeal the SSA granted Sharp Social Security**

**disability benefits based upon the medical evidence and Sharp's testimony.**

5.      Defendant's Paragraph No. 111:

"The explanation concluded that Mr. Sharp was in a mine accident on December 16, 2003, but that the SSDI disabilities were not causally related to the mine accident. A.R. 249."

**Response:  Plaintiff admits the Plan statement ends with this conclusion.    This document represents a recitation of sections of medical records and a preliminary denial of benefits by an employee-nurse of the Plan.   It does not represent the final determination which was issued subsequently in 2017and therefore is immaterial to the issues.   It is disputed in that it does not recite all of the medical records, including the visits of Dr. Mack in 2004 as set forth in his discovery deposition (R 368-369).   The contents and opinions of both Dr. Mack and Dr. Chapa are set forth in their evidence depositions (R 368-386).   In response to the initial report of July 26, 2016 (R 242-251) Plaintiff, through his attorney, provided the Plan with additional documents that were requested by the Plan and felt to be germane by the Plan (R 261).  In addition, this explanation did not deal with nor even respond to the basis of the claim: that the Plaintiff's preexisting condition was aggravate by the accident of December 16, 2003 and thus lead to the surgery of May, 2004, the recommendation for surgery by Dr. Mack in February, 2005 and the ultimate performance of that surgery in March, 2007, nor does it deal with the opinions offered by two primary treating physicians and an examining physician, Dr. David Lange, hired by the adverse employer, Freeman United Coal Mining Company, to render opinions with respect to causation (R 368-386; R 67-71).**

**D.      Defendant's Statement Of Facts That Sharp Asserts Are Undisputed But Immaterial Facts For The Purpose Of The Response To This Summary Judgment.**

1.      Defendant's Paragraph No. 1:

"Mr. Sharp was evaluated since the 1980s for "numerous problems including his low back. [He] had chronic low back pain complaints prior to December 16, 2003." A.R. 346."

**Response:  General statements pertaining to the preexisting low back condition are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to Sharp's undisputed disability as determined by the SSA.**

2.    Defendant's Paragraph No. 2:

"In 1999, Mr. Sharp had radiculopathy and possibly a lumbar disc rupture, after which Vittal Chapa, M.D. ordered a lumbar MRI." A.R. 349

**Response:  These facts regarding the preexisting low back condition are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA.**

3.    Defendant's Paragraph No. 3:

"On November 1, 1999, Mr. Sharp underwent a lumbar MRI. A.R. 355. When compared to an MRI in 1997, significant change at the L2-3 and L4-5 levels was noted. A.R. 355. The MRI also showed that Mr. Sharp had developed a posterolateral herniation of the disc with encroachment upon the L3 nerve root." A.R. 355.

**Response:  These facts regarding the preexisting low back condition are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA.**

4.    Defendant's Paragraph No. 4:

"On January 19, 2000, Mr. Sharp underwent a CT myelogram, which showed diffuse disc bulge at L3-4 with bilateral inferior foraminal stenosis." A.R. 355

**Response:  These facts regarding the preexisting low back condition are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA.**

5.      Defendant's Paragraph No. 5:

"In 2000, Dr. Chapa diagnosed Mr. Sharp with lumbar disc radiculopathy, and Mr. Sharp was hospitalized for intractable low back pain." A.R. 349.

**Response:  These facts regarding the preexisting low back condition are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA.**

6.      Defendant's Paragraph No. 6:

"An MRI report dated September 8, 2000 showed "diffuse bulging of the disc…at L3-4." A.R. 69.

**Response:  These facts regarding the preexisting low back condition are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA.**

7.      Defendant's Paragraph No. 7:

On October 17, 2000, Dr. Chapa diagnosed Mr. Sharp with chronic low back pain and lumbar disc disease." A.R. 349

**Response:  This fact regarding the preexisting low back condition is immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA. This fact is also misleading since Sharp's subsequent eleven (11) office visits with Dr. Chapa prior to the accident dated December 16, 2003 did not disclose any low back complaints, low back diagnostic testing, low back treatment or radicular complaints (R 335-336).**

8.      Defendant's Paragraph No. 8:

"On July 21, 2003, Dr. Chapa noted Mr. Sharp's history of chronic back pain and osteoarthritis. A.R. 352.

**Response:   The facts regarding the preexisting low back condition are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by SSA.**

9.      Defendant's Paragraph No. 13:

"In a deposition, David Mack, M.D., an orthopedic surgeon, "opined that all the things seen on the [January 5, 2004] MRI were present prior to the December 16, 2003 accident and were present and growing for years." A.R. 347

**Response:  These facts from Dr. Mack's deposition testimony are undisputed pertaining to the preexisting low back condition but immaterial to the issue of aggravation since Dr. Mack's medical opinion on causation was that the accident dated December 16, 2003 aggravated the preexisting low back condition and necessitated medical treatment, including surgery performed by Dr. Van Fleet in 2004 (R 373-374).**

10.     Defendant's Paragraph No. 15:

"Mr. Sharp first visited Dr. Mack on January 20, 2004, and Mr. Sharp reported "his long history of low back pain difficulty." A.R. 342, 347. At that visit, Dr. Mack "diagnosed degenerative disc at L3-4 and L4 nerve root irritation, where nerves go down in to the lower legs and especially the anterior thighs..." A.R. 343.

**Response:   These facts are undisputed pertaining to the preexisting low back condition but immaterial to the issue of aggravation since Dr. Mack's medical opinion was that the December, 2003 accident aggravated the preexisting low back condition necessitating the medical treatment, including surgeries performed on May 10, 2004 and March 23, 2007, which eventually resulted in the implantation of a**

spinal cord stimulator, per Dr. Lange, and the undisputed
disability as determined by the SSA (R 373-374).

11.  Defendant's Paragraph No. 16:

"Dr. Bansal from Bansal Occupational Medicine diagnosed a lumbar
strain in a Return to Work slip dated January 28, 2004." A.R. 343.

**Response:   The fact that Dr. Bansal diagnosed a lumbar
sprain is immaterial to the issue of aggravation of the
preexisting low back condition considering the medical
evidence and opinions of Dr. Mack, Dr. Chapa and Dr. Lange.
Furthermore, Dr. Bansal was merely assigned the task of
providing injections by the treating physicians.**

12.  Defendant's Paragraph No. 17:

"On January 30, 2004, Dr. Mack diagnosed Mr. Sharp with
degenerative disc disease with lumbar spinal stenosis and foraminal
stenosis." A.R. 343

**Response:   This fact is excerpted from a complete note
description and is undisputed pertaining to the preexisting
low back condition but immaterial to the issue of
aggravation of the preexisting condition since Dr. Mack's
medical opinion was that the accident aggravated the
preexisting low back condition necessitating the medical
treatment, including surgeries dated May 10, 2004 (R 373)
and March 23, 2007, which eventually resulted in the
implantation of a spinal cord stimulator, per Dr. Lange, (R
70) and the undisputed disability as determined by the SSA.**

13.  Defendant's Paragraph No. 22:

"On March 19, 2004, Mr. Sharp noted that his pain was worse on the
left, and Dr. Mack diagnosed "spinal stenosis L4-5 with radicular
pain." A.R. 344.

**Response:  These facts are undisputed to the preexisting low
back condition but immaterial to the issue of aggravation
since Dr. Mack's medical opinion was that the accident
aggravated the preexisting low back condition necessitating
the medical treatment, including surgeries dated May 10,
2004 (R 373) and March 23, 2007, which eventually resulted**

**in the implantation of a spinal cord stimulator, per Dr. Lange, (R 70) and the undisputed disability as determined by the SSA.**

14.    Defendant's Paragraph No. 24:

"Mr. Sharp visited Dr. Mack on April 7, 2004. A.R. 344. A Workers' Compensation decision summarized the visit:

[Mr. Sharp] complained of low back pain that also went out onto his left hip. Dr. Mack diagnosed L4-5 spinal stenosis with radicular pain (Dp 14). Dr. Mack testified that [Mr. Sharp] told him he would like to have something done since his level of activity had markedly decreased...Dr. Mack diagnosed degenerative changes with foraminal stenosis. At that time, Dr. Mack felt [Mr. Sharp] needed a bilateral decompression and possibly a posterolateral fusion." A.R. 344.

**Response:  These facts are partial statements of a visit note and are immaterial to the issue of aggravation considering that Dr. Mack's medical opinion on causation was that the accident aggravated the preexisting low back condition and caused the need for the surgeries dated May 10, 2004 and March 23, 2007.    Furthermore, in the Workers' Compensation decision cited by the Defendant, the Illinois Industrial Commission ruled in Sharp's favor that the accident dated December 16, 2003 aggravated the preexisting low back condition and awarded Sharp workers' compensation benefits, including payment of past and prospective medical treatment and weekly workers' compensation temporary total disability benefits while he was off of work.**

15.    Defendant's Paragraph No. 25:

"The Workers' Compensation decision also summarized the report by Timothy Van Fleet, M.D., an orthopedic surgeon, to Dr. Mack on April 23, 2004, stating:

[Mr. Sharp] was seen this day and reported he had been experiencing low back pain and lower extremity pain for some time. Dr. Van Fleet noted that he had previously worked [Mr. Sharp] up with a discogram which demonstrated 3 positive disc spaces and opined that [Mr. Sharp] would not do well with a spinal fusion. Dr. Van Fleet recommended bilateral laminotomies at L3-4 and L4-5. He

opined [Mr. Sharp] should be able to return to work after the surgery." A.R. 344.

**Response:  These facts are partial statements of a visit note and are immaterial considering that in the Workers' Compensation decision the Defendant cites the Illinois Industrial Commission ruled in Sharp's favor that the accident dated December 16, 2003 aggravated the preexisting low back condition and awarded Sharp workers' compensation benefits, including payment of past and prospective medical treatment and weekly temporary total disability benefits while he was off of work.**

16.   Defendant's Paragraph No. 26:

"Dr. Chapa conducted a preoperative examination of Mr. Sharp on May 4, 2004. A.R. 101-104. Dr. Chapa listed "a history of chronic low back pain, lumbar disk disease, osteoarthritis of the right AC joint, irritable bowel syndrome, elevated LDL, and hypertension." A.R. 101. His impression was "spinal stenosis, hypertension, elevated LDL, irritable bowel syndrome, osteoarthritis." A.R. 102.

**Response:    These facts are undisputed but immaterial regarding the issue of aggravation of the low back condition being the cause of Plaintiff's symptoms considering that Dr. Chapa, Dr. Mack and Dr. Lange opined that the accident aggravated the preexisting condition and caused the need for the surgeries dated May 10, 2004 and March 23, 2007 which eventually resulted in the implantation of a spinal cord stimulator, per Dr. Lange, and the undisputed disability as determined by the SSA.**

17.   Defendant's Paragraph No. 28:

"In a Workers' Compensation decision, it was noted that Dr. Mack testified that "Dr. Van Fleet did not remove any disc material. [He] removed degenerative bony growth that had been occurring for a number of years and some degenerative ligamentum flavum." A.R. 347.

**Response:  These facts regarding the preexisting low back condition cited in the Workers' Compensation decision are only a portion of the deposition and immaterial considering that Dr. Mack's medical opinion on causation was that the**

**accident aggravated the preexisting low back condition necessitating the surgeries dated May 10, 2004 (R 373) and March 23, 2007 (R 70).  Furthermore, in the Workers' Compensation decision cited by Defendant the Illinois Industrial Commission ruled in Sharp's favor that the accident dated December 16, 2003 aggravated the preexisting low back condition and awarded Sharp workers' compensation benefits, including payment of past and prospective medical care and weekly temporary total disability benefits while he was off of work.**

18.  Defendant's Paragraph No. 40:

"Dr. Mack also provided the following in his September 9, 2004 deposition, as described in a Workers' Compensation decision:

Dr. Mack opined that [Mr. Sharp's] foraminal stenosis is a result of degenerative disease (Dp 31-32). Dr. Mack did not know if [Mr. Sharp] ever made radicular complaints in his legs prior to December 16, 2003, but that could be consistent with his problem. (Dp 33). The results noted in the EMG would have been a nerve problem prior to December 16, 2003. There were no left leg findings on the February 27, 2004 EMG (Dp 33). Facet hypertrophy is essentially an enlargement of the joints which occur secondary to the degenerative process and most people think of this as arthritis.

Dr. Mack testified that when he was reviewing [Mr. Sharp's] records for this deposition, he discovered that [he] had prior low back injuries (Dp 34). He noted that [Mr. Sharp] had a long history of low back treatment (Dp 34). Prior tests such as MRIs had shown [Mr. Sharp] had bulging discs and worsening of the condition (Dp 35) …Dr. Mack opined that all the MRI findings and other tests in 2004 could be the result of prior low back injuries (Dp 35). Dr. Mack opined that degenerative conditions in the low back are generally progressive in nature (Dp 35). He opined that [Mr. Sharp's] condition has been progressive, but was not necessarily unusually progressive (Dp 35). He opined that facet arthropathy can get worse over time and [Mr. Sharp] has this (Dp 35-36)."  A.R. 347.

**Response:  Dr. Mack's deposition testimony as cited in the Workers' Compensation decision is undisputed but the best evidence is Dr. Mack's deposition itself (R 368-375); these excerpts are immaterial to the issue of aggravation considering that Dr. Mack also testified that the accident**

**aggravated the preexisting low back condition necessitating the surgeries dated May 10, 2004 and March 23, 2007. Furthermore, in the Workers' Compensation decision cited by Defendant the Illinois Industrial Commission ruled in Sharp's favor that the accident dated December 16, 2003 aggravated the preexisting low back condition and awarded Sharp workers' compensation benefits, including payment of past and prospective medical care and weekly temporary total disability benefits while he was off of work.**

19.    Defendant's Paragraph No. 44:

"A Workers' Compensation decision noted that a lumbar MRI was performed on October 12, 2004, and provided the following:

[T]he lumbar MRI...showed mild diffuse disc bulge at L4-5 (Dp. 45). Dr. Chapa opined that diffuse is usually a degenerative finding as opposed to a focal bulge, which can be traumatic (Dp. 45). The radiologist who interpreted the October 12, 2004 MRI found no disc herniation or significant central canal stenosis at L4-5 (Dp. 45). The foramina was not narrowed and was still open and there was room for the nerve roots to exit and there was no nerve root impingement (Dp. 46). The prior stenosis seen on the earlier MRI had been relieved by surgery (Dp. 46)." A.R. 350.

**Response:  The MRI results dated October 12, 2004 which Defendant cited from the Workers' Compensation decision are undisputed but immaterial to the issue of aggravation of the preexisting low back condition considering that the Illinois Industrial Commission ruled in Sharp's favor that the accident dated December 16, 2003 aggravated the**

**preexisting low back condition and awarded Sharp workers' compensation benefits including payment of past and prospective medical treatment and weekly temporary total disability benefits while he was off of work.**

20.    Defendant's Paragraph No. 48:

"A Workers' Compensation decision noted that Dr. Mehra's examination found Mr. Sharp "entirely normal." A.R. 350.

**Response:  Dr. Mehra's statement that is cited from the Workers' Compensation decision is undisputed but this**

**quote is misleading; the best evidence is Dr. Mehra's report itself (R 274-276) where he found recurrent right L-5 radiculopathy, recommending an epidural block.   Out of context, the quote is not material.**

21.   Defendant's Paragraph No. 52:

"On November 23, 2004, Freeman terminated Mr. Sharp from employment." A.R. 52.

**Response:   This fact is not disputed but is immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA; the termination itself is not material to any issue in this case.**

22.   Defendant's Paragraph No. 53:

"A Workers' Compensation decision provides the following regarding Mr. Sharp's termination:

[Mr. Sharp] was called into [Freeman's] office as the result of a surveillance video taken on November 10, 2004 (Rx22). During this period of time, [Mr. Sharp] had continued to oversee B. Sharp Electric (Tr 45) ...In a Labor Arbitration Decision dated January 21, 2005, Rx20, an arbitrator found that [Mr. Sharp] violated his doctor's orders and restrictions many times as seen on videotape. The arbitrator found that [Mr. Sharp] misrepresented his condition when he turned in his slip of restrictions on November 4, 2004. [He] was repeatedly seem climbing a ladder on November 6 and 7, 2004 after turning in the slip just two days before. The arbitrator found [Freeman] was justified in discharging [Mr. Sharp] from his employment." A.R. 345, 355.

**Response:   These facts regarding Sharp's termination cited in the Workers' Compensation decision are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition that is causally linked to the undisputed disability as determined by the SSA.   Furthermore, in the Workers' Compensation decision cited by the Defendant, the Illinois Industrial Commission ruled in Sharp's favor that the accident dated December 16, 2003 aggravated the**

**preexisting low back condition.  This recitation of immaterial information is inappropriate given the fact that the underlying tapes refuting these "conclusions" are not in the record and were not requested as relevant by the Plan and the Industrial Commission itself found the videos of no import in resolving the causation issue.**

23.  Defendant's Paragraph No. 57:

"However, as described in a Workers' Compensation decision, Dr. Chapa also testified that:

[his] January 12, 2004 impression was spinal stenosis (Dp 34). He opined that stenosis can be arthritis and ligaments can add to stenosis. A bulging or herniated disc can cause stenosis (Dp 35). Dr. Chapa reviewed the Operative Report and stated that Dr. Van Fleet did not remove any disc material (Dp 35). He opined that the laminectomies performed were to make more room for the nerve roots to exit the spinal cord (Dp 36). Dr. Chapa opined that the bulging disc could be due to dehydration of the disc, which is normal aging process or injury, and he could not tell which is the case here...Dr. Chapa opined that...[t]here are situations where the stenosis exists and is the result of trauma and have increased pain (Dp 61) ...Dr. Chapa testified that the disc was not taken out and that space was made so the nerves in the spine were not pinched (Dp 61). The December 2003 x-rays showed significant degenerative changes (Dp 62). Dr. Chapa opined that these degenerative changes progressed to the point where they impinged on the nerves (Dp 63). Dr. Chapa opined that normal activity can make degenerative changes symptomatic." A.R. 349-350, 385.

**Response:   These facts are immaterial to the issue of aggravation considering that Dr. Chapa's medical opinion on causation was that the accident dated December 16, 2003 aggravated the preexisting low back condition necessitating the medical treatment including the surgeries dated May 10, 2004 (R 379-380); the diagnosis of failed laminectomy syndrome (R111) and the ultimate surgery of March 23, 2007, which eventually resulted in the implantation of a spinal cord stimulator, per Dr. Lange, and the undisputed disability as determined by the SSA.   Furthermore, in the Workers' Compensation decision the Defendant cites the Illinois Industrial Commission decision ruled in Sharp's favor.  Dr. Chapa found persistent back pain with radicular**

**symptoms stemming from the December, 2003 accident (R 130-131).**

24.   Defendant's Paragraph No. 62:

"The Workers' Compensation decision describes Dr. Leventhal's examination and opinion as follows:

Dr. Leventhal opined that [Mr. Sharp's] reported diffuse numbness was not in a normal dermatomal pattern which would indicate a nerve root distribution (Dp 11). Dr. Leventhal opined that negative straight leg raising tests [which were examined] would indicate there was no nerve root irritation. Dr. Leventhal found no cause for the range of motion limitation (Dp 15). Dr. Leventhal opined that the examination results were fairly normal, other than decreased range of motion (Dp 14). Dr. Leventhal stated he had viewed the videotapes and opined that the activities at the examination were not consistent with what he saw on the videotapes in that [Mr. Sharp] had a much greater range of motion seen on the videotapes (Dp 15). Dr. Leventhal opined that he saw no signs of disability or discomfort by [Mr. Sharp] on the videotapes (Dp 15). He had reviewed [Mr. Sharp's] job description and opined he was capable of the work (Dp 16) ...Dr. Leventhal took x-rays ...[and] opined that the spurring had been present for years...[and] the degenerative changes noted in the MRI reports and x-rays were consistent with long-standing arthritis (Dp 19). Dr. Leventhal diagnosed spinal stenosis of the lumbar spine, status post-two level decompression with continued subjective complaints (Dp 19). Dr. Leventhal opined that the December 16, 2003 accident did not cause the spinal stenosis (Dp 19). Dr. Leventhal opined that the accident might have caused a temporary aggravation of back pain, but would not cause any progression of the spinal stenosis (Dp 20) ...Dr. Leventhal opined that the surgery was not necessitated by the December 16, 2003 accident, but was necessitated by the spinal stenosis (Dp 22)...Dr. Leventhal opined no causal connection for the surgery, which was necessitated by the spinal stenosis [Mr. Sharp] had. He opined [Mr. Sharp's] low back condition was degenerative and progressive and that it can progress over time to where normal activities of life can cause it to become symptomatic (Dp 26) ...Dr. Leventhal opined that [Mr. Sharp] was capable of working as an electrician...Dr. Leventhal opined that the accident could have made [Mr. Sharp] symptomatic on a temporary basis ... [but] that the accident would not aggravate the spinal stenosis, but could potentially have been a temporary exacerbation of symptoms and increased his low back pain (Dp 35)...Dr. Leventhal

opined that the December 16, 2003 accident did not cause a permanent exacerbation (Dp 63)…"  A.R. 351.

**Response:  Dr. Leventhal was the physician hired by Sharp's employer in the workers' compensation claim on the issue of whether the accident aggravated the preexisting low back condition necessitating the medical treatment, including surgery.  Dr. Leventhal opined that the accident was merely a temporary aggravation of back pain which did not lead to substantial medical treatment, including surgery.  In the Workers' Compensation decision, the Illinois Industrial Commission, the administrative body assigned to determine these issues and weigh the credibility of witnesses, specifically rejected Dr. Leventhal's opinions in favor of the medical opinions of Dr. Mack and Dr. Chapa and ruled in Sharp's favor.   Specifically, the, the Illinois Industrial Commission determined that the accident dated December 16, 2003 aggravated the preexisting low back condition, necessitating medical treatment, including the surgeries dated May 10, 2004 and March 23, 2007, and awarded Sharp workers' compensation benefits, including payment of past and prospective medical treatment and temporary total disability benefits while he was off of work.  Dr. Leventhal felt the surgery of May, 2004 was reasonable but not related to the December, 2003 accident, notwithstanding no break in complaints of pain and radicular symptoms. The Arbitrator and Industrial Commission totally discounted this testimony based upon the credibility of Plaintiff and the medical evidence of Dr. Mack, Dr. Chapa and a review of the total set of facts.  His opinions are immaterial for reasons found by the Industrial Commission.**

25.  Defendant's Paragraph No. 63:

"Mr. Sharp testified that he had complained of back pain with pain and numbness into his legs prior to the December 16, 2003 accident and had a prior accident in 1999 for which he filed a Workers' Compensation claim. A.R. 352-353.

**Response:  These facts regarding the preexisting low back condition and a prior injury claim are immaterial to the issue of whether the undisputed accident at work on December 16, 2003 involved an aggravation of a preexisting condition**

**that is causally linked to the undisputed disability as determined by the SSA.**

26.   Defendant's Paragraph No. 70:

"On August 11, 2006, Mr. Sharp saw Dr. Chapa for a well visit. A.R. 171. It was noted that this was Mr. Sharp's first visit in about a year. A.R.171. Dr. Chapa counseled Mr. Sharp about weight reduction and smoking, and labs were drawn. A.R. 171. There was no mention of back pain or issues with lower extremities. A.R. 171."

**Response:    These  undisputed  facts  are  immaterial considering Dr. Mack's and Dr. Chapa's medical opinion that the accident dated December 16, 2003 aggravated the preexisting low back condition necessitating the surgeries dated May 10, 2004 and March 23, 2007 which eventually resulted in the implantation of a spinal cord stimulator, per Dr. Lange, and the undisputed disability as determined by the Social Security Administration in 2007.**

27.   Defendant's Paragraph No. 71:

"On August 21, 2006, Mr. Chapa visited Mr. Sharp concerning his labs, which showed high LDL and cholesterol levels. A.R. 172. Dr. Chapa advised weight reduction and low cholesterol diet. A.R. 172. There was no mention of back pain or issues with lower extremities. A.R. 172."

**Response:    These  undisputed  facts  are  immaterial considering Dr. Mack's and Dr. Chapa's medical opinion that the accident dated December 16, 2003 aggravated the preexisting low back condition necessitating the surgeries dated May 10, 2004 and March 23, 2007 which eventually resulted in the implantation of a spinal cord stimulator, per Dr. Lange, and the undisputed disability as determined by the Social Security Administration in 2007.**

28.   Defendant's Paragraph No. 72:

"There are no documents within the administrative record of complaints by Mr. Sharp of back or extremity pain or medical appointments concerning back or extremity pain between September 13, 2005 and January 26, 2007."

**Response:  Plaintiff does not dispute that the administrative record contains no documents of medical visits regarding back or lower extremity pain or radiculopathy between September 13, 2005 and January 26, 2007.**

**Plaintiff submits that this is immaterial given the fact that Dr. Mack had indicated the need for a second surgery in his visit of February 18, 2005 (R 144) which occurred at a time when the Plaintiff had been terminated by Freeman United Coal Mining Company and was without personal insurance through Blue Cross Blue Shield who had paid for the initial surgery in 2004 (R 381-382) and that Freeman United Coal Mining Company continued to litigate issues relating to the compensability of the claim and liability for the resultant surgeries well into the year 2007 (R 340-358).**

29.     Defendant's Paragraph No. 84:

"On May 9, 2007, SSA determined he did not qualify for SSA disability benefits. A.R. 122; 227-229. The decision noted that Mr. Sharp did have some restrictions but determined that these did not keep him from working. A.R. 123. This decision evaluated the following evidence: reports from Dr. Chapa, Dr. Trudeau, the Memorial Medical Center, and Dr. Mack. A.R. 123. The primary diagnosis on the Disability Determination and Transmittal form was "Disorders of back (discogenic and degenerative)." A.R. 122. No secondary diagnosis was established. A.R. 122.

**Response:  The fact that the SSA determined Sharp did not qualify for Social Security disability benefits on May 9, 2007 is immaterial because upon further appeal the SSA granted Sharp disability benefits based upon the medical evidence and Sharp's testimony.**

30.     Defendant's Paragraph No. 86:

"On May 29, 2007, Mr. Sharp reported pain down his leg to Dr. Mack, who attributed the pain to Mr. Sharp not wearing his brace. A.R. 135. He noted that x-rays showed wide decompression and his impression was decompression. A.R. 135. Dr. Mack recommended that Mr. Sharp lose weight and go to therapy to develop his abdominal muscles." A.R. 135.

> **Response:** These undisputed facts are immaterial considering Dr. Mack's medical opinion that the accident dated December 16, 2003 aggravated the preexisting low back condition necessitating the surgeries dated May 10, 2004 (R 379-388) and March 23, 2007, which eventually resulted in the implantation of a spinal cord stimulator, per Dr. Lange, (R 70) and the undisputed disability as determined by the SSA.

### ARGUMENT

### A.    Standard Of Review.

Plaintiff is in substantial agreement regarding the required elements of proof and that the test for this Court is whether the decision of the Plan is "arbitrary and capricious".  Plaintiff's agreement, however, is tempered by the admonition of cases in the Seventh Circuit indicating that this Court's review should not be to "rubber stamp" the findings of the Plan.  <u>Cerentano v. UMWA Health Ret. Funds</u>, 735 F.3d 976, 981 (7th Circ. – 2013).  The Court should review the entire picture as reflected in the record rather than engaging in a selective use of evidence.  <u>Holmstrom v. Metro. Life Ins. Co.</u>, 650 F.3d 758 (7th Cir. – 2010).

### B.    The 1974 Pension Plan Provisions.

In listing the three eligibility requirements for the Plan's disability award, Defendant states that "the mine accident must be <u>the cause</u> of the SSDI disability" (Arg. 28).  Plaintiff disagrees with this statement and turns to the actual language found in the Plan at p. 5, Art. II. (C):

> "A Participant shall be considered to be totally disabled only "if by reason" of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits…"  The continuance of the disability pension is to be based on

> medical evidence that supports the Participant's
> inability to be employed in classified work in the
> industry (Plan, p. 5).

The language of this same Plan is discussed in Cerentano v. UMWA Health Ret. Funds, 735 F.3d 976, 981 (7th Circ. – 2013). The Cerentano Court points out that the phrase "as a result of" is ambiguous and that the interpretation that has been given by the Plan includes an analysis of whether there is "a causal link" between the mine accident and the Social Security Disability award.  Plaintiff submits that the Cerentano approach is the appropriate test for this Court to use.

Pursuant to the Cerentano decision, the Plan should determine whether there is "a causal link" between the mine accident and the SSDI award.  This is consistent with the Plan's own guidelines found in Q & A 252 (b) or (f).

The Plan's guidelines specifically recognize that proof of disability can arise from an aggravation of a preexisting condition (DP-1; Exh. 1):

> "If a condition or injury resulting from a mine accident
> aggravates or combines with a preexisting condition or
> prior injury which did not result from a mine accident
> and the mine worker thereby becomes totally disabled,
> the mine worker is considered "totally disabled as a
> result of a mine accident".

Both Q & A 252 and DP-1 have rather classic definitions of "aggravation of a preexisting condition" causing an injury or condition which is also in conformity with longstanding Illinois Law.  Illinois Pattern Jury Instructions, Civil; §30.21; 30.01; Balestri v. Terminal Freight Co-op & Ass'n., 76 Ill.2d 451, 31 Ill. Dec. 189 (189); Cerentano, supra.  It is also consistent with recognizing causation where a mine injury's affect in exacerbating a preexisting condition which can cause a panoply of

symptoms.  <u>Boyd v. Trs. of UMW Health & Ret. Funds</u>, 873 F.2d 57 (4th Cir. –

1989).  Thus, the test is not whether the accident was "the cause" of the disability

but rather whether the accident was "a cause" or part of "a causal link" to the

disabling condition as found by the SSDI award.

### C.    The Plan's Denial Of Benefits Is Arbitrary And Capricious.

Defendant's claim that the Social Security ALJ decision supports their

determination that the December 16, 2003 mine accident was not a cause of Mr.

Sharp's disability is contrary to any reasonable understanding of the ALJ's award

and the job he is charged with fulfilling.  Much is made of the fact that the ALJ

does not find and fails to mention that the December 16, 2003 accident was a

cause of the disability which he found in his ruling of January, 2008.

This argument misses the purpose served by the ALJ.  The job of the ALJ in

a Social Security Disability case is to determine, based upon the medical evidence,

whether the claimant is disabled, either from a severe impairment or, in the

alternative, by going through the five-step procedure outlined within the

regulations which set forth the factors to be considered.  20 C.F.R. §404.1520(a),

(c) and (d).

The ALJ is not charged with the task of deciding whether an accident or

combination of accidents were a cause of the disabling conditions.  See CFR

§404.1520 and CFR §404.1520 (a) and (d).  It is unreasonable for the Plan to rely

upon the ALJ's failure to mention the 2003 accident in his decision, since the ALJ is

not expected to determine the cause of the disability.  This argument suggests the

Plan is selectively using the evidence available to reach one's own ends (Holmstrom v. Metro Life Ins. Co., 615 F.3d 758, 761, 777 (7th Cir. 2010).

In a similar vein, Defendant argues the "overwhelming" documentation is that Mr. Sharp's only injury from the December 16, 2003 accident was a lumbosacral sprain. This "overwhelming" evidence consists of an accident report filled out on December 16, 2003 by an unidentified employee of Freeman United Coal Mining Company and a working diagnosis of Dr. Chapa on his first visit of December 19, 2003 where he writes "lumbosacral sprain" followed by a secondary diagnosis of "rule out radiculopathy", the latter being ignored by Defendant in its analysis of the entire record. Four days later, on December 23, 2003, Dr. Chapa's impression has changed to lumbar disk with radiculopathy (R 95).

It is possible to selectively find statements by a doctor within this voluminous set of medical records indicating, for example, a working diagnosis of "lumbosacral sprain" in the early days of an injury when Dr. Chapa is hopeful that the symptoms will subside and the less serious of possible conditions proves to be the proper diagnosis. When the problems persist, both in severity of complaints and longevity of complaints, the diagnosis can and does change as it did in this case. To say that Mr. Sharp suffered only from a "lumbosacral sprain" is to look for excerpts with a closed mind to the overall picture. This selective use of evidence and the failure to look at the entire picture is arbitrary and capricious (Holmstrom, supra, p. 761, 777).

What is important, in looking at the entire picture, is to look at the totality of the evidence to see what any reasonable person would conclude based upon the evidence.  Mr. Sharp had an accident at work where he stepped in a hole in a dark, abandoned portion of the coal mine, grabbed for a belt line and was able to break his fall to the ground but, in the process, twisted his lower back (R 325; 93).

Within three days, he is in to see his family doctor and reports low back pain along with radiating complaints of symptoms into his right leg (R 93-94).   He reports that his pain complaints have improved since the accident but also reports that he is taking pain medication from the time of the accident until the first office visit (R 93).

A series of visits with his family doctor, Dr. Chapa, followed and Mr. Sharp was referred to an orthopedic surgeon, Dr. David Mack, who he saw in early January, 2004 (R 368).   His complaints throughout this period remain low back pain which has not abated as well as radicular symptoms to the right leg (R 93; 95; 96-97; 368-371).

An EMG was ordered and amongst other findings, the EMG was reported by Dr. Smucker as reflecting right L5 and S1 radiculopathy (R 365-366).   During this entire period, Mr. Sharp was not engaging in any heavy work and while he was restricted to "light duty" at the mine, none was available and he was doing some supervisory-type work (R 317; 369).

Ultimately, Dr. Mack recommended surgery for a situation of unremitting pain and radicular symptoms into both the left and right leg which had arisen and

remained steady since the accident of December 16, 2003 (R 371). There was objective evidence of a recent injury, including the EMG by Dr. Smucker which is the first test indicating radicular symptoms into the right leg for Mr. Sharp (R 370).

Surgery was performed on May 10, 2004 by Dr. Van Fleet. However, at the time of his release by Dr. Van Fleet in June, 2004, Mr. Sharp did not return to work due to a suspension and remained off work until September 7, 2004 (R 317). Upon returning to work at the mine and attempting to walk the four to six miles required for a mine examiner, he immediately experienced an increase in back pain with a return of radicular symptoms into the right leg, leading to a visit to Dr. Chapa (R 317-318; 104-105).

Defendant cites isolated instances of reports by Mr. Sharp that he "feels better" or is "doing well following the surgery" as an indication that the mine accident was not a cause of his ultimate disabling condition. This overlooks the fact that when he wasn't working at harder labor in the mine, Mr. Sharp "felt better", but upon attempting to return to the work of a mine examiner, he immediately had an increase in symptoms which lead to an ultimate conclusion by Dr. Mack in February, 2005 that Mr. Sharp was in need of a second decompression surgery and possible fusion of the low back to try to alleviate unremitting low back and right leg radicular symptoms that had been consistent for the past one and a half years (R 144). This consistency of Plaintiff's complaints led Dr. David Mack and Dr. Vittal Chapa, who felt by December, 2004 that Plaintiff suffered from "failed laminectomy syndrome" (R 111), to conclude that the accident of December 16,

2003 was clearly a cause of his symptomology which necessitated both the surgery performed in May, 2004 as well as the surgery recommended in February, 2005.

While the ALJ in the Social Security case was not charged with the duty to address whether the accident of December, 2003 was a cause of Plaintiff's disability, in discussing the rationale for finding disability involving "disorders of the back (discogenic and degenerative), neuropathy, and obesity", the ALJ specifically referenced the two surgeries that Mr. Sharp had undergone (albeit with an incorrect date) of February, 2005 and March, 2007, both of which the overwhelming medical evidence finds were causally connected to the December, 2013 mine accident.  The ALJ also noted the seriousness of the disability and that the symptoms had not abated at the time of his determination.  The ALJ's descriptors of the evidence that he relied upon to establish the disability for SSDI purposes shows the substantial relationship that existed between the conditions which were uniformly found by two treating physicians (Dr. Chapa and Dr. Mack) and one examining physician (Dr. Lange) to be caused by the December, 2003 accident.

Other than obesity, there was no other condition listed by the ALJ as being a cause of disability except the low back condition which had led to two surgeries and ongoing and unremitting pain.  The entire picture leads to a clear conclusion: The mine accident was a cause of the symptoms and the necessity for the surgery of May, 2004, the proposed surgery of February, 2005 and the resultant surgery in

March, 2007; Plaintiff's low back and radicular symptoms were not only substantial but were nearly the only cause for the ALJ's finding of disability in January, 2008.

The Defendant, while willing to look for guidance from the ALJ's opinion on the causation issue between the December, 2003 accident and its relationship to the disability, is unwilling to give any credence to the decision of the Illinois Workers' Compensation Commission.  Both an Arbitrator and a panel of Commissioners heard and reviewed the evidence in a contested proceeding and determined that the evidence supported a causal connection between the December, 2003 accident and the condition which required two surgeries, the one performed by Dr. Van Fleet in May of 2004 and the one ultimately performed by Dr. Mack in March of 2007 (R 323-328; 330-331; 333-338; 340-358).

The Industrial Commission, unlike the ALJ, is specifically charged with the task of determining the issue of causal connection.  Long v. Industrial Commission, 76 Ill.2d 561, 31 Ill. Dec. 815 (1979).  As an administrative agency charged with deciding disputed medical issues such as causation, its findings cannot be ignored but is entitled to great weight due to its expertise on medical matters.  Long, supra, 562.

Contrary to Defendant's position that the Illinois Industrial Commission followed its own "test" to reach its conclusions, there is no test other than Illinois law.  The standard for proof of causation where preexisting conditions are aggravated are the same for the Industrial Commission as it is at common law and the same to be applied by the Plan, i.e., was the workplace accident "a cause" of

the condition for which disability benefits are awarded?  Sisbro, Inc. v. Industrial Commission, 207 Ill.2d 193, 278 Ill. Dec. 70 (2003); Balestri v. Terminal Freight Co-op. Ass'n., 76 Ill.2d 451, 31 Ill. Dec. 189 (1979); Cerentano v. UMWA Health & Ret. Fund, 735 F.3d 976 (7th Cir. – 2013).

Having given no weight to the Workers' Compensation Commission's decision, Defendant instead cites a recitation from the Commission's review of testimony of Dr. Leventhal.  It is important to note that Dr. Leventhal was hired by Freeman United Coal Mining Company to examine Mr. Sharp and render opinions on behalf of Freeman United in defense of the workers' compensation case.  While not disputing the fact that Mr. Sharp had sustained an injury, Dr. Leventhal opined that the injury was temporary only (R 340).  Dr. Leventhal's opinion was clearly rejected by the Industrial Commission for a number of reasons, including that he was hired as an examining physician by the employer mine, and an employer's examining physician's opinions on causation issues are usually not privy to the weight of physicians who have seen and treated a patient, particularly those who have seen him over a number of years and for a period of time (Holmstrom, supra, p. 775).  Interestingly, the Social Security Administration and its ALJ have a similar approach when weighing medical evidence.  An ALJ is required to give more weight to a treating physician's opinions since treating physicians can give a truer longitudinal picture of the impairment and have a unique perspective that neither objective tests nor any examining physician can provide.  20 CFR §404.1527.

The Plan chose to follow a synopsis of a report from the employer's hired physician who concluded that the surgery of May 10, 2004 and the proposed surgery of Dr. Mack in February, 2005 was not related to the December accident even though the medical records show that Mr. Sharp was relatively pain free for a two-year period prior to the accident (R 352). The Plan chose to adopt the employer's hired physician's conclusions even though after the accident of December 16, 2003 Mr. Sharp had post-accident symptoms of unremitting pain and radicular symptoms through early 2005 (R 352). These undisputed facts belie any reasonable conclusion that the injury was temporary. Furthermore, Dr. Leventhal conceded that the May 10, 2004 surgery was reasonable and necessary. He ignored the persistent symptoms which led to the surgery of May, 2004 and were traceable to a particular time, place and incident of December 16, 2003 (R 351-352). The Defendant, in accepting the report of Dr. Leventhal over that of experienced and long-time treating physicians of Mr. Sharp and the Illinois Workers' Compensation Commission finding, is another indication of arbitrary and capricious actions (Holmstrom, supra, p. 773).

Defendant argues that they are justified in denying disability benefits because the SSDI determination of disability occurred some three years following the accident of December 2003. Taking this one bit of evidence as determinative of the outcome is to fail to look at the complete picture of what occurred during those three years.

It is clear that Mr. Sharp was in pain with extreme low back pain and radicular symptoms.  Not only were these complaints made almost immediately after returning to work in September, 2004 (R 104-105), but they were present still in February, 2005 when Dr. Mack examined the Plaintiff and felt he needed a repeat surgery along with a fusion for unremitting symptoms that had continued unabated since their onset on December 16, 2003 (R 144).  In point of fact, the complaints, notwithstanding the surgery in March of 2007, continued through 2009 when it was found that Plaintiff was taking potentially lethal dosages of pain medications upon being examined by Dr. Lange (R 70).

The cases that are cited by Defendant which rely on the time lapse between the accident and the SSA award are ones in which the Plaintiff has returned to work and worked without complaints for a significant period of time or there has been an intravening non-mine significant accident precipitating the filing for SSDI benefits. Osbourne, supra; this is clearly not the situation in Mr. Sharp's case.

Here, the unrebutted evidence is that Mr. Sharp has not done any manual labor of consequence after giving up his mine examiner position for a lower paying job at the mine in 2004 and, in fact, Mr. Sharp engaged in little manual labor prior to filing for SSDI benefits in 2007 (R 318-319).  Similarly, there is also no evidence of any intervening accident or accidents that could have played any part in the continuing and unremitting symptoms through 2009.  The fact that Mr. Sharp continued to try to work light duty, doing estimating jobs and supervising jobs for B-Sharp Electric should not be held against him.

Defendant's argument for greater weight on "objective" tests rather than "subjective" complaints made to both Dr. Chapa and Dr. Mack appears to be made with blinders.  This overlooks, of course, the fact that the practice of medicine is not based strictly upon test results, but involves judgment by a physician in listening to the patient's complaints and determining whether the complaints match up with the physical findings and the results of diagnostic tests.  This is the definition of "practicing medicine."  Doctors must rely on what the patient tells them and when there is a consistent set of complaints over several months and a consistent history, issues of causation are regularly decided on the combination of objective and subjective evidence, particularly with back injuries which are not always easy to diagnose strictly on test results.

To suggest that Mr. Sharp's complaints of pain are not a reliable basis to reach a conclusion of causal connection in this case by Dr. Mack and Dr. Chapa is truly inappropriate for a number of obvious reasons set forth in the record.  First, the Arbitrator and the panel of the Workers' Compensation Commission found Mr. Sharp credible when it determined that the accident aggravated his preexisting condition and necessitated the surgeries dated May 10, 2004 and March 23, 2007 and also awarded past and prospective medical treatment.  Secondly, the ALJ in the Social Security decision also found Mr. Sharp's testimony credible in determining that he was disabled (R 86) as did Dr. Lange in offering opinions detrimental to the company, Freeman United, who hired him, when he found a

normal Waddell testing (R 68) and consistency of complaints without malingering (R 70). Thirdly, the medical records are clear that Mr. Sharp has undergone unremitting pain in his low back and his right leg which began on December 16, 2003 and, based upon the record, stretched long past the point where he had been declared disabled by Social Security into 2009 when Dr. Lange noted that he was on potentially lethal doses of over-the-counter medications, necessitating the implantation of a pain stimulator to help control that pain. The pursuit of surgical intervention to try to control the pain (in Mr. Sharp's case, two back surgeries) and using heavy doses of medication to try to control pain, is evidence that raises the inference that the pain itself is disabling whether objective tests are available or not. Diaz v. Prudential Ins. Co. of America, 499 F.3d 640, 646 (7th Cir. – 2007).

Defendant also faults the testimony of Dr. Mack and Dr. Chapa for not using the phrase "substantially caused" in their causation opinions. This is simply not required to establish causal connection. The Defendant indiscriminately uses the term "substantially caused" out of context. Defendant is confusing the proof necessary to show a causal relationship between the onset of symptoms and the need for treatment where a preexisting condition is aggravated with any required proof for that condition being a substantial part of the disability found by the ALJ. This is illustrated by a number of the cases cited by the Defendant, which are inapplicable and easily distinguishable from the case before this Court. Cases cited by Defendant contain multiple reasons for the finding of disability, including a mine accident, but the mine accident did not result in lost time or any significant medical

treatment: consequently, the connection is not "substantial enough" to warrant a mine disability.   Bailey vs. UMW Health & Ret. Funds, 2014 U.S. Dist. LEXIS 107133; Osbourne v. Trustees of UMWA Health & Retirement Funds, 1992 U.S. App. LEXIS 1376.

Clearly, the preexisting arthritis and stenosis in Plaintiff's lower back played a part in his ultimate disability.  In the absence of any "disease" in his back, the accident of stepping in a hole and twisting his lower back may not have led to two surgeries followed by unremitting pain with radicular symptoms down the right leg.

From a medical standpoint, the evidence is overwhelming that the symptoms and resultant surgeries were caused, in part, by the accident of December, 2003.  Recovery of disability benefits for cases involving aggravation of a preexisting condition, by definition, accepts the premise that the individual is more prone to injury.  In this case, not only is the medical testimony through Dr. Mack and Dr. Chapa overwhelming, but added to that is the report from Dr. Lange. This evidence shows that the mine accident and its sequelae are a substantial factor in the SSDI disability award.

Mr. Sharp, after being found disabled by the Social Security Administration, continued to have unremitting pain and radicular symptoms and sought a pain stimulator implant to curb the pain.  Freeman United engaged the services of a different orthopedic surgeon, Dr. David Lange of St. Louis, Missouri, to exam Mr. Sharp.  As Freeman United's examining physician in the workers' compensation case, Dr. Lange found, based upon review of Mr. Sharp's medical records and his

own physical exam, that the December, 2003 accident had caused the need for the surgeries performed in 2004 and 2007; that Mr. Sharp's complaints were consistent and credible; that a test implant was reasonable and causally connected to the original accident of December, 2003 (R 67-70). The test implant was ultimately placed by Dr. Narla to control unremitting pain in 2009 (R 313-314).

Defendant claims that the neuropathy or "meralgia" in Plaintiff's thigh is not connected to the December, 2003 accident. While Plaintiff has already pointed out that the ALJ's designation of "neuralgia" as a cause of Mr. Sharp's disability could be referencing either the thigh complaint (meralgia) or the radicular symptoms, the Defendant properly recognizes that Dr. Trudeau's results from his nerve conduction studies indicate that the meralgia came on after Dr. Trudeau's initial study of February 6, 2007 (R 184). The Plan argues that by reason of the onset coming four years after the mine accident, it is reasonable to conclude that there could be no connection between the accident and the meralgia.

The unrebutted medical evidence in this case comes from Dr. Lange's report where he specifically states that while "indirectly" related to the December, 2003 accident, the meralgia is the result of the necessary operative positioning of Mr. Sharp during the surgery performed by Dr. Mack in March, 2007 (R 70).

While the Defendant label's Dr. Lange's opinion as "speculation", there is nothing in the record that supports that conclusion. Dr. Lange's opinion is clear and there is no contravailing medical testimony to refute it. Similarly, his opinion that the 2007 surgery was directly related to the December, 2003 accident is also

unrefuted.   Again, Dr. Lange was the orthopedic surgeon hired by the employer mine in 2009 to defend against a continuing workers' compensation claim.

Defendant suggests that Dr. Lange's opinions should be given no weight because they were not available to the ALJ at the time of the Social Security determination and decision.   The issue the Plan was presented was to decide whether the medical evidence presented by Plaintiff in this claim for mine disability benefits is supported by the medical evidence supplied by Plaintiff and not whether the ALJ had the evidence available to him in 2007.   The opinion by the employer's hired physician in a disputed workers' compensation case cannot be ignored.

Plaintiff submits that the arguments advanced by Defendant reflect a selective choosing of bits of evidence and a failure to look at the entire medical picture and a failure to consider aggravation of a preexisting condition as a proper basis for a disability determination under its own rules.   Plaintiff submits the Plan's Motion for Summary Judgment should be denied.

WILLIAM R. SHARP, Plaintiff,

By_____ /s/ Grady E. Holley_____
One of His Attorneys

## **CERTIFICATION**

Grady E. Holley hereby certifies that the Argument portion of this motion complies with the type volume limitation; it contains 4,210 words, 25,580 characters and 346 lines of text.

_____ /s/ Grady E. Holley_____

**GRADY E. HOLLEY (1247204)**
**HOLLEY, ROSEN & BEARD, LLC**
440 South Grand Avenue West
Springfield, Illinois 67204
217-544-3368

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2018, Plaintiff's Memorandum of Law in Response to Defendant's Motion for Summary Judgment was served via email to the attorneys of record in the above matter.

_____ /s/ Grady E. Holley _____

# *Exhibit No. 1*

DP-1 (81)

Subject:    DISABILITY PENSION; Mine Accident Definition, Disability Criteria,
            Determination of Total Disability

Reference:  (50P) II C; (74P) II C, II D

Question:

Does the mine worker meet the disability criteria for a Disability Pension in
the following cases?

(1) Mine worker suffered a herniated nucleus pulposus (slipped disc) in a top
    fall which occurred while he was performing classified service.  Shortly
    thereafter he strained his back shoveling gravel in his back yard.

(2) Mine worker lost one foot in a non-work related automobile accident,
    then lost the other in a mine accident.

Answer:

(1) Yes, if he meets the medical criteria for Social Security Disability Bene-
    fits.  Where a condition which resulted from a mine accident is aggravated
    or compounded by another condition which arises later and is not the direct
    result of a mine accident, and the two conditions, combined, result in a
    total disability, the mine worker will be considered "totally disabled as
    the result of a mine accident," if:

    (a)    the condition which resulted from a mine accident contributed
           substantially to the total disability;

    (b)    the condition which was not the result of a mine accident was a
           foreseeable or normal consequence of the condition which was the
           result of a mine accident; and

    (c)    the existence of the condition which resulted from a mine accident
           substantially increased the probability that the condition which
           did not result from a mine accident would occur.

(2) Yes.  If a condition or injury resulting from a mine accident aggravates
    or combines with a pre-existing condition or prior injury which did not
    result from a mine accident and the mine worker thereby becomes totally
    disabled, the mine worker is considered "totally disabled as the result
    of a mine accident."