E-FILED
Tuesday, 13 November, 2018  03:39:16 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| WILLIAM R. SHARP, | ) |
| | ) |
|         Plaintiff, | ) |
| | )    No. 3:18-cv-03056-SEM-TSH |
|    v. | ) |
| | ) |
| TRUSTEES OF THE UMWA 1974 PENSION | ) |
| TRUST, | ) |
| | ) |
|        Defendant. | ) |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO
SUMMARY JUDGEMENT MOTION OF PLAINTIFF**

**I.  Reply to Additional Material Facts**

**A.  Conceded To Be Material And Undisputed Facts:**

None.

**B.  Material But Disputed Facts.**

1.  Defendant's Paragraph No. 1:

Dr. Trudeau's report in February 2007 provided:

"We do suspect that…Mr. Sharp may have right L5 and right S1 radiculopathies on the basis of structural abnormalities both at L4/5 and L5/S1.  The patient has disc bulge at both L4/5 and L5/S1 levels, it was noted that there is possibly moderate spinal canal stenosis at L4/5, and we suspect that structural abnormalities at the L4/5 level may compromise both the right L5 and less so the right S1 nerve root.  (A.R. 157)."

**Response:  Plaintiff admits that the quoted language from R 156-157 is accurate but must be read in connection with the following paragraph which reads:**

> **"Therefore, it may be that both at the L4/5 and L5/1 levels there are structural factors which may contribute to compromise of right L5 and right S1 nerve roots, although this, of course, is theoretical speculation at this point."**

2.      Defendant's Paragraph No. 4:

The Trustees' denial included a detailed explanation for the appeal, providing, in part:

"…The neurologic exam [on December 19, 2003] was normal and Dr. Chapa returned him to work the following day.  Dr. Chapa diagnosed low back strain with a history of lumbar disc disease and rule out radiculopathy.  On January 5, 2004, an MRI of the lumbar spine revealed significant canal stenosis and foraminal stenosis at L4-5…[t]he [February 11, 2004] EMG revealed right L5 and S1 radiculopathy suggestive of degenerative disc disease, but no neuropathy.  On May 10, 2004, Dr. Van Fleet performed bilateral laminectomies at L3-4 and L4-5.  This surgical procedure, as described by Dr. Van Fleet, was intended to relieve the pain caused by degenerative spondyloradiculopathy.… In his operative report, Dr. Van Fleet made no reference to repairing an injury or removing a herniated or ruptured disc.  He stated he found evidence of age related stenosis and body overgrowth during the surgical procedure. On February 18, 2005, Mr. Sharp saw Dr. Mack for evaluation of back pain and leg pain and was diagnosed with degenerative disc disease with foraminal stenosis…After that visit, the records indicated that Mr. Sharp did not see Dr. Mack or any doctor for seven months. If stepping into a hole and twisting the back caused an acute and disabling injury, then it would be reasonable to expect immediate medical intervention with the diagnosis of a traumatic injury.  **It is reasonable to assume that Mr. Sharp suffered a temporary worsening of an existing degenerative spine condition when he strained his back on December 16, 2003, as opined by Dr. Leventhal**…Mr. Sharp suffered from disc disease and arthritis of the shoulders as early as the 1980s…It would have been helpful to have had the missing records…He returned to work in the mine after an injury in 1999.  In 2000, he was hospitalized for uncontrollable low back pain.  He suffered low back strain in 2003, and again he returned to work.  The nature of spinal disc disease is progressive

and despite treatment, it can worsen over time.  There can also be periods of reduced pain, as evidenced by gaps in Mr. Sharp's medical care…The medical records, in the file of evidence, clearly described an on-going, progressive and degenerative condition of the spine over a period of more than 20 years.  Mr. Sharp had a successful return to gainful employment after this injury.   After Mr. Sharp recovered from back surgery, Dr. Van Fleet returned him to full time, regular duty on June 25, 2004, although he did not return to work in the mine until September 7, 2004 due to a work suspension.   He continued to work in the mine until he was terminated on November 22, 2004…Mr. Sharp was a self-employed electrician from 1999 until March 21, 2007, the date he stated that he became disabled, almost four years after his mine accident.   He described his work as an electrician as heavy duty: lifting 50 or 100 pounds, carrying supplies and holding boxes up to house to be attached and operating machinery…**For these reasons, it would not be reasonable to conclude that the 2003 mine accident caused or significantly contributed to his total disability as defined by Social Security…** (A.R. 409-410)."

**Response:  Cited portions of the denial letter from the Plan's employee is material since it evidently was the basis of the Plan's denial of disability benefits.   The content of this paragraph is, however, disputed for the reasons set forth in Plaintiff's Motion for Summary Judgment and Plaintiff's Response to Defendant's Motion for Summary Judgment. Particularly, as it relates to these excerpts from the report of the Plan's employee, Plaintiff disputes the reading of Dr. Smucker's note and opinion which Dr. Smucker described as "suggesting possible discogenic/degenerative disk pain with history of exacerbation this past December".   Plaintiff further can find no reference to the lack of neuropathy in Dr. Smucker's report (R 365-366).**

**Plaintiff disputes that portion of the description of Dr. Van Fleet's operative report as suggesting that the pain was caused by "degenerative" conditions; the doctor shows that his indications for surgery relates to a "gentleman who has a history of lumbar spondyloradiculopathy who has failed to improve despite non-operative measures…"; Plaintiff finds no evidence to support the statement that Dr. Van Fleet**

stated "he found evidence of age-related stenosis and body overgrowth during the surgical procedure" (R 271-272).

Plaintiff admits that he saw Dr. Mack on February 18, 2005 with complaints of back pain and radicular symptoms into the right leg as reflected by Dr. Mack's notes and Dr. Mack reviewed an EMG performed by Dr. Mehra which showed "inflammation in the right with radicular symptoms" and an indication that a previous MRI in February, 2004 had also shown evidence of a right L5-1 radiculopathy (R 144).

Defendant disputes a conclusion of the Plan's employee that Plaintiff did not seek medical attention immediately.  The accident was followed by a visit to a family doctor within three days (R 93).
Plaintiff disputes the conclusion that he "returned to work" following a back strain in 2003.  The record reflects that he was released to return to restricted work but none was available so that upon return to work he did supervising only (R 341-342).  Plaintiff's return to his regular employment as a mine examiner lasted a week to 10 days at best before low back pain and radiating symptoms into the right leg prohibited regular duties (R 104-105).

Plaintiff disputes the conclusion reached by the Plan's employee in describing his work with B. Sharp Electric after his surgery of May, 2004.  Presumably, the conclusions reached by the Plan's employer are based upon the record (R 220-222).  The Social Security Administration provided forms which asked Mr. Sharp to list the jobs which he had done in the 15 years preceding stopping work (R 212-220). He then gave a general description of his work performed at Freeman United Coal Mining Company (R 221), followed by a description of work within the past 15 years at B. Sharp Electric which included as an electrician and as a supervisor. There is no delineation in the form of the time frame covered in the description of when he was acting as an electrician and when he was acting as a supervisor, the content of the form would cover the period of 1999 to the year 2007.  The conclusion that Mr. Sharp performed "heavy duty" during the time period after December 16, 2003 is without a factual basis, is pure speculation, constitutes a selective and totally

**erroneous conclusion of the actual facts which shows he acted only in a supervisor capacity after December 16, 2003 (R 318-319). It is also contrary to the medical evidence to assert or infer that the Plaintiff was able to perform heavy labor after the 2003 accident.**

**C.     Immaterial But Disputed Facts.**

1.     Defendant's Paragraph No. 2:

Plaintiff provided that his job at B. Sharp Electric required him to climb for 5 hours a day, and stoop for 2 hours a day. (A.R. 222).

**Response: This alleged fact is immaterial to any issue in this case since the document (which Plaintiff acknowledges was filled out by him) reflects a description of the nature of the labor performed by the Plaintiff at B. Sharp Electric during the period of 1999 to 2007, which is what the Social Security Administration requested in asking for the nature of the work he had performed during the last 15 years (R 220, 222). Following the injury of December 16, 2003, Plaintiff performed no heavy labor, but rather did supervisory work only for B. Sharp Electric (R 318-319).**

2.     Defendant's Paragraph No. 3:

In describing the lifting and carrying for his job at B. Sharp Electric, he stated, "carried supplies from truck to job site. Carried material from van to basement. Hold boxes up to be fasten to house or other structures." (A.R. 222).

**Response: This alleged fact is immaterial to any issue in this case since the document (which Plaintiff acknowledges was filled out by him) reflects a description of the nature of the labor performed by the Plaintiff at B. Sharp Electric during the period of 1999 to 2007, which is what the Social Security Administration requested in asking for the nature of the work he had performed during the last 15 years (R 220, 222). Following the injury of December 16, 2003, Plaintiff performed no heavy labor, but rather did supervisory work only for B. Sharp Electric (R 318-319). It is also contrary to**

the medical evidence to assert or infer that the Plaintiff was able to perform heavy labor after the 2003 accident.

**D.   Immaterial And Undisputed Facts:**

None.

## ARGUMENT

I.   **The Mine Accident Is A Cause Of The Disabling Condition As Found By The ALJ.**

The Plan cites McCoy v. Holland, 364 F.3d 166 (4th Cir. – 2004) as the closest analogous case to the one now before the Court.  Plaintiff submits the McCoy case is not even close to being analogous.  In McCoy, the Plaintiff had a mine accident in 1993 when he was hit on the head with falling rock and got medical treatment in the emergency room.  He took three days off work.  The only diagnosis was "muscle spasms".  There was then no further medical treatment of any kind until 1995, almost two years later.  During this time, the Plaintiff continued to work his regular job at the mine until he was laid off in 1994.  The claimant then worked as a carpenter for 16 months when he was forced to quit, primarily due to psychological problems.

Following the mine accident in 1993 with an emergency room visit, and then no medical treatment until August of 1995, there is also no evidence of any pain complaints until 1995.  Claimant ultimately received Social Security Disability for a primary problem of "affective disorder" along with a secondary diagnosis of

degenerative cervical and lumbar spine problems.   Somehow, the Defendant considers this as an analogous case.

In McCoy, the Court found justification for the Plan's finding of the lack of evidence that the 1993 accident was significant in relationship to the finding of disability.   A major factor was that the disability was primarily based upon the psychological "affective disorder".   Also, the only connection that the mine accident could have played was from pain that first surfaced in 1995 or thereafter according to the medical records.   This is not remotely comparable to this case where the primary reason for the finding by the ALJ of disability was the continuing pain and limitations brought about by two back surgeries which both treating doctors connected causally to the December 16, 2003 accident.   More significantly, unlike the fact pattern in McCoy, the unrebutted and unrefuted medical evidence in this case is that the Plaintiff saw his treating physicians, either Dr. Chapa or Dr. Mack, on a regular and continuous basis beginning December 19, 2003 through February, 2005 and saw Dr. Van Fleet, on referral for the initial surgery in May, 2004, until he was discharged in June, 2004, during which period he complained continually of pain in the back and radiating symptoms into the right leg.

Unlike McCoy, Plaintiff did not return to regular work but was on restricted duty until September 7, 2004 and was then only able to work for approximately a week before he was again disabled due to the continued low back and radiating right leg symptoms (R 104-105).   In McCoy, the Plaintiff did not seek medical

treatment for a two-year period after the accident that supposedly "caused" the disability.  Here, Mr. Sharp treated consistently through February 18, 2005 when his treating physician, Dr. Mack, was of the opinion that the ongoing and continuing symptoms warranted a repeat laminectomy and fusion of the lumbar spine (R 104-105, 106, 274, 107-108, 100, 110, 111, 169, 144, 170, 144).  The Plan's conclusion that Mr. Sharp continued to perform heavy lifting type work after he left the mine is simply not supported by the record.  Mr. Sharp testified, under oath in the workers' compensation proceeding, that any work that he performed for B. Sharp Electric following his back injury of December, 2003 was supervisory only (R 326-327, 318-319, 345).  The Plan does not dispute Mr. Sharp's testimony given on either occasion.

The Plan also argues that Plaintiff made no complaints of back pain or extremity pain for one and a half years between September 24, 2005 and January, 2007, inferring for the first time that the lack of complaints to a medical provider equates to the lack of significant pain and discomfort (Brief p. 10).

This argument is contrary to the Plan-employee's initial report that found during this same period that "he continued to report back pain and radiating pain down the right leg" (R 249).  This type of post hoc rationale, contrary to the initial review decision and not raised in the final appeal decision, is not proper at this stage of the proceeding where Plaintiff is not able to provide additional evidence to refute the arguments.  King v. Hartford Life and Accident Ins. Co., 414 F.3d 1994,

994 (8th Cir. 2005).  It also defies common sense to suggest that Mr. Sharp didn't have pain and discomfort and was able to engage in heavy labor, given the condition of his low back.

Plaintiff's second analogous decision is <u>Pacconi v. Trs. of the UMW Health & Ret. Fund of 1974</u>, No. 02:05CV1488, 2006 U.S. Dist. LEXIS 77997 (W. Pa. 2006). The Plaintiff in <u>Paconi</u> worked in the mines for 30 years between 1970 and 2000 and filed for a disability pension in June, 2003.  He submitted evidence of nine injuries during the course of his career.  The most significant time off for one of the injuries was a four-month period of being unable to work in the mine in 1993.  Five separate accidents that occurred from 1995 through 1997 resulted in no time off from work.

Pacconi continued to work until he had ankle surgery in May of 1998, and a second surgery in 1999 but he returned to his regular work.  After being laid off in 2000, he was involved in a rear-end motor vehicle accident on August 26, 2001 when struck from the rear at approximately 60 miles per hour, suffering a whiplash injury.  His SSA disability date corresponded with the MVA date of August 26, 2001. His principal problem, i.e., a herniated disc at the C3-4 and C4-5 levels was found by the ALJ attributable to the motor vehicle accident of 2001.  Mr. Pacconi had a number of other conditions including carpal tunnel, right elbow pain, a left biceps tear and foot problems, which had no medical evidence linking these conditions to a mine accident.  Again, this is not remotely analogous to the facts in this case

where the primary disabling condition is clearly the condition of the low back secondary to two surgeries which three medical providers found were caused by a mine accident, directly or indirectly. Here, three physicians (Chapa, Mack and Lange) found causal connection between the mine accident and the disabling condition (R 380, 373, 70). By contrast, in <u>Pacconi</u>, the bulk of the disabling conditions under the SSA decision had no medical evidence to connect the conditions to any mine accident.

Plaintiff believes there are two cases that are indeed analogous to his case. These two cases also address two legal issues raised by Defendant.

In <u>Boyd v. Trustees of United Mine Workers' Health & Retirement Funds</u>, 873 F.2d 57 (4th Cir. – 1989), Plaintiff Boyd was employed in the mine industry between 1979 and 1983. On July 30, 1982, Ms. Boyd suffered a cervical strain when a timber fell on her right shoulder and the accident was sufficiently severe to keep her off work until September, 1982. Thereafter, Ms. Boyd was off work for various periods of time with continuing and ongoing complaints of pain in the neck and shoulder until she stopped work in September, 1983 because of persisting pain in her neck, right shoulder and right arm. After undergoing treatment for pain complaints during 1984, Ms. Boyd filed for Social Security Disability and was awarded benefits in August, 1985 even though the tests had failed to disclose any objective evidence of a long-term injury. The ALJ found severe mental impairment precluded Ms. Boyd from performing any type of work.

The Plan's defense to a subsequent disability pension application was lack of proof of causation.  In defining the causation issue, the <u>Boyd</u> Court pointed out that causation is established:

> "...if the Plaintiff was injured in a mine accident and that injury, whether in combination with a previous or subsequent condition, is substantially responsible for Plaintiff's inability to perform his job and for whatever medical and vocational reasons he is unable to perform an alternate job, then his total disability results from a mine accident." (<u>Boyd</u>, 59)

In <u>Boyd</u>, the fact that the Plaintiff suffered from a cognitive dysfunction (an actual organic brain syndrome) from a 1979 car accident did not preclude a finding of causation because the ALJ's decision included not only a cognitive dysfunction but also an emotional impairment aspect to the disability (depression and anxiety symptoms) which were supported by the evidence as related to the July 30, 1982 accident.  This was true even though there was evidence of emotional instability which predated the mine accident.

The <u>Boyd</u> Court, citing from an earlier decision of <u>Robertson v. Connors</u>, 848 F.2d 472 (4th Cir. 1988), held that if someone suffered from a comparatively minor neck injury and there is evidence that after the mine accident persistently complained of debilitating pain, and where the preexisting condition had not prevented her from working, was determinative of the issue of causation since the accident was by definition a "substantial" cause of the Social Security disability determination.

As previously pointed out, the injury to Mr. Sharp and sequalae of the mine accident that led to two low back surgeries is the sole significant reason found by the ALJ for his disability.  Boyd represents a classic case recognizing the right to a disability benefit based upon the aggravation of a preexisting condition as well as illustrating the meaning of "substantial" in relation to the ALJ's disability determination.

The second decision of note is <u>Lester v. UMW Health & Retirement Fund</u>, 40 F.Supp.2d 800 (S.D. WV – 1999) in which Mr. Lester suffered two injuries, one in 1986 when the canopy from a mine buggy struck him on the right side of the neck leading to an emergency room visit and a second accident in 1987 when a timber fell on Mr. Lester injuring his neck, back and arm from which he missed one week of work.  Following these two accidents, Mr. Lester continued working in the mines until 1991 when he ceased employment and began seeing a string of doctors who eventually diagnosed him with degenerative changes in the cervical spine as a possible cause of his pain complaints.  While there were differing medical opinions as to the cause of the pain, Plaintiff ultimately did have surgery to the neck in April, 1997.

Mr. Lester originally filed for Social Security Disability in 1992 and it was denied through an appeal to the U.S. District Court.  After reapplying for Social Security benefits, an ALJ found Mr. Lester disabled due to cervical sprain with chronic pain syndrome along with major depression and anxiety disorders with a

disability date of August 13, 1994, more than three years after his last mine employment.

In reversing a decision by the Plan denying a disability pension, the Court held that the Plan was not free to totally discount unrebutted medical testimony (two doctors who attributed the accidents of 1986 and 1987 as a causative factor to the degenerative cervical condition) on the basis of a lapse of time between the date of the accidents and the date of the disability determination of August 13, 1994, some seven years after the accident and the disability determination and six years after leaving mine employment.

Like the Court in Boyd, the Lester Court looked at the continuity of the pain complaints along with the continued efforts to see doctors for complaints of neck pain.

The Court also dealt with Q & A 252 which was relied upon by the Plan to deny disability benefits due to the presence in the medical records of references to degenerative disk disease existing prior to 1994. The Court in Lester points out that Q & A 252 is not applicable under facts similar to those now before the Court, recognizing that where there is a trauma resulting from a mine accident and the medical evidence shows that the Plaintiff suffered an injury that worsened over time after the initial trauma is totally different from a situation where there is gradual development of a degenerative condition not triggered by a mine accident trauma (Lester, 809).

Plaintiff has clearly shown that the accident of December 16, 2003 was a cause of the symptomology leading to two surgeries and that his lower back condition arising from the aggravation of the preexisting condition was a substantial factor in the ALJ's determination of disability.

II.     **No Substantial Evidence Exists To Support The Trustees Decision To Deny Disability Benefits.**

The Plan complains that the Plaintiff did not submit any original medical records predating his accident of December 16, 2003.  This is a red-herring since the Plan never requested the original medical records which it now complains of not seeing.

As the record clearly reflects, whenever the Plan asked Plaintiff for records which it felt would be helpful, Plaintiff promptly supplied those records, including the accident report for December 16, 2003 (R 7, 115).  Also, following the initial Plan denial letter dated July 19, 2006 (R 329-338), Plaintiff promptly provided the Plan with certain medical records to assist the Plan, including the operative report of Dr. Van Fleet, the MRI of January 5, 2004, and Dr. Smucker's EMG of February 11, 2004 (R 315, 360, 363, 365).  Plaintiff also provided, at the Plan's request, an authorization to obtain all of the records from the Social Security Administration (R 92).  It is unfair of the Plan to make this argument when Plaintiff clearly indicated a willingness to submit whatever documents the Plan desired (R 115).

The Plan then cites secondary references supplied by Plaintiff (referencing a synopsis of Dr. Chapa's deposition testimony in a decision of the Workers'

Compensation Commission) (R399) to support an argument that Plaintiff had pre-accident right leg radiculopathy.   The Plan totally ignores the same secondary material, however, where the synopsis makes it clear that the problems arising from the 1999 incident (which had totally cleared up by 2001) was in the <u>left</u> leg (R 335).

The Plan also cites Dr. Trudeau's report of February, 2007.   This report followed nerve conduction studies done approximately one month before Mr. Sharp underwent his second back surgery by Dr. Mack on March 21, 2007.  In discussing possible reasons for the ongoing radicular findings in the right leg, the Plan quotes a portion of Dr. Trudeau's opinions but then omits the next sentence of the paragraph where Dr. Trudeau has talked about "structural abnormalities" which states:

> "<u>Theoretically</u>, as well the patient may have structural abnormality at L5/S1 compromising the right S1 root." (emphasis supplied) (R 157)

and the Plan reluctantly leaves out the next full paragraph of the same report which states:

> "Therefore, it may be that both at the L4/5 and L5/1 levels there are structural factors which may contribute to compromise of right L5 and right S1 nerve root, although this of course is <u>theoretical speculation</u> at this point." (emphasis supplied R 157)

This is now what supports the Plan's denial of disability benefits: "theoretical speculation".

This would be bad enough except that the Plan conveniently ignores Dr.

Trudeau's subsequent report from November, 2007 (after Dr. Mack has performed

the second surgery) in which Dr. Trudeau states in much more definitive terms:

> "Dr. Mack was kind enough, of course, to send along a copy of the operative note of 03/21/2007 and it was noted that in the course of the operative intervention, "considerable scar formation was encountered...marked thickening was present in the lateral recess on the right...the L5 and S1 nerve roots freed up.
>
> Therefore, this pleasant gentleman did have significant scar tissue and anatomical compromise, particularly of the right L5 nerve root, we would surmise, and therefore maybe, of course, granulation tissue formation either intramurally, extramurally or both and therefore Mr. Sharp has likely, on this basis, a persistent or residual right L5 radiculopathy." (R 182)

The Plan is clearly aware of the November 2007 report of Dr. Trudeau,

quoting it in an argument that Plaintiff's attorney cannot follow.  What's most

telling, however, about the quote (Defendant's response, p. 16) is that the quote is

totally inaccurate.  Dr. Trudeau does not state that the radiculopathy is "chronic";

he quite clearly says:

> "Right L5 radiculopathy, old or chronic <u>as well as acute features, likely persistent residual lesion and not unusual given time frame since previous (EMG) studies of 02-06-2007 and operative intervention of 03-21-2007 – please note above discussion</u>." (emphasis supplied) (R 184)

How what Dr. Trudeau said supports an argument that the problem is from a progressive degenerative condition is hard to understand given Dr. Trudeau's own statements attributing the radiculopathy to scar tissue.

The Plan continues to prefer reading excerpts from a synopsis of the testimony of Dr. Mack (R 347) rather than going to the original medical document. Looking at Dr. Smucker's EMG report of February 11, 2004 (R 365-366), Dr. Smucker, in the portion of the report reflecting electrodiagnostic findings, found prolongations on the right side as compared to the left, suggesting a radicular component. A needle EMG testing revealed right-sided spontaneous activity as well as some increased polyphasicity in a particular muscle, the right biceps femoris long head. He then distinguished the two findings, opining that the former finding was consistent with an acute denervation while the latter, i.e., the muscle over the front of the thigh was suggestive of a more longstanding component (R 365). Again, we have a selective misreading of a synopsis which is incomplete and ignores the original document that contains the doctor's opinions.

III. **The Social Security Disability Onset Date And The Plaintiff's Ability To Perform Supervisory Work After The Mine Accident Does Not Support The Trustees Decision.**

The Plaintiff must comment on the insertion by the Plan of arguments relating to Plaintiff's discharge from employment with Freeman United Coal Mining Company, citing a labor arbitrator's decision to suspend and then terminate Mr. Sharp. The Defendant has cited, from the workers' compensation decision, a labor

arbitrator in the discharge case for no reason other than to prejudice the Plaintiff, since the termination issues have no relevance to any issue in this case.  Plaintiff finds it interesting that the Plan is willing to give credence to the recitation of some of the videotapes regarding a discharge issue by a workers' compensation commissioner whose opinion it has otherwise ignored and in fact refuses to give any credence on the issues relevant to this case (Brief Response, pp. 18-19).  The tapes are not part of the administrative record, but the Workers' Compensation Commission's opinion of those tapes is contained in the record but conveniently ignored by the Plan.  As the arbitrator characterized the videos, they show:

> "The videotapes are not continuous, but reflect snippets of time in which the Petitioner is observed driving a vehicle and performing normal daily functions…there is no indication in the tape that any physical work was performed of a strenuous nature…there is no indication that he is doing any repetitive bending or lifting of heavy objects." (R 326-327)

The arbitrator who actually saw the tapes describes their content and give them no credence.

The Plan again asserts that surgery performed on March 21, 2007 is three years removed from the accident and that the SSA disability award is also over three years from the mine accident.  The timing is not determinative under the facts in this case (Lester, supra).

IV.    **The Plan's Review Of The Evidence Has Been Selective.**

Plaintiff relies upon its response brief as well as the obvious selective reading of the record as pointed out in this reply brief.  Plaintiff does stand by his argument that the Plan simply ignored the opinions of Dr. Chapa, Dr. Mack and Dr. Lange.

It is true that the Plan's decision goes through each medical record citing portions for each doctor visit but a review of the lengthy quote from the final decision of the Plan's employee in the response brief (pp. 20-21) fails to contain any reference to or negation of an injury resulting in low back surgeries as a result of aggravation of a preexisting condition; Plaintiff is unable to find anywhere in the denial letter the term "aggravation" or the term "preexisting condition".

Nor can Plaintiff find in the final report of the Plan's employee any discussion of a reason to reject the opinion testimony of Dr. Mack, Dr. Chapa or of the examining physician, Dr. Lange.  While Plaintiff agrees that the decision of the Supreme Court in Black and Decker Disability Plan v. Nord, 538 U.S. 822 (2003), held that a plan administrator is not required to give special deference to a treating physician's opinion as would be required within a context of a Social Security hearing, nonetheless the Court in Black and Decker recognized that a plan administrator may not arbitrarily refuse to credit a claimant's reliable medical evidence. Black and Decker Disability Plan, p. 834.

Rather than rely upon reliable medical evidence, the Plan returns again to the description of portions of Dr. Leventhal's testimony contained within the Workers' Compensation arbitrator and Industrial Commission opinions.  Plaintiff has already addressed several reasons why, the opinion from the first physician hired by the employer, Dr. Leventhal, was found to be unreliable by the Illinois Workers' Compensation Commission.  Perhaps the most telling fact showing Dr. Leventhal's unreliability lies in the decision by the employer to jettison Dr. Leventhal when confronted with a claim to pay for a pain stimulator for Mr. Sharp.  Instead of seeking another opinion from Dr. Leventhal, the employer hired another orthopedic physician, Dr. Lange, to address issues in the workers' compensation claim.

What is clear is that Dr. Leventhal agreed that Mr. Sharp's accident of December 16, 2003 could indeed result in making Plaintiff's preexisting conditions of spinal stenosis and foraminal stenosis symptomatic and that the degenerative conditions in fact would make him more prone to injury from a trauma than a person without degenerative changes (R 336).  He likewise acknowledged that, prior to the surgery by Dr. Van Fleet of May, 2004, conservative treatment, including multiple epidural steroid injections, may not have caused Mr. Sharp's symptomatic condition to improve and that the surgery performed by Dr. Van Fleet was indicated and that he would defer to the treating physician to perform the surgery due to the continued pain complaints (R 336).

The Plan has offered no rational reason to ignore the testimony of an orthopedic physician who as the Plan points out has been treating the Plaintiff for various injuries since 1980; ignored the testimony of the long-time family physician, Dr. Chapa; ignored the opinions of Dr. David Lange, an orthopedic physician employed by Freeman United to defend Plaintiff's claim, and discounted the findings and opinions of the Illinois Workers' Compensation Commission who weighed the evidence of Plaintiff's injury cause.

## **CONCLUSION**

Plaintiff prays that the Court reverse the decision of the Plan and direct that calculations be made for the amount due for disability pension benefits from March 21, 2007 to the present and for such other and further equitable relief as the Court deems fit.

WILLIAM R. SHARP, Plaintiff,

By_____ /s/ Grady E. Holley_____
One of His Attorneys

**GRADY E. HOLLEY (1247204)**
**HOLLEY, ROSEN & BEARD, LLC**
440 South Grand Avenue West
Springfield, Illinois 67204
217-544-3368

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2018, the foregoing was filed electronically with the court and served via the ECF filing system to all participating parties.

_____/s/ Grady E. Holley_____