## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **WILLIAM R. SHARP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-cv-03056** |
| | ) | |
| **TRUSTEES OF THE UMWA 1974** | ) | |
| **PENSION TRUST,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>OPINION</u>

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before the Court are Defendants' Motion for Summary Judgment (d/e 19) and Plaintiff's Motion for Summary Judgment (d/e 21). For the reasons set forth below, Plaintiff's summary judgment motion is GRANTED. Accordingly, Defendants' summary judgment motion is DENIED.

## I. INTRODUCTION

On March 23, 2018, Plaintiff William R. Sharp filed a Complaint against the United Mine Workers of America Health and Retirement Funds. On August 3, 2018, Plaintiff, with leave of Court, filed an Amended Complaint against Defendants, Trustees of

the UMWA 1974 Pension Trust. Plaintiff's Amended Complaint, pursuant to provisions of the Employee Retirement Income Security Act (ERISA), requests an award of pension disability benefits under the United Mine Workers of America 1974 Pension Plan (Pension Plan), prejudgment interest, costs, and attorney's fees.

Both parties now move for summary judgment. The material facts are undisputed.[1] Plaintiff claims that the undisputed material facts establish that he is entitled to pension disability benefits under the Pension Plan. In contrast, Defendants assert that the undisputed material facts establish that Defendants' decision to deny Plaintiff pension disability benefits was not arbitrary or capricious and must be affirmed.

---

[1] Plaintiff failed to respond to the facts asserted in paragraphs 23, 37, 83, and 110 of Defendants' Motion for Summary Judgment. Accordingly, the Court treats these facts as admitted by Plaintiff. See CDIL-LR 7.1(D)(2)(b)(6) ("A failure to respond to any numbered fact will be deemed an admission of the fact."). Plaintiff claims that paragraphs 116 through 119 of Defendant's summary judgment motion contain disputed material facts. Response (d/e 24), at 18-24. These paragraphs merely assert that a document explaining Defendants' decision to deny Plaintiff disability benefits contains certain statements. Plaintiff disagrees with the statements but does not dispute that they are located in the document. The same can be said with respect to Plaintiff's disputes as to additional facts put forth by Defendants in response to Plaintiff's summary judgment motion. See Reply (d/e 26), at 1-6. Lastly, despite Plaintiff's claim that facts asserted in paragraphs 41, 93, and 111 of Defendant's summary judgment motion are disputed, the Court cannot discern any dispute that Plaintiff has with the facts asserted in those paragraphs.

## II. JURISDICTION AND VENUE

The Court has subject matter jurisdiction over Plaintiff's claim for pension disability benefits because that claim is brought under 29 U.S.C. § 1132(a)(1)(B).  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

Because a substantial part of the events giving rise to Plaintiff's claim occurred in the Central District of Illinois, this district is a proper venue for Plaintiff's claim.  See 28 U.S.C. § 1391(b)(2) (stating that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").

## III. FACTS

Since the 1980s, Plaintiff has been evaluated for "numerous problems including his low back."  R. 346.[2]  Plaintiff had chronic low back pain complaints prior to December 16, 2003.  Id.  In testimony provided in connection with a workers' compensation claim, Plaintiff stated that he had low back pain and left-leg

---

[2] In this Opinion, the Court uses "R." followed by a number (or numbers) to cite to the Administrative Record (d/e 18).

numbness prior to December 16, 2003 and that he filed a previous workers' compensation claim after an accident in October 1999 involving his low back.  R. 352-53.

In 1999, Plaintiff had radiculopathy and, possibly, a lumbar disk rupture.  R. 349.  Vittal Chapa, M.D., ordered a lumbar MRI. Id.  Plaintiff underwent an MRI in November 1999.  R. 355.  The MRI results, when compared to the results of an MRI conducted in June 1997, noted a significant change at the L2-3 and L4-5 levels. Id.  At L3-4, Plaintiff had developed a posterolateral herniation of the disk with encroachment upon the L3 nerve root.  Id.  On January 19, 2000, Plaintiff underwent a CT myelogram, which showed a diffuse disk bulge at L3-4 with bilateral inferior foraminal stenosis.  Id.

In 2000, Dr. Chapa diagnosed Plaintiff with lumbar disk radiculopathy, and Plaintiff was admitted to the hospital for intractable low back pain.  R. 349.  An MRI from September 2000 showed a diffuse bulging of the disk at L3-4.  R. 69.  On October 17, 2000, Dr. Chapa diagnosed Plaintiff with chronic low back pain and lumbar disk disease.  R. 349.  On July 21, 2003, Dr. Chapa

noted Plaintiff's history of chronic back pain and osteoarthritis. R. 352.

Plaintiff was employed by Freeman United Coal Mining Company (Freeman), a signatory company to the Pension Plan, which was administered by Defendants. On December 17, 2003, Freeman completed an accident report stating that Plaintiff had stepped in a hole and twisted his back, resulting in a sprain. R. 116.

Two days later, Dr. Chapa met with Plaintiff, who reported that he had stepped in a hole and twisted his back and was experiencing pain in his low back that radiated down his right leg. R. 93. Plaintiff also reported that his pain was somewhat better than it had been two days prior and that he was experiencing some intermittent numbness in his right leg. Id. Dr. Chapa found that Plaintiff had a "positive straight leg raising test on both sides at 70 degrees." Id. Dr. Chapa's impression was "[l]umbosacral sprain," "[r]ule out lumbar radiculopathy," and "[p]revious history of lumbar disk disease." Id. Dr. Chapa noted that Plaintiff could return to restricted work not involving physical activity on December 20, 2003. R. 93-94.

On December 23, 2003, Dr. Chapa again saw Plaintiff, who reported that his pain was still present and that he was experiencing numbness radiating down his right leg.  R. 95. Plaintiff also reported that he was back at work but not doing any bending, lifting, or stooping.  Id.  Dr. Chapa found that Plaintiff had a "positive straight leg raising test on the right at 70 degrees" and mild paravertebral muscle spasms.  Id.  Dr. Chapa's impression was "[l]umbar disk with radiculopathy," and he ordered an MRI of the lumbar spine.  Id.

On January 5, 2004, Plaintiff underwent an MRI of his lumbar spine.  R. 363.  The findings were as follows: (1) "mild degenerative change without significant canal or foraminal stenosis" at the L1-2 and L2-3 interspaces; (2) "mild degenerative change without significant canal or foraminal stenosis" at L3-4; (3) "moderate canal and bilateral foraminal stenosis secondary to a combination of disk bulge, ligamentous hypertrophy and facet arthropathy" at L4-5; (4) "minimal degenerative change in the disc with small central disc bulge" and "[n]o significant canal or foraminal stenosis" at L5-S1; and (5) "a rudimentary disc at S1-S2."  Id.  The MRI findings were summarized as follows: "Significant canal and foraminal stenosis at

L4-5. Very small disc at S1-2." Id. During a deposition, David W. Mack, M.D., an orthopedic surgeon who treated Plaintiff, "opined that all the things seen on the [January 5, 2004,] MRI were present prior to the December 16, 2003 accident and were present and growing for years." R. 346-47, 368.

On January 12, 2004, Plaintiff saw Dr. Chapa and reported significant back pain that required Plaintiff to lay with a heating pad for two hours after work. R. 96. Dr. Chapa, whose impression was "[s]pinal stenosis," planned to refer Plaintiff to Dr. Mack. Id. Dr. Chapa advised that Plaintiff should not bend, stoop, lift over 20 pounds, or ride on rough equipment. R. 97.

On January 20, 2004, Plaintiff visited Dr. Mack and reported back pain that went into his legs and "a long history of difficulty with his back." R. 342, 368. However, Plaintiff felt that his back was doing "fairly well" until he stepped in a hole and twisted his back in December 2003. R. 368. Dr. Mack diagnosed "degenerative disc at L3-4 and L4 nerve root irritation" involving the lower legs and thighs. R. 343. Ten days later, Dr. Mack diagnosed "degenerative disc with lumbar spinal stenosis and foraminal

stenosis." Id.  On January 28, 2004, a return-to-work slip

diagnosed Plaintiff with a lumbar strain.  Id.

On February 11, 2004, Plaintiff was seen by Paul A. Smucker,

M.D., who performed electromyography (EMG) testing on Plaintiff.

R. 268.  Plaintiff reported "longstanding pain in his low back, with

an exacerbation this past December when he stepped into a hole," a

"sharp pain radiating into his right leg" when he stepped into the

hole, a history of "episodic back problems," and a "tendency to

experience numbness and tingling" in his thighs and legs.  Id.

Plaintiff also reported that his low back pain was more problematic

than his "lower extremity symptoms."  Id.

Dr. Smucker's conclusions were "[m]ild right L5 and S1

radiculopathy" with no "electrodiagnostic evidence of definable

radiculopathy on the left" and "[n]o electrophysiological evidence of

diffuse peripheral neuropathy."  R. 269.  Dr. Smucker's impression

was "[l]ow back pain, suggesting possible discogenic/degenerative

disc pain, with history of exacerbation this past December."  Id.

On February 19, 2004, Plaintiff saw Dr. Chapa, who noted

that Plaintiff was performing restricted work and reporting back

pain.  R. 99.  Dr. Chapa's impression was "[l]umbar disc with radiculopathy."  Id.

On March 19, 2004, Plaintiff informed Dr. Mack that Plaintiff's pain was worse on the left.  R. 344.  Dr. Mack diagnosed "spinal stenosis L4-5 with radicular pain."  Id.  Three days later, Plaintiff was seen by Dr. Chapa, who noted that Plaintiff was seeing Dr. Mack for his back pain and had received epidural injections.  R. 100.  Dr. Chapa's impression was "[l]umbar disc with back pain." Id.

On April 7, 2004, Plaintiff visited Dr. Mack.  R. 344.  At this visit, according to an August 2007 decision by the Illinois Workers' Compensation Commission (Commission), Plaintiff complained of low back pain that went into the left hip and, according to Dr. Mack, voiced a desire to "have something done" because Plaintiff's level of activity had markedly decreased.  R. 340, 344, 358. According to the Commission decision, Dr. Mack diagnosed L4-5 spinal stenosis with radicular pain and "degenerative changes with foraminal stenosis" and felt that Plaintiff needed "a bilateral decompression and possibly a posterolateral fusion."  R. 344.

The same Commission decision also summarized a report by Timothy Van Fleet, M.D., to Dr. Mack on April 23, 2004, as follows:

> [Plaintiff] was seen this day and reported he had been experiencing low back pain and lower extremity pain for some time. Dr. Van Fleet noted that he had previously worked [Plaintiff] up with a discogram which demonstrated 3 positive disc spaces and opined that [Plaintiff] would not do well with a spinal fusion. Dr. Van Fleet recommended bilateral laminectomies at L3-4 and L4-5. He opined [Plaintiff] should be able to return to work after the surgery.

R. 344.

Plaintiff underwent a preoperative examination by Dr. Chapa on May 2, 2004. R. 101-03. Dr. Chapa noted that Plaintiff had a history of chronic back pain and lumbar disk disease. R. 101. Dr. Chapa's impression included spinal stenosis. Id.

On May 10, 2004, Plaintiff underwent L3-4 and L4-5 bilateral laminectomies performed by Dr. Van Fleet. R. 271-72. Plaintiff's preoperative diagnosis was lumbar radiculopathy. R. 271. Dr. Van Fleet noted that Plaintiff "has a history of lumbar spondyloradiculopathy" and "has failed to improve despite nonoperative measures." Id. The Commission's August 2007 decision noted that Dr. Mack testified that Dr. Van Fleet "did not remove any disc material" during Plaintiff's surgery but did remove

"degenerative bony growth that had been occurring for a number of years and some degenerative ligamentum flavum." R. 347.

On May 26, 2004, Plaintiff was doing well, and the pain in his legs had improved. R. 347. On June 23, 2004, Plaintiff reported to Dr. Van Fleet that Plaintiff had no "significant difficulties other than occasional burning into the leg." Id. On June 25, 2004, Dr. Van Fleet released Plaintiff from care in good condition to return to full duty. R. 326-27, 344.

On August 4, 2004, Plaintiff reported that his back felt better but that he had occasional numbness in his right leg. R. 347. Due to a work suspension, Plaintiff did not return to work until September 7, 2004. R. 327, 345.

During a deposition conducted on September 9, 2004, Dr. Mack was asked whether Plaintiff's accident on December 16, 2003, was a cause, by way of aggravation, of the condition for which Dr. Mack treated Plaintiff and Plaintiff's May 10, 2004 surgery. R. 373. Dr. Mack responded as follows:

> Yes. What he gives is pretty much classic history. They will have the degenerative changes. They will have the narrowing, the foraminal stenosis, do fairly well, come and go, and then all of the [sic] sudden he will get into some accident, and then we get him in here.

Probably about half of the time you can bail them out with a combination of shots, medicine, epidurals. Then a small percentage will go on just like him, and everything you do is not fruitful. So, consequently you wind up doing surgery. Surgery usually, fortunately you get them back going, and they do pretty well now. When you do foraminotomies, the down side of it is if he gets back into mining, he could do well for three, five, seven, ten years, and then it is gradually going to fill in again.

Id. Dr. Mack also stated that Plaintiff would return to work and "probably do well for a while." R. 375.

The decision issued in August 2007 by the Commission described a portion of Dr. Mack's deposition testimony as follows:

Dr. Mack opined that [Plaintiff's] foraminal stenosis is a result of degenerative disease. Dr. Mack did not know if [Plaintiff] ever made radicular complaints in his legs prior to December 16, 2003, but that could be consistent with his problem. The results noted in the EMG would have been a nerve problem prior to December 16, 2003. There were no left leg findings on the February 27, 2004 EMG. Facet hypertrophy is essentially an enlargement of the joints which occur secondary to the degenerative process and most people think of this as arthritis.

Dr. Mack testified that when he was reviewing [Plaintiff's] records for this deposition, he discovered that [Plaintiff] had prior low back injuries. He noted that [Plaintiff] had a long history of low back treatment. Prior tests such as MRIs had shown [Plaintiff] had bulging discs and worsening of the condition.

* * *

Dr. Mack opined that all the MRI findings and other tests in 2004 could be the result of prior low back injuries. Dr. Mack opined that degenerative conditions in the low back are generally progressive in nature. He opined that [Plaintiff's] condition has been progressive, but was not necessarily unusually progressive. He opined that facet arthropathy can get worse over time and [Plaintiff] has this.

R. 347 (citations omitted).

On September 16, 2004, Plaintiff informed Dr. Chapa that Plaintiff had back pain that had started a few weeks prior and was radiating to the right leg. R. 105. Plaintiff stated that his pain was worse than before the surgery. Id. Dr. Chapa found that Plaintiff had a "positive straight leg raising test on [the] right side at 60 degrees," which could have indicated a pinched nerve in Plaintiff's back. R. 105, 378. Dr. Chapa's impression was persistent radicular symptoms post lumbar disk surgery. R. 105. According to Dr. Chapa, Plaintiff did not link his renewed back pain to a "worsening or new onset at work." R. 349. Plaintiff indicated that, after the appointment with Dr. Chapa on September 16, 2004, that Plaintiff "'bid off' the mine examiner job, took a reduction in pay, and began performing duties as a general laborer on the midnight shift." R. 327.

During a follow-up visit with Dr. Chapa on September 30, 2004, Plaintiff reported significant pain in his right thigh radiating down from his back and stated that his back surgery "did not help him very much." R. 106. Dr. Chapa noted that Plaintiff was known to have lumbar disk disease, ordered an MRI of the lumbar spine, and referred Plaintiff for an EMG. Id. Dr. Chapa's impression was lumbar radiculopathy with persistent pain post lumbar surgery. Id.

With respect to the MRI conducted on October 12, 2004, the August 2007 Commission decision noted the following:

> Dr. Chapa testified that the lumbar MRI . . . showed mild diffuse disc bulge at L4-5. Dr. Chapa opined that diffuse is usually a degenerative finding as opposed to a focal bulge, which can be traumatic. The radiologist who interpreted the . . . MRI found no disc herniation or significant central canal stenosis at L4-5. The foamina [sic] was [sic] not narrowed and was [sic] still open and there was room for the nerve roots to exit and there was no nerve root impingement. The prior stenosis seen on the earlier MRI had been relieved by surgery.

R. 350 (citations omitted).

On October 27, 2004, Plaintiff was examined by M.L. Mehra, M.D., a neurologist, and underwent an EMG. R. 274-75. Plaintiff reported residual burning pain in his back and right thigh that went into the right leg but no pain on the left side. R. 274. Plaintiff

also stated that the pain, which never got better after his surgery, was worse when he stood, walked, or stooped.  Id.  Dr. Mehra noted that Plaintiff had a lumbar laminectomy in May 2004 after an accident in December 2003.  Id.  Dr. Mehra also noted that Plaintiff had lumbar disk disease three years ago and also had an epidural block and a local cortisone injection.  Id.  Dr. Mehra reviewed Plaintiff's MRI scan, which showed mild postop changes at L4-5.  Id.

Dr. Mehra noted that the EMG of Plaintiff's paraspinous, quadriceps, tibialis anterior, extensor hallucis longus, extensor digitorum brevis, gastrocnemius, soleus, and hamstrings showed "an old right L5 irritation with fibrillation and positive wave in the paraspinous, tibialis anterior and gastrocnemius with diminished number of motor units and increased polyphasic potential."  R. 275. Dr. Mehra's impression was recurrent right L5 radiculopathy post lumbar laminectomy.  R. 276.  Dr. Mehra recommended and scheduled an epidural block.  Id.  The August 2007 Commission decision stated that Dr. Mehra's examination found Plaintiff "entirely normal."  R. 350.

On October 28, 2004, Dr. Chapa saw Plaintiff, who complained of significant back pain that sometimes radiated to the

right leg.  R. 107.  Dr. Chapa noted Dr. Mehra's diagnosis of an L5 root irritation and referral for epidural injections.  Id.  Dr. Chapa's impression was lumbar radiculopathy with persistent pain post lumbar surgery.  Id.  Dr. Chapa recommended restricted work as tolerated with no prolonged walking and epidural injections.  R. 108.

On November 4, 2004, Plaintiff reported back pain to Dr. Chapa, who restricted Plaintiff to light-duty work.  R. 109.  Dr. Chapa's impression was lumbar radiculopathy.  Id.  Five days later, Dr. Chapa reported that Plaintiff was able to perform light work.  R. 114.

On December 7, 2004, Plaintiff saw Dr. Chapa and complained of back pain and side effects from epidural injections.  R. 110.  Dr. Chapa's impression was chronic back pain with radicular symptoms post back surgery.  Id.  Dr. Chapa, who stopped Plaintiff's steroid injections, noted that Plaintiff had a "positive straight leg raising test on both sides."  Id.

On December 21, 2004, Plaintiff complained of back pain and numbness in the right leg to Dr. Chapa, whose impressions were lumbar radiculopathy and "[f]ailed laminectomy syndrome" due to a

work-related injury on December 16, 2003.  R. 111.  On January 4, 2005, Dr. Chapa, during a deposition, testified that Plaintiff's back pain and "lower extremity symptoms" are related to Plaintiff's December 2003 injury.  R. 380.  With respect to this impression of "failed laminectomy syndrome," Dr. Chapa explained that the term is sometimes used to describe patients who do not response to surgery and continue to have back pain in spite of surgery.  Id.

The August 2007 Commission decision described testimony provided by Dr. Chapa as follows:

> Dr. Chapa's January 12, 2004 impression was spinal stenosis.  He opined that stenosis can be arthritis and ligaments can add to stenosis.  A bulging or herniated disc can cause stenosis.  Dr. Chapa reviewed the Operative Report and stated that Dr. Van Fleet did not remove any disc material.  He opined that the laminectomies performed were to make more room for the nerve roots to exit the spinal cord.  Dr. Chapa opined that the bulging disc could be due to dehydration of the disc, which is normal aging process or injury, and he could not tell which is the case here.

> \* \* \*

> There are situations where the stenosis exists and is the result of trauma and have [sic] increased pain.

> \* \* \*

> Dr. Chapa testified that the disc was not taken out and that space was made so the nerves in the spine were not

pinched.  The December 2003 x-rays showed significant degenerative changes.  Dr. Chapa opined that these degenerative changes progressed to the point where they impinged on the nerves.  Dr. Chapa opined that normal activity can make degenerative changes symptomatic.

R. 349-50 (citations omitted).

On February 1, 2005, Dr. Chapa saw Plaintiff, who complained of intermittent numbness in his right leg, which sometimes gave out on him.  R. 169.  Dr. Chapa's impression was lumbar radiculopathy.  Id.

On February 4, 2005, Dr. Mehra conducted a nerve conduction study on Plaintiff.  R. 193.  Dr. Mehra's clinical impression was mild right L5 radiculopathy post lumbar laminectomy.  Id.

On February 18, 2005, Plaintiff saw Dr. Mack, who noted that Dr. Van Fleet saw Plaintiff on May 4, 2004 and scheduled him for bilateral laminectomies, which were completed six days later.  R. 144.  Plaintiff complained of back pain that went down into his leg. Id.  Dr. Mack noted that Plaintiff, at the time the laminectomies were performed, had been diagnosed with spinal stenosis and had decompression at the L3-4 and L4-5 levels.  Id.  According to Dr. Mack, the laminectomies cleared up Plaintiff's pain "on the left," but

Plaintiff "developed more pain on the right." Id. Dr. Mack noted that Plaintiff had "positive straight leg raising on the right" with slight weakness. Id.

Dr. Mack also noted that Plaintiff was shown to have "inflammation in the right with radicular symptoms" and that Plaintiff "had evidence back in February 2004 of the mild right L5-S1 radiculopathy." Id. In addition, Dr. Mack stated that Plaintiff's MRI on October 13, 2004, showed a mild, diffuse bulge at L3-4 and some postop changes on the right at L4-5. Id. Dr. Mack's impression was "[d]egenerative disc with foraminal stenosis" and he recommended another decompression of Plaintiff's lower back and, possibly, a fusion. Id.

On March 17, 2005, Lawrence Leventhal, M.D., performed an independent medical examination of Plaintiff at Freeman's request. R. 351. On May 11, 2005, Dr. Leventhal, testified in a deposition regarding Plaintiff. Id. The August 2007 Commission decision described Dr. Leventhal's examination and opinion as follows:

> Dr. Leventhal opined that [Plaintiff's] reported diffuse numbness was not in a normal dermatomal pattern which would indicate a nerve root distribution. Dr. Leventhal opined that negative straight leg raising tests would indicate there was no nerve root irritation. Dr.

Leventhal found no cause for the range of motion limitation. Dr. Leventhal opined that the examination results were fairly normal, other than decreased range of motion. Dr. Leventhal stated he had viewed the videotapes and opined that the activities at the examination were not consistent with what he saw on the videotapes in that [Plaintiff] had a much greater range of motion seen on the videotapes. Dr. Leventhal opined that he saw no signs of disability or discomfort by [Plaintiff] on the videotapes. He had reviewed [Plaintiff's] job description and opined he was capable of the work.

* * *

Dr. Leventhal took x-rays . . . [and] opined that the spurring had been present for years . . . [and] that the degenerative changes noted in the MRI reports and x-rays were consistent with long-standing arthritis.

Dr. Leventhal diagnosed spinal stenosis of the lumbar spine, status post-two level decompression with continued subjective complaints. Dr. Leventhal opined that the December 16, 2003 accident did not cause the spinal stenosis. Dr. Leventhal opined that the accident might have caused a temporary aggravation of back pain, but would not cause any progression of the spinal stenosis.

* * *

Dr. Leventhal opined that the surgery was not necessitated by the December 16, 2003 accident, but was necessitated by the spinal stenosis.

* * *

Dr. Leventhal opined no causal connection for the surgery, which was necessitated by the spinal stenosis [Plaintiff] had. He opined [Plaintiff's] low back condition

was degenerative and progressive and that it can
progress over time to where normal activities of life can
cause it to become symptomatic.

\* \* \*

Dr. Leventhal opined that [Plaintiff] was capable of
working as an electrician.

\* \* \*

Dr. Leventhal opined that the accident could have made
[Plaintiff] symptomatic on a temporary basis.  Dr.
Leventhal opined that the accident would not aggravate
the spinal stenosis, but could potentially have been a
temporary exacerbation of symptoms and increased his
low back pain.

\* \* \*

Dr. Leventhal opined that the December 16, 2003
accident did not cause a permanent exacerbation.

R. 351-52 (citations omitted).

In 2004, Plaintiff filed a workers' compensation claim based on

his work accident on December 16, 2003.  R. 322-28.  On August

10, 2005, the Commission issued an arbitration decision awarding

Plaintiff temporary total disability benefits from Freeman from May

10, 2004, through June 25, 2004.  R. 324.  The Arbitrator noted as

follows:

Prior to December 16, 2003, [Plaintiff] suffered from a
condition of both spinal stenosis and foraminal stenosis,

predominantly at the L3-4 and L4-5 levels. [Plaintiff] had injured his back in 1999 and received treatment to his low back, including epidural steroid injections. The case was arbitrated in July, 2001 and [Plaintiff] testified at that time that he still suffered from occasional low back pain and occasional radiation of pain into the left leg.

\* \* \*

There is no indication that [Plaintiff] had any treatment for low back pain or symptoms radiating into either leg during the calendar year 2001 and 2002.

\* \* \*

Dr. Mack acknowledged that the spinal stenosis and foraminal stenosis was a degenerative condition which existed prior to December 16, 2003, but testified that the accident of December 16, 2003 was a cause by way of aggravation of his preexisting condition, and that the need for surgery performed by Dr. Van Fleet was related to the accident of December 16, 2003. It was Dr. Mack's opinion that the onset of low back pain with pain radiating into the legs is usually traumatic in nature and the injury as described (a fall with twisting) is most consistent as the cause which led to the need for surgery on May 10, 2004.

\* \* \*

[Freeman's] IME physician, Dr. Lawrence Leventhal, agreed that [Plaintiff's] accident of December 16, 2003 could indeed result in [Plaintiff's] preexisting condition of spinal stenosis and foraminal stenosis becoming symptomatic and further agreed that [Plaintiff's] preexisting condition made him more prone to injury from a trauma than a person who did not have a degenerative condition in his low back. While Dr. Leventhal concluded that the symptoms would be

causally related only on a temporary basis . . . Dr. Mack and Dr. Van Fleet, were of the opinion . . . that surgery was indicated and necessary.

R. 325-26.

The Arbitrator found that Plaintiff's May 2004 surgery was "causally related" to Plaintiff's December 2003 accident. R. 326. Specifically, the Arbitrator stated as follows on the issue of causal connection:

Given the significant complaints and lack of any treatment for low back complaints between the years 2001 and the date of the accident on December 16, 2013 and the testimony of Dr. Mack and Dr. Chapa supporting causal connection, the evidence viewed in its entirety supports the conclusion that the condition of [Plaintiff] and the surgery performed on May 10, 2004 is causally related to [Plaintiff's] accident of December 16, 2003.

R. 326. With respect to whether Plaintiff's recommended second surgery was causally connected to his December 2003 accident, the Arbitrator stated as follows:

Given the totality of the evidence, including the onset of recurrent symptoms in the low back and radiation of pain into the right leg within a week to ten days after returning to heavy labor on a full-time basis with [Freeman], and considering the testimony of Dr. Chapa and his diagnosis of "failed laminectomy syndrome" and the report of Dr. Mack indicating the reasonableness of a repeat decompression, the proposed treatment of a repeat decompression is reasonable and proper and causally related to the accident of December 16, 2003.

R. 328.

The Arbitrator awarded Plaintiff temporary total disability benefits for 6 and 4/7 weeks and $4,245 for necessary medical expenses.  R. 324, 328.  On August 25, 2005, Freeman filed a petition to review the Arbitrator's decision.  R. 341.

On September 13, 2005, Dr. Chapa saw Plaintiff, who reported back pain that had been "on and off" and occasional numbness in his right leg.  R. 170.  Dr. Chapa noted that Plaintiff's lumbar spine MRI in October 2004 "revealed no evidence of disc herniation or significant central canal stenosis."  Id.  Dr. Chapa's impression was lumbar radiculopathy.  Id.

The Commission affirmed the Arbitrator's August 2015 decision on July 19, 2006.  R. 330-31.  Freeman subsequently appealed to the Circuit Court of Macoupin County, Illinois, and a state court judge remanded the case to the Commission for further consideration.  R. 341.

On August 11, 2006, Plaintiff had a visit with Dr. Chapa, who noted that it was Plaintiff's first visit in about a year.  R. 171.  Dr. Chapa counseled Plaintiff about weight reduction and smoking, and

labs were drawn.  Id.  There was no mention of back pain or issues with lower extremities.  On August 21, 2006, Dr. Chapa saw Plaintiff to discuss Plaintiff's lab results and advised Plaintiff to lose weight.  R. 172.  Again, there was no mention of back pain or issues with lower extremities.  There are no documents within the administrative record indicating that Plaintiff complained of back pain or extremity pain or had medical appointments concerning back pain or extremity pain between September 13, 2005, and January 26, 2007.

On January 26, 2007, Dr. Mack saw Plaintiff, who reported pain in the lower back and right leg with tingling and numbness.  R. 145.  Plaintiff rated the pain as a 9 on a scale from 1 to 10.  Id.  Dr. Mack noted that the pain was on Plaintiff's left side but went to the right side after Plaintiff's surgery and that Plaintiff's pain was consistent on the right "with severe pain down the leg."  Id.  According to Dr. Mack, x-rays of Plaintiff showed "a great deal of degenerative changes at the two lower levels."  Id.  Dr. Mack recommended an EMG and an MRI.  Id.

On February 2, 2007, an MRI of Plaintiff's lumbar spine was performed.  R. 146.  According to Lucy R. Christopherson, M.D., the

MRI showed mild degenerative disk disease and mild facet arthritis at L3-4, mild diffuse disk bulge and facet arthritis at L4-5, and mild diffuse disk bulge at L5-S1.  Id.  Noted with respect to L4-5 were an extremely limited axial data set, possible postop changes on the right, possible moderate spinal canal stenosis, and foraminal narrowing that was "greater on the left."  Id.  Noted with respect to L5-S1 were foraminal narrowing, "greater on the right," and a possible small central disk protrusion.  Id.  Dr. Christopherson's impression was that the MRI provided very limited views and that Plaintiff had a small central disk protrusion at L5-S1.  Id.

On February 6, 2007, Plaintiff underwent a nerve conduction test and an EMG conducted by Edward R. Trudeau, M.D.  R. 154-59.  Dr. Trudeau interpreted the EMG results as showing right L5 radiculopathy, "moderately severe in electroneurophysiologic testing terms," with chronic and acute features, which was consistent with the "quite correct clinical assessment of Dr. Mack" and right S1 radiculopathy, "mild in electroneurophysiologic testing terms."  R. 159.  Dr. Trudeau did not suggest the presence of peripheral neuropathy.  R. 69, 159.  Dr. Trudeau noted that his findings "may be consistent with a persistent, residual lesion and would not be

unusual" given the relevant time frame and suggested a bone scan of Plaintiff's lower back and right leg "to assess for degenerative, occult, or inflammatory lesions." R. 156-57. Dr. Trudeau, in his report, also stated as follows:

> [Plaintiff] may have right L5 and right S1 radiculopathies on the basis of structural abnormalities both at L4/5 and L5/S1. The patient has disc bulge at both L4/5 and L5/S1 levels, it was noted that there is possibly moderate spinal canal stenosis at L4/5, and we suspect that structural abnormalities at the L4/5 level may compromise both the right L5 and less so the right S1 nerve root.

> Therefore it may be that both at the L4/5 and L5/S1 levels there are structural factors which may contribute to compromise of right L5 and right S1 nerve roots, through this of course is theoretical speculation at this point.

Id.

On February 20, 2007, Plaintiff reported severe pain in his low back and right leg to Dr. Mack, who noted that Plaintiff was a self-employed electrician who was having trouble "if he spen[t] too much time up." R. 148. Plaintiff also informed Dr. Mack that Plaintiff's pain was on the left side before his surgery but is now on the right side. Id. Dr. Mack noted that Plaintiff's MRI showed degenerative changes, noted that Plaintiff's EMG showed a L5-S1 nerve root

"compatible with his pain pattern." Id. Dr. Mack, whose impression was disk syndrome on the right, recommended a partial laminectomy. Id.

On March 13, 2007, Plaintiff underwent a preoperative examination. R. 174. Plaintiff's history included "lumbar radicular Sx on Rt, lumbar radiculopathy, [and] osteoarthritis." Id. On March 21, 2007, Plaintiff underwent a decompressive laminectomy with posterolateral fusion and disk removal at L4-5, which was performed by Dr. Mack. R. 149. Dr. Mack encountered considerable scar tissue during the surgery. Id. The report from the operation noted that Plaintiff had a previous procedure in which a disk was removed that eliminated the pain from Plaintiff's left leg. Id. The report also noted that Plaintiff began experiencing pain in his right leg after a while. Id.

On March 28, 2007, Plaintiff filed for Social Security disability benefits. R. 122. In applying for the disability benefits, Plaintiff indicated that he had difficulty with bending over to tie his shoes and that his ability to lift diminished after his surgery. R. 214. On April 22, 2007, Plaintiff completed an SSA Work History Report. R. 220-23. In the report, Plaintiff noted that he stopped working at

Freeman in December 2004 but continued working as an electrician until March 2007.  R. 220.  Plaintiff also noted that his work as an electrician required him to frequently lift 50 pounds or more, climb five hours a day, stoop for two hours a day, carry supplies and materials, and hold boxes to be fastened.  R. 222.  Plaintiff stated that, after his back surgery, he could not be as active as he once was or perform his job duties as he once could.  R. 223.

On May 9, 2007, the Social Security Administration (SSA) determined that Plaintiff did not qualify for Social Security disability benefits.  R. 122, 227-29.  Plaintiff's primary diagnosis was "[d]isorders of back (discogenic and degenerative)," and no secondary diagnosis was established.  R. 122.  The SSA, having reviewed reports from Dr. Chapa, Dr. Trudeau, Memorial Medical Center, and Dr. Mack, found that, although Plaintiff had some restrictions, Plaintiff could still do light work.  R. 123.  Plaintiff filed for reconsideration of the SSA's decision on the same day it was issued.  R. 120.

On May 29, 2007, Plaintiff reported leg pain to Dr. Mack, who attributed the pain to Plaintiff not wearing a brace.  R. 135.  Dr. Mack noted that Plaintiff's x-rays showed wide decompression.  Id.

Dr. Mack recommended that Plaintiff lose weight and go to therapy to develop his abdominal muscles.  Id.

On July 2, 2007, Dr. Chapa saw Plaintiff, who complained of back pain and pain shooting down his right leg.  R. 129.  Dr. Chapa's impressions included chronic back pain after two back surgeries.  Id.

On July 12, 2007, Dr. Chapa wrote a letter stating that Plaintiff injured his back at work in December 2003, had back surgery in May 2004, went back to work in September 2004, reinjured his back after returning to work, and had a second back surgery in March 2007.  R. 130.  Dr. Chapa's letter also states that Plaintiff complains of right thigh numbness and back pain that radiates down the left leg, issues that have not improved since the second surgery.  Id.  Dr. Chapa, whose impression was persistent lumbar radicular symptoms after two back surgeries, noted that Plaintiff's back pain after the surgeries was significant and radiated down Plaintiff's legs.  R. 130-31.  Dr. Chapa's letter also stated that Plaintiff was able to do sedentary work only.  R. 131.

On July 13, 2007, Plaintiff reported leg soreness to Dr. Mack, who noted that Plaintiff had a "decompression with a fusion" on

March 21, 2007.  R. 136.  Dr. Mack recommended an injection in Plaintiff's back, that Plaintiff join Weight Watchers, and that Plaintiff go to physical therapy for abdominal strengthening.  Id.

On August 22, 2007, the Illinois Workers' Compensation Commission issued an Amended Decision and Opinion on Review on Remand.  R. 340-58.  The Commission affirmed the August 10, 2005, decision, finding a causal relationship between the injuries Plaintiff sustained on December 16, 2003, and his "condition of ill-being."  R. 355.  The Commission noted that Plaintiff was temporarily totally disabled from May 10, 2004, to June 25, 2004, and entitled to a "repeat decompression surgery."  Id.

On September 4, 2007, the SSA affirmed its decision of May 9, 2007.  R. 120-21, 224-26.  The SSA acknowledged that Plaintiff's condition prevented him from doing his past jobs, but determined that Plaintiff, who was 52 years old and had completed 12 years of school, would be able to perform less demanding work within 12 months of his condition's onset.  R. 121.

On November 27, 2007, Dr. Trudeau performed an EMG and evaluated Plaintiff.  R. 180-85.  Dr. Trudeau interpreted the EMG results as showing "right lateral femoral cutaneous neuropathy

(meralgia paresthetica), mild to moderately severe in electroneurophysiologic testing terms," that was not seen in Plaintiff's February 2007 EMG results. R. 184. Dr. Trudeau's interpretation of the EMG results also included "[r]ight L5 radiculopathy, old or chronic as well as acute features, likely persistent or residual lesion and not unusual" given that Plaintiff had surgery in March 2007, a month after his previous EMG. Id.

Dr. Trudeau also noted that the report from Plaintiff's March 2007 surgery mentioned that "considerable scar formation was encountered," that "marked thickening was present in the lateral recess on the right," and that "the L5 and S1 nerve roots freed up." R. 182. On this basis, Dr. Trudeau opined that Plaintiff likely has "a persistent or residual right L5 radiculopathy." Id.

On January 17, 2008, an Administrative Law Judge (ALJ) for the SSA issued a decision finding that Plaintiff was disabled under sections 216(i) and 223(d) of the Social Security Act beginning on March 21, 2007. R. 87. The ALJ found that Plaintiff had the following severe impairments: "disorders of the back (discogenic and degenerative), neuropathy, and obesity." R. 85.

While the ALJ found that Plaintiff had the residual functional capacity to perform some work, the ALJ determined that "there are no jobs that exist in significant numbers in the national economy that [Plaintiff] can perform" given Plaintiff's age, education, work experience, and residual functional capacity. R. 86. In rendering his decision, the ALJ stated as follows:

> The evidence of record shows that the claimant stopped working in March 2007 because of a recurrent back injury that resulted in surgery in February 2005 and again in March 2007. David Mack, M.D., the surgeon performed a laminectomy at L3 and L4-5 and a decompressive laminectomy with fusion and disc removal at L4-5. During the second surgery, considerable scar tissue was revealed. The claimant continues to complain of back pain and numbness radiating down the left lower extremity.
>
> * * *
>
> In July 2007, Vittal Chapa, M.D., the claimant's long time treating physician indicated that the claimant would be unable to perform more than sedentary work.

R. 85-86. The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of Plaintiff's symptoms were "generally credible." R. 86. The ALJ also found that the demands of Plaintiff's past relevant work exceeded his residual functional capacity. Id. On February 11, 2008, the SSA issued a

Notice of Award, finding that Plaintiff became disabled under the SSA's rules on March 21, 2007.  R. 72.

On June 19, 2009, Plaintiff was seen by David R. Lange, M.D., for an independent spine evaluation at Freeman's request.  R. 67, 71.  Plaintiff indicated that the back pain and right thigh discomfort he was experiencing as a mine examiner led him to bid on a belt shoveling job on the midnight shift.  Id.  Plaintiff stated that, although he felt better after his surgery in March 2007, he had more chronic pain than he would prefer and experienced back pain with prolonged sitting or standing.  R. 68.  Plaintiff also indicated that he had an unpleasant and numbing sensation in his right thigh that began after the March 2007 surgery.  Id.  Dr. Lange noted that "Waddell testing was totally normal."[3]  Id.  Dr. Lange also noted that Plaintiff's reflexes from a seated position were essentially absent in the lower extremities.  Id.

Based on a review of Plaintiff's medical records and an examination of Plaintiff, Dr. Lange found that Plaintiff presented with "residual mechanical low back pain and right lower extremity

_____

[3] Waddell's signs—tenderness tests, simulation tests, distraction tests, regional disturbances, and overreaction—are used to detect nonorganic/psychogenic manifestations of low back pain.

symptoms consistent with a persistent right L5 radiculopathy and a right lateral femoral cutaneous neuropathy." R. 68-70. Dr. Lange found that Plaintiff "presented with no signs of symptom magnification." R. 70. Dr. Lange opined that Plaintiff's "current treatment is at least indirectly related to the original injury and the treatment to address the initial 2003 injury." Id.

In addition, Dr. Lange opined that Plaintiff "has a residual L5 radiculopathy on the right despite 2 decompressive attempts," that Plaintiff's "right lateral femoral cutaneous neuropathy unfortunately is likely a complication of the second surgical procedure, presumably due to positioning," and that "both in one way or the other are related to the 2003 incident." Id. Dr. Lange suggested a spinal cord stimulator trial to try to address Plaintiff's right leg pain and stated that Plaintiff would be at "maximal medical improvement after the spinal cord stimulator trial." Id.

On November 5, 2009, Plaintiff underwent a percutaneous insertion of a spinal cord stimulator. R. 313. The preoperative diagnosis was "[f]ailed back syndrome, having had 2 laminectomy surgeries, with persistent pain radiating down the right lower limb." Id.

On December 22, 2009, Plaintiff activated his service pension application with the UMWA 1974 Pension Trust, and he began receiving a 1974 Deferred Vested Pension effective March 1, 2010. R. 33-34, 44. On May 27, 2015, over seven years after receiving an award for Social Security disability benefits, Plaintiff applied for disability benefits from the Pension Plan. R. 51-52.

On July 26, 2016, Plaintiff's application for pension disability benefits from the Pension Plan was denied. R. 252. A detailed explanation was given for the denial, with all medical evidence received up to the date of the denial considered. R. 242-251. The denial explanation stated that the medical documentation did not support a causal link between Plaintiff's December 2003 mine accident and his disabilities. R. 250.

On October 18, 2016, Plaintiff appealed the denial of pension disability benefits. R. 256-57. In an affidavit submitted in support of the appeal, Plaintiff asserted that he performed only light work while working as an electrician from 2004 to 2007. R. 315, 318-19.

On February 1, 2017, the Pension Plan informed Plaintiff that an additional independent review of the medical evidence on file would be conducted and that medical evidence not previously

considered would be accepted as relevant and material to the appeal. R. 258. On July 17, 2017, Plaintiff's counsel sent to the Pension Plan a letter and the following medical evidence, some of which had been previously submitted: EMG reports from May 2004, October 2004, February 2007, and November 2007; reports for Plaintiff's surgeries in 2004 and 2007; Dr. Lange's June 2009 report; and the report for Plaintiff's spinal cord stimulator surgery in November 2009. R. 261-62.

On October 17, 2017, Plaintiff's appeal for pension disability benefits was denied. R. 389. The explanation for the denial stated as follows:

> The neurologic exam [on December 19, 2003] was normal and Dr. Chapa returned [Plaintiff] to work the following day. Dr. Chapa diagnosed low back strain with a history of lumbar disc disease and rule out radiculopathy. On January 5, 2004, an MRI of the lumbar spine revealed significant canal stenosis and foraminal stenosis at L4-5 and a developmental abnormality at S1-S2. On February 11, 2015, Dr. Smucker completed an EMG study for [Plaintiff's] complaints that he had a flare of his back pain in December 2003. The EMG revealed right L5 and S1 radiculopathy suggestive of degenerative disc disease, but no neuropathy. On May 10, 2004, Dr. Vanfleet [sic] performed bilateral laminectomies at L3-4 and L4-5. This surgical procedure, as described by Dr. Vanfleet [sic] was intended to relieve the pain caused by degenerative spondyloradiculopathy. Radiculopathy and neuropathy are different conditions, although they have some of the

same symptoms.  In his operative report, Dr. Vanfleet [sic] made no reference to repairing an injury or removing a herniated or ruptured disc.  He stated he found evidence of age related stenosis and bony overgrowth during the surgical procedure.  On February 18, 2005, [Plaintiff] saw Dr. Mack for evaluation of back pain and leg pain and was diagnosed with degenerative disc disease with foraminal stenosis.

\* \* \*

After that visit, the records indicated that Mr. Sharp did not see Dr. Mack or any doctor for seven months.  If stepping into a hole and twisting the back caused an acute and disabling injury, then it would be reasonable to expect immediate medical intervention with the diagnosis of traumatic injury.  It is reasonable to assume that [Plaintiff] suffered a temporary worsening of an existing degenerative spine condition when he strained his back on December 16, 2003, as opined by Dr. Leventhal.

\* \* \*

[Plaintiff] suffered from disc disease and arthritis of the shoulders as early as the 1980's [sic], when he began to see Dr. Mack, an orthopedic surgeon, and his partners for complaints of low back pain.  It would have been helpful to have had the missing records of Dr. Mack's care for review.  He returned to work in the mine after an injury in 1999.   In 2000 he was hospitalized for uncontrollable low back pain.  He suffered low back strain in 2003, and again he returned to work.  The nature of spinal disc disease is progressive and despite treatment, it can worsen over time.  There can also be periods of reduced pain, as evidenced by gaps in [Plaintiff's] medical care.

\* \* \*

The medical records, in the file of evidence, clearly described an on-going, progressive and degenerative condition of the spine over a period of more than 20 years.

[Plaintiff] had a successful return to gainful employment after this injury. After [Plaintiff] recovered from back surgery, Dr. Vanfleet [sic] returned him to full time, regular duty on June 25, 2004, although he did not return to work in the mine until September 7, 2004, due to a work suspension. He continued to work in the mine until he was terminated on November 22, 2004.

* * *

[Plaintiff] was a self-employed electrician from 1999 until March 21, 2007, the date he stated that he became disabled, almost four years after his mine accident. He described his work as an electrician as heavy duty: lifting 50 or 100 pounds, carrying supplies and holding boxes up to houses to be attached and operating machinery.

* * *

The onset date of his disability, the lack of records defining functional limitations, the lack of medical evidence of a traumatic injury, the gaps in medical care and his return to work were critical factors in determining that a causal link did not exist between his accident and his Social Security award.

For these reasons, it would not be reasonable to conclude that the 2003 mine accident caused or significantly contributed to his total disability as defined by Social Security.

R. 409-10.  Regarding the ALJ's diagnosis of "disorders of the back (discogenic and degenerative)," the denial explanation noted that it is a "broad diagnostic term used to describe osteoarthritis" and further stated as follows:

> [Plaintiff] had been diagnosed with lumbar spinal stenosis in 1999, or earlier in the 1980's [sic], which is an age-related, progressive and degenerative condition.
>
> * * *
>
> After [Plaintiff] underwent [a] laminectomy; his condition improved temporarily[,] but later he developed additional symptoms.  That speaks to the progressive and changeable nature of discogenic and degenerative spine conditions.

R. 411.  Regarding the ALJ's diagnosis of "neuropathy," the denial explanation stated as follows:

> On February 11, 2004, Dr. Smucker completed an EMG and found no peripheral (hands and feet) neuropathy. Dr. Trudeau noted on February 6, 2007, that electrodiagnostics revealed no evidence of peripheral neuropathy.  Repeat studies performed on November 27, 2007[] revealed right lateral cutaneous femoral neuropathy[,] or meralgia paresthetica.  This diagnosis was made four years after the reported mine accident.  In this condition, the nerve is pinched where the hip meets the pelvis, not in the spine.

Id.

# IV. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).

When ruling on a motion for summary judgment, the Court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008).  The ordinary standards for summary judgment remain unchanged if the parties have filed cross-motions for summary judgment; the Court must "construe all inferences in favor of the party against whom the motion under consideration is made."  Oneida Nation v. Vill. of Hobart, Wis., 371 F. Supp. 3d 500, 508 (E.D. Wis. 2019) (quoting

<u>Metro. Life Ins. Co. v. Johnson</u>, 297 F.3d 558, 561–62 (7th Cir. 2002)).

## V. ANALYSIS

Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff challenges Defendants' decision to deny him disability benefits under the Pension Plan. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). If the plan gives the administrator or fiduciary the authority to determine eligibility for benefits or construe the plan's terms, the decision to deny benefits is reviewed to determine whether the decision is arbitrary and capricious. <u>Jackman Fin. Corp. v. Humana Ins. Co.</u>, 641 F.3d 860, 864 (7th Cir. 2011).

The parties agree that Defendants' denial of disability benefits to Plaintiff should be reviewed under the arbitrary-and-capricious standard.[4] This deferential standard, which, in ERISA cases, is

---

[4] The Pension Plan states that "[t]he Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits." Pension Plan (d/e 20-2), at 29.

synonymous with the abuse of discretion standard, is not a rubber stamp.  Holmstrom v. Metro. Life Ins. Co., 615 F.3d 758, 766, 767 n.7 (7th Cir. 2010).  "[I]f fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious."  Swaback v. Am. Info. Techs. Corp., 103 F.3d 535, 540 (7th Cir. 1996).

Under the arbitrary-and-capricious standard, the Court will overturn an administrator's decision to deny disability benefits "only where there is an absence of reasoning to support it."  Jackman, 641 F.3d at 864.  If an administrator offers a reasonable explanation for its decision to deny disability benefits, that decision will not be disturbed "even if another reasonable, but different, interpretation may be made."  Krawczyk v. Harnischfeger Corp., 41 F.3d 276, 279 (7th Cir. 1994).  So long as an administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts," the administrator's decision will be upheld.  Loyola Univ. of Chicago v. Humana Ins. Co., 996 F.2d 895, 898 (7th Cir. 1993).

**A.    Defendants' Application of the "Substantially Responsible" Causation Standard in Denying Plaintiff Disability Benefits Under the Pension Plan Was Arbitrary and Capricious.**

While the parties agree on the standard of review, they disagree on the causation standard applicable to the determination of whether Plaintiff is entitled to disability benefits under the Pension Plan.  With respect to disability benefits, the Pension Plan states as follows:

> A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2002, shall, upon retirement (hereinafter "Disability Retirement"), be eligible for a pension while so disabled.  A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

Pension Plan (d/e 20-2), at 5.  Defendants assert that for Plaintiff to have become disabled "as a result of a mine accident," Plaintiff's December 2003 mine accident must be "substantially responsible" for Plaintiff's disabilities.  See, e.g., Response (d/e 20), at 29.  Plaintiff, relying on Cerentano v. UMWA Health and Retirement Funds, 735 F.3d 976 (7th Cir. 2013), takes the position that he

need only establish a "causal link" between his disabilities and his mine accident.  See, e.g., Reply (d/e 24), at 42.

When a pension plan's language is ambiguous, the trustees' interpretation is entitled to deference.  Cerentano, 735 F.3d at 981. In Cerentano, the trustees, in denying the plaintiff's application for pension disability benefits, stated that the plaintiff's Social Security disability benefits were not "causally related" to the plaintiff's mine injuries and that the plaintiff did not establish a "causal link" between his mine accidents and his Social Security disability benefits.  Id.  Therefore, the Seventh Circuit, deferring to the trustee's interpretation of the plan, determined that the crucial question was whether there was a "causal link" between the plaintiff's injuries from his mine accidents and the ALJ's decision to award him Social Security disability benefits.  Id.

Defendants, in arguing that Plaintiff must establish that Plaintiff's mine accident was "substantially responsible" for Plaintiff's disability to receive a pension disability under the Pension Plan, rely on DP-1(81), an interpretation of the Pension Plan by Defendants.  Reply (d/e 25), at 2.  The Court must give deference to Defendants' plan interpretations, but DP-1(81) offers no support for

the position that the "substantially responsible" causation standard

applies here.

DP-1(81) states, in pertinent part, as follows:

Where a condition which resulted from a mine accident is aggravated or compounded by another condition which arises <u>later</u> and is not the direct result of a mine accident, and the two conditions, combined, result in a total disability, the mine worker will be considered "totally disabled as the result of a mine accident," if:

(a)   the condition which resulted from a mine accident contributed substantially to the total disability;

(b)   the condition which was not the result of a mine accident was a foreseeable or normal consequence of the condition which was the result of a mine accident; and

(c)   the existence of the condition which resulted from a mine accident substantially increased the probability that the condition did not result from a mine accident would occur.

Response (d/e 24), Ex. 1.

However, this interpretation of the Pension Plan—requiring

that a mine accident injury contribute substantially to the worker's

total disability in order for the worker to be eligible for disability

benefits under the Pension Plan—is applicable only where the mine

accident injury predates the condition not related to the mine

accident and the two combine to render the worker totally disabled. In this case, Plaintiff already had a preexisting back condition when his December 2003 mine accident occurred. Therefore, the language from DP-1(81) that applies to Plaintiff's request for pension disability benefits is the following:

> If a condition or injury resulting from a mine accident aggravates or combines with a <u>pre-existing condition</u> or <u>prior injury</u> which did not result from a mine accident and the mine worker thereby becomes totally disabled, the mine worker is considered "totally disabled as the result of a mine accident."

<u>Id.</u> (emphasis added). As a result, Plaintiff need only show that his injury stemming from the December 2003 mine accident aggravated or combined with his preexisting back condition to render him totally disabled in order to be eligible for disability benefits under the Pension Plan.

In an effort to convince the Court that the "substantially responsible" causation standard applies in this case, Defendants cite several cases from the Fourth, Sixth, and Eleventh Circuits. These cases from outside the Seventh Circuit are not binding on the Court. <u>See</u> <u>United States v. Glaser</u>, 14 F.3d 1213, 1216 (7th Cir.

1994) (noting that opinions bind a court "only within a vertical hierarchy").

Nor do these cases persuade the Court that Plaintiff is eligible for disability benefits under the Pension Plan only if his December 2003 mine accident was "substantially responsible" for Plaintiff's disability. In most of these cases, the "substantially responsible" causation standard is determined to apply based on previous cases where the standard was applied, not an analysis of documentation interpreting the relevant pension plan. See Green v. Holland, 480 F.3d 1216, 1219 (11th Cir. 2007); Ball v. Holland, 142 F. App'x 860, 862 (6th Cir. 2005); McCoy v. Holland, 364 F.3d 166, 170 (4th Cir. 2004); Boyd v. Trustees of United Mine Workers Health & Ret. Funds, 873 F.2d 57, 59 (4th Cir. 1989); Robertson v. Connors, 848 F.2d 472, 475 (4th Cir. 1988).

In the only case cited by Defendants in which a provision interpreting the relevant pension plan is discussed, the Eleventh Circuit specifically notes that the provision applies only where a "a mining-related injury [] is 'aggravated or compounded' by a later condition, unrelated to the mine accident." Wayton v. United Mine Workers of Am. Health & Ret. Funds, 568 F. App'x 738, 740 (11th

Cir. 2014) (emphasis added). As explained above, this case does not involve a mine injury that was aggravated by a later condition; rather, Plaintiff's back issues preexisted his December 2003 mine accident. Therefore, under Defendants' own interpretation of the Pension Plan, Plaintiff need not show that his preexisting back condition was substantially related to his disability in order to be eligible for disability benefits.

In denying Plaintiff pension disability benefits under the Pension Plan, Defendants determined that "it would not be reasonable to conclude that [Plaintiff's] 2003 mine accident caused or significantly contributed to [Plaintiff's] total disability as defined by Social Security." R. 410. Based on the language of DP-1(81), on which Defendants rely in their arguments to the Court, Defendants' decision to apply the "substantially responsible" causation standard was unreasonable and an abuse of discretion. See Swaback, 103 F.3d at 540. Plaintiff need only show that the injury from his December 2003 mine accident aggravated or combined with his preexisting back condition, thereby rendering him totally disabled.

Defendants' decision to apply the wrong causation standard in determining whether Plaintiff is entitled to disability benefits under

the Pension Plan would justify a remand for Defendants to conduct another eligibility determination. However, the Court will instead apply the appropriate causation standard and determine whether Defendants' decision to deny Plaintiff disability benefits was arbitrary or capricious.

The Court's decision to forego another eligibility determination by Defendants is supported by Defendant's explanation in denying Plaintiff disability benefits under the Pension Plan. Indeed, the explanation contains language indicating that the result will be the same if Defendants apply the correct causation standard. See R. 409 ("It is reasonable to assume that [Plaintiff] suffered a temporary worsening of an existing degenerative spine condition when he strained his back on December 16, 2003 . . . ."); R. 410 ("The onset date of [Plaintiff's] disability, the lack of records defining functional limitations, the lack of medical evidence of a traumatic injury, the gaps in medical care and his return to work were critical factors in determining that a causal link did not exist between his accident and his Social Security award."); R. 411 ("[Plaintiff] failed to establish a link between his 2003 mine accident and his total disability as defined by Social Security."); Id. ("There was no link

found between [Plaintiff's neuropathy] diagnosis and a mine accident."); R. 412 ("The medical records of evidence fail to show a causal relationship between the impairments that are the basis of [Plaintiff's] Social Security disability and the mine accident that occurred on December 16, 2003.").

In addition, although Defendants rely heavily on the "substantially responsible" causation standard in their summary judgment filings, that standard is referenced only once in the explanation for Defendants' denial of disability benefits. The Court will analyze Defendants' denial of pension disability benefits as if they had applied the applicable causation standard—whether Plaintiff's December 2003 mine accident aggravated or combined with his preexisting back condition to render Plaintiff disabled.

## B. Defendants' Decision to Deny Plaintiff Disability Benefits Under the Pension Plan Was Arbitrary and Capricious.

Two days after a December 2003 mine accident, Plaintiff saw Dr. Chapa complaining of low back pain radiating down the right leg and intermittent right-leg numbness. Four days later, Plaintiff saw Dr. Chapa and again reported pain and numbness in the right leg. Although Plaintiff was back at work at this time, he was not

bending, lifting, or stooping. Dr. Chapa's impression changed from "lumbosacral sprain" to "lumbar disk with radiculopathy."

In February 2004, Plaintiff told Dr. Smucker that Plaintiff's low back pain was exacerbated by the December 2003 accident, which resulted in Plaintiff experiencing a sharp pain in the right leg. Plaintiff saw Dr. Chapa and reported having back pain doing restricted work. In April 2004, just four months after the December 2003 mine accident, Plaintiff complained of low back pain to Dr. Mack, who felt that Plaintiff needed a "bilateral decompression and possibly a posterolateral fusion."

In May 2004, Plaintiff, whose preoperative diagnosis was lumbar radiculopathy, underwent L3-4 and L4-4 bilateral laminectomies performed by Dr. Van Fleet. The following month, Plaintiff reported no "significant difficulties" after the surgery except for "occasional burning into the leg," and Dr. Van Fleet released Plaintiff to full duty. In August 2004, Plaintiff reported occasional numbness in the right leg.

In September 2004, Plaintiff returned to work after serving a work suspension. However, less than two weeks after returning to work, Plaintiff complained to Dr. Chapa about back pain that had

started a few weeks prior, pain that was radiating to the right leg and worse than the pain prior to Plaintiff's surgery. This renewed pain led Plaintiff to take a different position at work. At the end of September 2004, Plaintiff was still reporting significant back pain and indicating that his back surgery had not helped him much.

After complaints of pain in the low back and right leg in October and November of 2004, Plaintiff was restricted to light-duty work. Plaintiff continued to complain of back pain throughout December 2004. In February 2005, Dr. Mack recommended another decompression of Plaintiff's back and, possibly, a fusion. In September 2005, Plaintiff reported "on and off" back pain and occasional numbness in the right leg.

In January 2007, Plaintiff reported to Dr. Mack pain in the lower back and right leg that Plaintiff rated as a 9 on a scale from 1 to 10. Plaintiff again reported severe pain in the lower back and right leg in February 2007, at which time Dr. Mack recommended a partial laminectomy. In March 2007, Dr. Mack performed a decompressive laminectomy with posterolateral fusion and disk removal at L4-5. Dr. Mack encountered considerable scar tissue during Plaintiff's surgery.

Defendants abused their discretion in failing to conclude that Plaintiff's SSA disability determination was the result of Plaintiff's preexisting back condition being aggravated by Plaintiff's December 2003 mine accident. In denying Plaintiff pension disability benefits, Defendants rely heavily on the fact that Plaintiff's degenerative back condition was diagnosed prior to his mine accident and referenced in the medical records related to Plaintiff's treatment beginning in December 2003. But Defendants fail to give any weight to the fact that Plaintiff's back condition never prevented Plaintiff from working for Freeman prior to December 2003. Only after the December 2003 accident did Plaintiff begin to visit doctors with complaints of severe back pain that went down into the right leg and intermittent numbness in the right leg, issues that eventually rendered Plaintiff unable to work in the mine at full duty. Only after the December 2003 accident was Plaintiff required to have not one, but two surgeries for the purpose of alleviating his back pain. The only reasonable conclusion to be drawn is that Plaintiff's injury from the December 2003 accident aggravated Plaintiff's preexisting back condition to render Plaintiff disabled.

Defendants' refusal to award Plaintiff pension disability benefits also relies on Dr. Leventhal's opinion that Plaintiff's December 2003 accident created a mere temporary aggravation of Plaintiff's preexisting back condition. However, in Defendants' analysis as to whether Plaintiff was disabled as a result of his mine accident, Defendants fail to note that, in September 2004, Dr. Mack opined that Plaintiff's December 2003 accident was a cause of Plaintiff's May 2004 surgery. Also ignored in Defendants' causation analysis is that, in January 2004, Dr. Chapa opined that Plaintiff's back pain and "lower extremity symptoms" were related to Plaintiff's December 2003 injury and that, in June 2009, Dr. Lange determined that Plaintiff's "residual L5 radiculopathy" and "right lateral femoral cutaneous neuropathy" are both related, "in one way or the other," to Plaintiff's December 2003 accident.

Another important aspect of this case gets almost no play in Defendants' causation analysis: In August 2005, an Arbitrator for the Illinois Workers' Compensation Commission awarded Plaintiff temporary total disability benefits, finding that Plaintiff's May 2004 surgery was causally related to Plaintiff's December 2003 accident and that another back surgery was proper and causally related to

the accident. The Arbitrator's decision took the opinions of Dr. Mack, Dr. Chapa, and Dr. Leventhal into account, but only Dr. Leventhal's opinions are referenced in the causation analysis adopted by Defendants in denying Plaintiff's application for pension disability benefits.[5] Further, in August 2007, the Commission affirmed the August 2005 decision, finding a causal relationship between Plaintiff's December 2003 accident and his "condition of ill-being."

The only other portion of the causation analysis adopted by Defendants in denying Plaintiff's application for pension disability benefits related to the Arbitrator's decision states as follows: "The Funds does [sic] not rely on Workers' Compensation guidelines or regulations when determining eligibility for a Funds Disability Pension." R. 410. Defendants are not required to defer to the Commission's determinations with respect to causation, but Defendants' failure to include a thorough discussion of the Arbitrator's decision in their causation analysis was arbitrary and

---

[5] The causation opinions of Dr. Mack and Dr. Chapa are referenced in an earlier section of the explanation for Defendants' denial of Plaintiff's application for disability benefits under the Pension Plan. See R. 397.

capricious.  See Holmstrom, 615 F.3d at 774 ("Administrators may not arbitrarily refuse to credit a claimant's reliable evidence . . . .").

Other facts on which Defendants' decision relies indicate that the decision was arbitrary and capricious.  In finding that Plaintiff is not eligible for disability benefits under the Pension Plan, Defendants rely on the fact that there are no documents within the administrative record indicating that Plaintiff complained of back pain between September 13, 2005 and January 26, 2007, a period of time falling between Plaintiff's first back surgery and his second back surgery.  However, what Defendants ignore in their causation analysis is that Plaintiff's complaints of pain in the lower back and right leg after his first surgery had caused Dr. Mack to recommend a second back surgery in February 2005—six months prior to the gap in Plaintiff's medical treatment.

Defendants also point to the fact that Plaintiff returned to work in the mine for Freeman after his December 2003 accident as a basis to deny Plaintiff pension disability benefits.  However, Defendants' causation analysis, while noting that Plaintiff returned to work shortly after his mine accident, fails to mention that Plaintiff was off work for a significant period of time prior to and

after his first surgery.  And while Defendants noted that Plaintiff experienced pain shortly after returning to work in September 2004, Defendants failed to mention that Plaintiff characterized this pain as worse than before the surgery and eventually switched positions at the mine in an effort to reduce his back pain.  Defendants characterize these developments as Plaintiff's "successful return to gainful employment."  R. 410.

In addition, Defendants cite McCoy v. Holland, 364 F.3d 166 (4th Cir. 2004), as support for their decision to deny Plaintiff disability benefits under the Pension Plan.  Response (d/e 22), at 9-11.  In McCoy, the plaintiff was awarded Social Security disability benefits based on a primary diagnosis of "severe major affective disorder" and a second diagnosis of "degenerative disc disease of the cervical and lumbar spine."  364 F.3d at 169.  The trustees subsequently denied the plaintiff's application for pension disability benefits, finding that the "medical evidence did not establish a causal link" between the plaintiff's mine accident and his disabling conditions.  Id.  The plaintiff filed suit, and the district court granted the plaintiff's motion for summary judgment and ordered the trustees to award the plaintiff a disability pension.  Id.

On appeal, the Fourth Circuit reversed, finding that the trustees' decision to deny the plaintiff pension disability benefits was supported by substantial evidence. Id. at 171-72. The court noted that the plaintiff became disabled more than two years after the mine accident, continued working in the mine after the accident, worked as a carpenter after being laid off from the mine, and had been "diagnosed with degenerative disc disease on numerous occasions by several physicians." Id. at 171.

Defendants find the facts in McCoy to be "remarkably similar" to the facts in this case. Response (d/e 22), at 10. Defendants point out that Plaintiff's disability onset date was over three years after his December 2003 mine accident, that Plaintiff continued working in the mine and as an electrician after his accident, and that Plaintiff was "diagnosed with degenerative back conditions on numerous occasions by several different physicians." Id. at 10-11.

However, Defendants ignore several relevant facts from McCoy that serve to distinguish that case from this one. In McCoy, there was no evidence in the record that the plaintiff had "sought any medical treatment relating to the mine accident between May 1993, shortly after the mine accident, and May 1995." 364 F.3d at 171.

There was also no evidence that the plaintiff "was experiencing neck, back or shoulder pain between May 1993 and April 1995." Id. Further, the only doctor who opined that the plaintiff's disability was related to the plaintiff's mine accident did not examine the plaintiff until more than six years after the accident. Id.

In contrast, Plaintiff sought medical treatment for pain in his low back and right leg as well as intermittent numbness in his right leg on numerous occasions beginning shortly after the December 2003 mine accident. In addition, two of the doctors who treated Plaintiff after the mine accident, Dr. Chapa and Dr. Mack, opined that Plaintiff's pain and the first surgery performed to alleviate that pain were causally related to the accident. Dr. Lange, a doctor hired by Freeman to examine Plaintiff, also opined that there was a causal connection between Plaintiff's December 2003 mine accident and Plaintiff's back issues.

Another case on which Defendants rely in responding to Plaintiff's summary judgment motion, Pacconi v. Trustees of the United Mine Workers of Am., 264 F. App'x 216 (3d Cir. 2008), is similarly distinguishable. In Pacconi, the Third Circuit held that the trustees' decision to deny pension disability benefits was

supported by the record. 264 F. App'x at 218. This holding was based on the fact that the plaintiff did not receive medical treatment until five months after his accident and that the plaintiff did not miss any work due to the accident. <u>Id.</u>

Like the facts in <u>McCoy</u>, the facts in <u>Pacconi</u> are easily distinguishable from the undisputed facts in this case. Plaintiff began receiving medical care a couple of days after his December 2003 accident, care which continued for some time and included two surgeries. Plaintiff also missed several months of work due to his back pain, had to switch positions at work once he returned due to increased pain, and was, at one point, restricted to light duty.

In conclusion, Defendants, in addition to applying the wrong causation standard to Plaintiff's application for disability benefits under the Pension Plan, adopted a causation analysis that failed to credit important pieces of the administrative record, evidence that shows that Plaintiff's December 2003 mine accident aggravated his preexisting back condition and, eventually, rendered him disabled. The result of this unreasonable analysis was a denial of disability benefits under the Pension Plan by Defendants that was arbitrary and capricious.

**C.    An Award of Disability Benefits Under the Pension Plan Is the Appropriate Remedy.**

"The most common remedy when an ERISA plan administrator's benefits decision is deemed arbitrary is to remand the matter for a fresh administrative decision." Lacko v. United of Omaha Life Ins. Co., 926 F.3d 432, 447 (7th Cir. 2019).  However, no remand for further findings or explanations is required where the record "contains such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled."  Majeski v. Metro. Life Ins. Co., 590 F.3d 478, 484 (7th Cir. 2009).

The material facts in this case are undisputed and not subject to change.  The Court finds that the record in this case can lead to only one reasonable conclusion: Plaintiff's December 2003 mine accident aggravated his preexisting back condition and thereby rendered him disabled.  Accordingly, rather than remand this case for another determination by Defendants as to whether Plaintiff is entitled to disability benefits under the Pension Plan.  The amount of pension disability benefits to be awarded by the Court will be

determined prior to entry of judgment in favor of Plaintiff and against Defendants.

## VI. CONCLUSION

For the reasons stated, Plaintiff's Motion for Summary Judgment (d/e 21) is GRANTED. Accordingly, Defendants' Motion for Summary Judgment (d/e 19) is DENIED. Plaintiff is hereby awarded disability benefits under the United Mine Workers of America 1974 Pension Plan that have accrued from March 21, 2007 to the present. Plaintiff's disability benefits shall continue to accrue until such time as Defendants can establish that Plaintiff is no longer entitled to Social Security disability benefits.

The parties are DIRECTED to engage in a good-faith effort to agree on the amount of pension disability benefits Plaintiff is owed as of the date of this Opinion and to submit a stipulation as to this amount by Monday, March 23, 2020. If the parties are unable to reach an agreement as to the amount of pension disability benefits, Plaintiff shall file a brief stating his position as to the amount owed by Monday, March 30, 2020. Defendants shall file a response to Plaintiff's brief by Monday, April 6, 2020.

Plaintiff is DIRECTED file a brief, supported by sufficient documentation, regarding his requests for prejudgment interest, costs, and reasonable attorney's fees by Monday, March 23, 2020. Any response by Defendants to the amounts requested by Plaintiff for prejudgment interest, costs, or attorney's fees shall be filed by Monday, April 6, 2020. Even if Defendants do not believe that prejudgment interest is warranted, the parties are DIRECTED to engage in a good-faith effort to agree on the appropriate amount of prejudgment interest. The Final Pretrial Conference set for March 2, 2020, at 3:00 p.m. is VACATED. The Bench Trial set for March 17, 2020, at 9:00 a.m. is VACATED. The Court schedules a telephone status hearing for Monday, April 13, 2020, at 10:00 a.m.

ENTER: February 27, 2020

/s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE